## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IAN CARLSON, Individually and on Behalf of All Others Similarly Situated, | Case No. |
| Plaintiff, | **CLASS ACTION COMPLAINT** |
| v. | |
| INOVIO PHARMACEUTICALS, INC., JACQUELINE E. SHEA, and PETER KIES, | **JURY TRIAL DEMANDED** |
| Defendants. | |

Plaintiff Ian Carlson ("Plaintiff"), individually and on behalf of all others similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants, alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States ("U.S.") Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Inovio Pharmaceuticals, Inc. ("Inovio" or the "Company"), analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial, additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a federal securities class action on behalf of a class consisting of all persons and entities other than Defendants that purchased or otherwise acquired Inovio securities between October 10, 2023 and December 26, 2025, both dates inclusive (the "Class Period"), seeking to

recover damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, against the Company and certain of its top officials.

2.      Inovio is a biotechnology company focused on the discovery, development, and commercialization of DNA medicines to treat and protect people from diseases associated with, *inter alia*, human papillomavirus ("HPV").  The Company's DNA medicines are comprised of two components: (i) DNA plasmids, which are small circular DNA molecules that purportedly work like software that the body's cells can download to produce specific proteins to target and fight disease; and (ii) its proprietary investigational medical device, "CELLECTRA," which it uses to help its DNA medicines enter the body's cells for purported optimal effect.

3.      Inovio's lead product candidate is INO-3107 for the treatment of recurrent respiratory papillomatosis ("RRP"), a life-long, rare disease of the respiratory tract caused by HPV infection.  At all relevant times, Defendants touted the prospects of the U.S. Food and Drug Administration ("FDA") granting accelerated approval and/or priority review for the Biologics License Application ("BLA") of INO-3107 for the treatment of RRP (the "INO-3107 BLA"). Defendants also touted their ability to complete rolling submission of the INO-3107 BLA by the second half of 2024.  In so doing, Defendants consistently and repeatedly indicated to investors that Inovio was rapidly approaching its transition into a commercial-stage company—one with a lead product asset that, once approved, would fill an unmet medical need and significantly improve the safety or effectiveness of current RRP treatments.  The commercial implications of this prospect, which Defendants consistently highlighted throughout the Class Period, were of the upmost importance to investors and analysts, and formed a core part of the Company's overall investment thesis.

4.      Simultaneously, while disseminating these positive statements to the market, throughout the Class Period Defendants conducted numerous offerings of Inovio's securities, reaping profits of tens of millions of dollars per offering.

5.      Throughout the Class Period, Defendants made materially false and misleading statements regarding the Company's business, operations, and prospects.  Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) manufacturing for Inovio's CELLECTRA device was deficient; (ii) accordingly, Inovio was unlikely to submit the INO-3107 BLA to the FDA by the second half of 2024; (iii) Inovio had insufficient information to justify the INO-3107 BLA's eligibility for FDA accelerated approval or priority review; (iv) accordingly, INO-3107's overall regulatory and commercial prospects were overstated; and (v) as a result, Defendants' public statements were materially false and misleading at all relevant times.

6.      The truth began to emerge on August 8, 2024, when, during post-market hours, Inovio issued a press release reporting its financial results and recent business highlights for the second quarter ("Q2") of 2024.  Therein, Defendants revealed that Inovio expected to submit the INO-3107 BLA to the FDA in mid-*2025*—representing an approximate full-year delay from Defendants' initially projected mid-2024 submission timeline—because of "a manufacturing issue" with a component of the CELLECTRA device.

7.      On this news, Inovio's stock price fell $0.27 per share, or 3.1%, to close at $8.44 per share on August 9, 2024.

8.      Then, on December 29, 2025, during pre-market hours, Inovio issued a press release announcing that the FDA had accepted the INO-3107 BLA on a standard rather than accelerated review timeline.  Defendants advised that the FDA had indicated that the Company did not submit adequate information to justify eligibility for accelerated approval.  Defendants

further advised that Inovio does not plan to seek approval under the standard review timeline and would request a meeting with the FDA to discuss how it may still pursue accelerated approval.

9.      On this news, Inovio's stock price fell $0.56 per share, or 24.45%, to close at $1.73 per share on December 29, 2025.

10.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

11.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

12.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act.

13.     Venue is proper in this District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b).  Inovio is headquartered in this District, Defendants conduct business in this District, and a significant portion of Defendants' actions took place within this District.

14.     In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## PARTIES

15.     Plaintiff, as set forth in the attached Certification, acquired Inovio securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

16.     Defendant Inovio is a Delaware corporation with principal executive offices located at 660 West Germantown Pike, Suite 110, Plymouth Meeting, Pennsylvania 19462.   The Company's common stock trades in an efficient market on the Nasdaq Stock Market ("NASDAQ") under the ticker symbol "INO."

17.     Defendant Jacqueline E. Shea ("Shea") has served as Inovio's President, Chief Executive Officer, and a Director of the Company at all relevant times.

18.     Defendant Peter Kies ("Kies") has served as Inovio's Chief Financial Officer at all relevant times.

19.     Defendants Shea and Kies are collectively referred to herein as the "Individual Defendants."

20.     The Individual Defendants possessed the power and authority to control the contents of Inovio's SEC filings, press releases, and other market communications.  The Individual Defendants were provided with copies of Inovio's SEC filings and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected.  Because of their positions with Inovio, and their access to material information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and

misleading.  The Individual Defendants are liable for the false statements and omissions pleaded herein.

21.    Inovio and the Individual Defendants are collectively referred to herein as "Defendants."

## SUBSTANTIVE ALLEGATIONS

### Background

22.    Inovio is a biotechnology company focused on the discovery, development, and commercialization of DNA medicines to treat and protect people from diseases associated with HPV, cancer, and infectious diseases.  The Company's DNA medicines are comprised of two components: (i) DNA plasmids, which are small circular DNA molecules that purportedly work like software that the body's cells can download to produce specific proteins to target and fight disease; and (ii) its proprietary investigational medical device, "CELLECTRA," which it uses to help its DNA medicines enter the body's cells for purported optimal effect.

23.    Inovio's lead product candidate is INO-3107 for the treatment of RRP, a life-long, rare disease of the respiratory tract caused by HPV infection.  At all relevant times, Defendants touted the prospects of the FDA granting accelerated approval and/or priority review for the INO-3107 BLA.  Defendants also touted their ability to complete rolling submission of the INO-3107 BLA by the second half of 2024.

24.    Under the FDA's accelerated approval procedures, the agency allows drugs for serious conditions that fill an unmet medical need to be approved based on a surrogate endpoint— that is, a marker such as a laboratory measurement, radiographic image, physical sign, or other measure that is thought to predict clinical benefit, but is not itself a measure of clinical benefit.  The FDA's priority review designation, meanwhile, means the agency's goal is to take action on

an application within six months as opposed to the tenth-month standard review timeline. This designation is afforded to drug applications that, if approved, would be significant improvements in the safety or effectiveness of the treatment, diagnosis, or prevention of serious conditions when compared to standard applications.

25. Accordingly, in repeatedly and consistently touting the INO-3107 BLA's prospects for accelerated approval and/or priority review, Defendants indicated to investors that Inovio was rapidly approaching its transition into a commercial-stage company—one with a lead product asset that, once approved, would fill an unmet medical need and significantly improve the safety or effectiveness of current RRP treatments. The commercial implications of this prospect, which Defendants highlighted throughout the Class Period, were of the upmost importance to investors and analysts, and formed a core part of the Company's overall investment thesis.

**Materially False and Misleading Statements Issued During the Class Period**

26. The Class Period begins on October 10, 2023, when Inovio issued a press release during pre-market hours, touting the anticipated INO-3107 BLA's prospects for accelerated approval. Specifically, the press release stated, in relevant part:

> INOVIO . . . has received feedback from the [FDA] that data from its completed Phase 1/2 trial of INO-3107 for the treatment of RRP could support INOVIO's submission of a BLA for review under the FDA's accelerated approval program. The FDA also advised that the company's previously planned Phase 3 randomized, placebo-controlled trial would not be required to support this submission. INOVIO will be required to initiate a confirmatory trial prior to BLA submission for accelerated approval and satisfy all other FDA filing requirements . . . . If approved, INO-3107 would be the first DNA medicine in the United States and the first INOVIO candidate to receive regulatory approval.

27. The same press release quoted Defendant Shea as touting Inovio's "focus[] on streamlining our development plan to support submission of a BLA for accelerated approval."

28.     On November 9, 2023, Inovio issued a press release reporting its financial results and operational highlights for the third quarter ("Q3") of 2023.  The press release highlighted that Inovio had "*[r]eceived FDA feedback that data from [a] completed Phase 1/2 trial could be used to submit a [BLA] under [the] Accelerated Approval program*" and was "*[a]ccelerating [its] commercialization strategy in preparation for an earlier launch*" (emphases in original).

29.     The press release likewise stated, *inter alia*:

The FDA advised that completion of a Phase 3 trial would not be required to support th[e BLA] submission. INOVIO will be required to initiate a confirmatory trial prior to BLA submission for accelerated approval and satisfy all other FDA filing requirements. Subsequent to this feedback, INOVIO has been focused on preparing to file its BLA under the accelerated approval program. The company anticipates additional meetings with the FDA to finalize next steps, including an Initial Comprehensive Multidisciplinary Breakthrough Therapy Meeting, or Type B meeting, which it has requested to be held in the fourth quarter of 2023. INOVIO plans to pursue other benefits offered by Breakthrough Therapy designation to quickly resolve any future questions, as well as take advantage of the opportunity to submit under the FDA's Rolling Review program and request a Priority Review once the BLA is fully submitted.

30.     In addition, the press release quoted Defendant Shea as stating, in relevant part:

Following Breakthrough Therapy designation from the FDA in September and subsequent feedback that we no longer need to complete a Phase 3 trial prior to submitting a BLA under the accelerated approval program, our team is laser-focused on next steps. These steps include holding an Initial Comprehensive Multidisciplinary Breakthrough Therapy Meeting with the FDA in the near future to confirm alignment on our accelerated development plans and to clarify timing associated with potentially making INO-3107 available to patients suffering from this devastating disease.

31.     Also on November 9, 2023, Inovio filed a quarterly report on Form 10-Q with the SEC, reporting the Company's financial and operating results for its Q3 ended September 30, 2023 (the "Q3 2023 10-Q").  The Q3 2023 10-Q reiterated that "data from our completed Phase 1/2 clinical trial of INO-3107 for the treatment of RRP can be used to support the submission of a . . . BLA[] for review under the FDA's accelerated approval program[,]" and that "[t]he FDA also

advised that we will no longer be required to conduct our previously planned Phase 3 randomized, placebo-controlled trial[.]"

32.    Notwithstanding the foregoing, the Q3 2023 10-Q purported to warn of risks that "may" or "could" materialize in connection with seeking accelerated approval for the INO-3107 BLA "if" certain conditions occurred, while simultaneously downplaying the same, stating, in relevant part[1]:

*We plan to pursue accelerated approval for our product candidate INO-3107[.]*

* * *

*If we pursue accelerated approval for INO-3107 for the treatment or [sic] RRP . . . we would do so on the basis that there is no available therapy for that disease or condition or that our product candidate provides a benefit over available therapy. If* standard of care were to evolve or *if* any of our competitors were to receive full approval on the basis of a confirmatory trial for a drug or biologic for a disease or condition for which we are seeking accelerated approval before we receive accelerated approval, the disease or condition would no longer qualify as one for which there is no available therapy, and accelerated approval of our product candidate would not occur without a showing of benefit over available therapy. The treatment landscape can change quickly as the FDA converts accelerated approvals to full approvals on the basis of successful confirmatory trials.

*We have received feedback from the FDA that data from our completed Phase 1/2 clinical trial of INO-3107 for the treatment of RRP can be used to support the submission of a BLA for review under the accelerated approval program*; however, whether any trial is sufficient to receive FDA approval under the accelerated approval pathway will depend on the safety and efficacy results of such trial and will only be determined by the FDA upon review of a submitted BLA.

* * *

In addition, the FDA *may* terminate the accelerated approval program or change the standards under which accelerated approvals are considered and granted in response to public pressure or other concerns regarding the accelerated approval program. Changes to or termination of the accelerated approval program *could* prevent or limit our ability to obtain accelerated approval of any of our clinical development programs.

---

[1] All emphases herein are added unless otherwise indicated.

Plainly, the foregoing risk warnings were generic, boilerplate provisions that were not tailored to Defendants' actual known risks regarding the true likelihood of the FDA accepting the INO-3107 BLA under the agency's accelerated approval pathway.

33.     Appended as exhibits to the Q3 2023 10-Q were signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX"), wherein the Individual Defendants certified, in relevant part, that the Q3 2023 10-Q "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report[.]"

34.     On January 3, 2024, Inovio issued a press release announcing that it "plans to submit a BLA for INO-3107 as a potential treatment for [RRP] *in the second half of 2024*" "*follow[ing] an Initial Comprehensive Multidisciplinary Breakthrough Therapy (Type B) Meeting with the FDA on critical aspects of the data package required to submit a BLA under the agency's accelerated approval program*." These statements clearly indicated to investors that Defendants had not only reached alignment with the FDA on the requirements for securing the INO-3107 BLA's accelerated approval, but that they could submit an accelerated approval-qualifying BLA for INO-3107 by the second half of 2024.

35.     Indeed, the same press release quoted Defendant Shea as touting that, "*[b]ased on productive discussions with the FDA, we believe we now have established a path to submitting a BLA for INO-3107 under the accelerated approval program*," and that "*[o]ur plan is to complete the submission of our BLA in the second half of 2024* and request a Priority Review."

36.     On March 6, 2024, Inovio issued a press release reporting its financial results and operational highlights for the fourth quarter ("Q4") and full year ("FY") of 2023.  The press release quoted Defendant Shea as stating, in relevant part:

> In the past year we have taken our lead candidate, INO-3107 for RRP, from positive Phase 1/2 trial results to Breakthrough Therapy designation and *an established path to BLA submission under the FDA's accelerated approval program* . . . . The year ahead will provide a critical opportunity to carry this positive momentum forward across our pipeline, particularly for INO3107 as we prepare for BLA submission and the initiation of a confirmatory trial in *the second half of 2024* and accelerate commercialization efforts for *a potential 2025 launch*.

37.     The same day, Inovio filed an annual report on Form 10-K with the SEC, reporting the Company's financial and operating results for its Q4 and FY ended December 31, 2023 (the "2023 10-K").  The 2023 10-K assured investors of the quality and integrity of its manufactured CELLECTRA devices, stating, *inter alia*, that these "devices have been designed to optimize delivery of our DNA medicine candidates depending on the target disease" and "*are validated and manufactured under Current Good Manufacturing Practices* (cGMP)."

38.     With more general respect to Inovio's commercialization and manufacturing efforts, the 2023 10-K stated, in relevant part:

> In 2023, we began accelerating the development of our commercialization plans for INO-3107 in the United States following notice from the FDA that the data from our completed Phase 1/2 trial in patients with RRP could be used to submit a BLA under the accelerated approval program.

> We believe our plasmids can be produced in commercial quantities through uniform methods of fermentation and processing that are applicable to all plasmids. We believe we will be able to obtain sufficient supplies of plasmids for all foreseeable clinical investigations.

39.     The 2023 10-K also contained the same generic, boilerplate provisions as referenced in ¶ 32, *supra*, purporting to warn of risks that "may" or "could" materialize in

connection with seeking accelerated approval for the INO-3107 BLA "if" certain conditions occurred, while simultaneously downplaying the same.

40.    Appended as exhibits to the 2023 10-K were substantively the same SOX certifications as referenced in ¶ 33, *supra*, signed by the Individual Defendants.

41.    On April 18, 2024, Inovio closed an underwritten registered direct offering (the "April 2024 Offering") of 2,536,258 shares of its common stock at an offering price of $7.693 per share, as well as pre-funded warrants to purchase 2,135,477 shares of its common stock at an offering price of $7.692 per pre-funded warrant, reaping approximately $33.2 million in net proceeds after underwriting discounts and commissions and estimated offering expenses.

42.    On May 13, 2024, Inovio issued a press release reporting its financial results and recent business highlights for the first quarter ("Q1") of 2024.  With respect to the INO-3107 BLA and the Company's commercial preparations to manufacture INO-3107, the press release stated, *inter alia*:

> ***INOVIO remains on target to submit its BLA seeking accelerated approval for INO-3107 in the second half of 2024.*** INOVIO is preparing trial sites for recruitment based on recent feedback from the FDA that they had no additional comments on INOVIO's proposed design for the confirmatory trial. The trial is being strategically designed to focus on evaluating clinical benefit in reducing surgical intervention to control RRP disease for the majority of RRP patients. Repeat surgical interventions is the current standard of care for RRP. INOVIO's market research to date with patients and healthcare professionals indicates that a reduction of even one surgery matters, because every surgery poses a significant risk of causing permanent damage to the vocal cords.
>
> \* \* \*
>
> ***INOVIO continues preparations to be ready to launch commercially in 2025***, should INO-3107 be approved. Efforts are focused on building the infrastructure needed to deliver the product to patients as quickly and easily as possible, from distribution and supply efforts to payer and healthcare provider support. INOVIO believes that ***INO-3107, if approved, has the potential to be the preferred treatment of choice for all patients with RRP, as well as healthcare professionals***

***and payers based on results from completed clinical trials and the competitive strengths of the DNA medicine platform***[.]

43.     Further, the press release quoted Defendant Shea as stating, in relevant part:

In the first quarter of 2024, we continued to deliver on our priorities for the year. ***Of utmost importance, we remain on track to submit our BLA in the second half of 2024 under the accelerated approval pathway for INO-3107 as a treatment for RRP*** and are working to initiate our confirmatory trial as soon as possible based on feedback from the FDA on the trial's design. We are energized by the opportunity to potentially deliver the first FDA-approved therapy for this devastating disease and continue to work expeditiously to be prepared to serve RRP patients and the physicians caring for them. If approved, INO-3107 would also be the first DNA medicine on the market in the United States, representing a major milestone for our technology platform[.]

44.     Also on May 13, 2024, Inovio filed a quarterly report on Form 10-Q with the SEC, reporting the Company's financial and operating results for its Q1 ended March 31, 2024 (the "Q1 2024 10-Q"). The Q1 2024 10-Q stated, *inter alia*, that "[w]e have received feedback from the FDA that data from our completed Phase 1/2 clinical trial of INO-3107 for the treatment of RRP can be used to support the submission of a BLA for review under the accelerated approval program[,]" and that "[a]s part of submitting our BLA under the accelerated program, ***which we plan to do in the second half of 2024***, we will need to satisfy all FDA filing requirements and initiate a confirmatory clinical trial prior to BLA submission."

45.     The Q1 2024 10-Q also contained the same generic, boilerplate provisions as referenced in ¶ 32, *supra*, purporting to warn of risks that "may" or "could" materialize in connection with seeking accelerated approval for the INO-3107 BLA "if" certain conditions occurred, while simultaneously downplaying the same.

46.     Appended as exhibits to the Q1 2024 10-Q were substantively the same SOX certifications as referenced in ¶ 33, *supra*, signed by the Individual Defendants.

47.    The statements referenced in ¶¶ 26-40 and 42-46 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) manufacturing for Inovio's CELLECTRA device was deficient; (ii) accordingly, Inovio was unlikely to submit the INO-3107 BLA to the FDA by the second half of 2024; (iii) Inovio had insufficient information to justify the INO-3107 BLA's eligibility for FDA accelerated approval or priority review; (iv) accordingly, INO-3107's overall regulatory and commercial prospects were overstated; and (v) as a result, Defendants' public statements were materially false and misleading at all relevant times.

48.    In addition, Defendants violated Item 303 of SEC Regulation S-K, 17 C.F.R. § 229.303(b)(2)(ii) ("Item 303"), which required Inovio to "[d]escribe any known trends or uncertainties that have had or that are reasonably likely to have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations."  Defendants failed to disclose that there were issues with manufacturing Inovio's CELLECTRA device.  Defendants likewise failed to disclose, *inter alia*, that they lacked sufficient data to support the INO-3107 BLA's accelerated approval or priority review by the FDA.  Defendants' failure to disclose these issues violated Item 303 because these issues represented known trends or uncertainties that were likely to have a material unfavorable impact on the Company's business and financial results.

**The Truth Begins to Emerge**

49.    The truth began to emerge on August 8, 2024, when, during post-market hours, Inovio issued a press release reporting its financial results and recent business highlights for Q2 2024 (the "Q2 2024 Earnings Release").  Therein, Defendants revealed that Inovio expected to

submit the INO-3107 BLA to the FDA in mid-*2025*—representing an approximate full-year delay from Defendants' initially projected mid-2024 submission timeline—because of "a manufacturing issue" with a component of the CELLECTRA device.  The press release quoted Defendant Shea as stating, in relevant part:

> We continue to make progress with our lead candidate, INO-3107, which has the potential to significantly improve the lives of patients with RRP. *We expect all non-device related elements of our BLA package to be completed by year end* and our pre-BLA meeting last week with the FDA provided us with confidence that we remain on the right track for the regulatory submission. However, as part of the testing process required for BLA submission, *we've recently identified a manufacturing issue with the single use disposable administration component of our device that we believe is resolvable, but will take additional time to rectify* . . . . *We're taking corrective steps to address the issue*, *and . . . we now expect to be able to submit the BLA in mid-2025.*

50.     The same day, also during post-market hours, Inovio held a conference call with investors and analysts to discuss its financial and operating results for Q2 2024 (the "Q2 2024 Earnings Call").  During the call, Inovio's Chief Medical Officer, Michael Sumner, provided further details regarding the manufacturing issue with the CELLECTRA device, stating, *inter alia*:

> [W]e have unfortunately run into a manufacturing issue with a component of our CELLECTRA device. The single-use disposable administration component, otherwise known as the array. This is used to inject the DNA medicine and administer the electroporation. The issue stems from one of the plastic molded parts within this array and was identified during routine testing to support our BLA filing.
>
> * * *
>
> Our device teams with the support of our external component manufacturers are working to rapidly address the issue and then repeat the required testing for the array. The additional time needed for completing this work and testing has extended our anticipated timeline for BLA submission to mid-2025.

51.     Following the Q2 2024 Earnings Release and Call, Inovio's stock price fell $0.27 per share, or 3.1%, to close at $8.44 per share on August 9, 2024, and at least two analysts cut their price targets ("PT") on Inovio's stock.  Specifically, on August 9, 2024, H.C. Wainwright & Co.

("H.C. Wainwright") cut its PT on Inovio stock to $12.00 from $15.00, stating that, "[i]mportantly, management noted that the [BLA] submission for INO-3107 is delayed to mid-2025 due to a manufacturing issue with the single use disposable administration component of the device." Likewise, on August 12, 2024, Oppenheimer cut its PT on Inovio stock to $33.00 from $40.00, noting that, "[w]hile th[e manufacturing] issue has no impact on the safety or efficacy of the device, it will delay the INO-3107 BLA submission."

52.    Despite the August 9, 2024 decline in Inovio's stock, the Company's securities continued trading at artificially inflated prices throughout the remainder of the Class Period because of Defendants' continued misstatements and omissions regarding, *inter alia*, the INO-3107 BLA's actual prospects for FDA accelerated approval or priority review.

53.    For example, also on August 8, 2024, Inovio filed a quarterly report on Form 10-Q with the SEC, reporting the Company's financial and operating results for its Q2 ended June 30, 2024 (the "Q2 2024 10-Q"). The Q2 2024 10-Q contained the same generic, boilerplate provisions as referenced in ¶ 32, *supra*, purporting to warn of risks that "may" or "could" materialize in connection with seeking accelerated approval for the INO-3107 BLA "if" certain conditions occurred, while simultaneously downplaying the same.

54.    Appended as exhibits to the Q2 2024 10-Q were substantively the same SOX certifications as referenced in ¶ 33, *supra*, signed by the Individual Defendants.

55.    On November 14, 2024, Inovio issued a press release reporting its financial results and recent business highlights for Q3 2024. The press release quoted Defendant Shea as touting INO-3107's purportedly demonstrated ability to meet an unmet medical need and/or significantly improve the safety or effectiveness of current RRP treatments, thereby indicating to investors that the FDA was likely to accept the INO-3107 BLA for accelerated approval or priority review:

Our development of INO-3107 is supported by a growing body of research that collectively points to INO-3107's potential to be an important therapeutic option for all RRP patients regardless of the severity of their disease. We recently presented new immunology data highlighting the ability of INO-3107 to induce new populations of T cells that travel to the airway tissue and papilloma and correspond with clinical benefit. We've also presented our full safety and efficacy data, demonstrating that INO-3107 was shown to be well tolerated and have clinical benefit in the Phase 1/2 trial. Additionally, by the end of year, we anticipate announcing long-term clinical durability data. We continue to believe INO-3107 has the potential to become the preferred choice for the broadest number of RRP patients, healthcare providers and payors, if approved.

56.    The same day, Inovio filed a quarterly report on Form 10-Q with the SEC, reporting the Company's financial and operating results for its Q3 ended September 30, 2024 (the "Q3 2024 10-Q").  The Q3 2024 10-Q contained the same generic, boilerplate provisions as referenced in ¶ 32, *supra*, purporting to warn of risks that "may" or "could" materialize in connection with seeking accelerated approval for the INO-3107 BLA "if" certain conditions occurred, while simultaneously downplaying the same.

57.    Appended as exhibits to the Q3 2024 10-Q were substantively the same SOX certifications as referenced in ¶ 33, *supra*, signed by the Individual Defendants.

58.    On December 16, 2024, Inovio closed an underwritten public offering (the "December 2024 Offering") of 10,000,000 shares of its common stock, as well as accompanying warrants to purchase 10,000,000 shares of its common stock, at an offering price of $3.00 per share and accompanying warrant, reaping approximately $27.6 million in net proceeds after underwriting discounts and commissions and offering expenses.

59.    On January 9, 2025, Inovio issued a press release "highlight[ing] anticipated milestones for 2025 and key accomplishments from 2024 in advance of upcoming investor meetings."  The press release touted Inovio's general preparedness to submit the INO-3107 BLA

to the FDA with information sufficient to warrant the agency's accelerated approval or priority

review, stating, *inter alia*:

**INO-3107**

<u>Anticipated Milestones for 2025</u>

- Submit BLA to the [FDA] by mid-2025 and request priority review. INO-3107 could be the preferred non-surgical therapeutic option for [RRP] and would be the first DNA medicine approved for any indication in the United States, should it be approved.
  - Resolution of previously announced single-use array manufacturing issue expected by February 2025. Next steps following resolution include completion of retesting process for the CELLECTRA® device and finalization of the device sections of the Chemistry, Manufacturing and Controls (CMC) module, which will be used to update the active Investigational New Drug (IND) Application for the confirmatory trial as well as the BLA submission.

* * *

- Submit a redosing study protocol to the FDA.
  - Recently announced durability data support rationale for redosing patients with goal to maintain or improve clinical benefit.

- Present and publish recently announced durability data and immunology data, as well as the full efficacy and tolerability data from completed Phase 1/2 clinical trial, in a peer-reviewed scientific journal.

60. On February 12, 2025, Inovio issued a press release highlighting data from its Phase

1/2 clinical trial of INO-3107 as a treatment for RRP, which purportedly supported INO-3107's

ability to meet an unmet medical need and/or significantly improve the safety or effectiveness of

current RRP treatments, stating, *inter alia*:

In the trial, treatment with INO-3107 induced new populations of T cells in the blood that traveled to the airway and papilloma tissue and were correlated with a reduction in the number of post-treatment surgeries. Of the 32 patients in the trial, 26 patients (81%) required fewer surgeries post-treatment when compared to the year prior to treatment. INO-3107 treatment was also well tolerated in the trial. INOVIO plans to submit its [BLA] for INO-3107 in mid-2025 and request rolling submission and priority review under the FDA's accelerated approval program. If

approved, INO-3107 would be the first DNA medicine approved for any indication in the United States.

61.    The press release also quoted Defendant Shea as touting INO-3107's purportedly demonstrated ability to meet an unmet medical need and/or significantly improve the safety or effectiveness of current RRP treatments, thereby further indicating to investors that the FDA was likely to accept the INO-3107 BLA for accelerated approval or priority review:

> These important data characterizing the cytotoxic T cell-based mechanism of action of INO-3107, in conjunction with our recently reported durability data showing that clinical benefit continued to improve through year two and into year three after initial treatment, with half of  patients not requiring any surgeries in year two, are **part of the growing body of evidence that INO-3107 has the potential to be the preferred product of choice for both patients and healthcare providers** . . . . The primary goal for RRP patients is to reduce or eliminate the need for surgery and INO-3107 has the potential to do just that for the majority of patients. Every surgery matters and a safe and effective therapeutic alternative to surgery would be truly life-changing for RRP patients and their caregivers.

62.    On March 18, 2025, Inovio issued a press release reporting its financial results and operational highlights for Q4 and FY 2024.  The press release quoted Defendant Shea as stating, in relevant part:

> INOVIO's recent progress puts us on the cusp of achieving several long-term goals for our DNA medicines, most importantly the submission of our first BLA and potential transition to a commercial-stage company . . . . By resolving the previously announced device array component issue, we are back on track to submitting our first BLA for INO-3107 to the FDA. We anticipate starting our submission in mid-2025 with non-device related modules under the agency's rolling submission program, assuming it is granted, with the goal of having the complete submission accepted for priority review before the end of the year. **We continue to believe that INO-3107 has the potential to be the preferred product candidate offering durable clinical benefit, tolerability and a patient-centric dosing regimen and are moving forward with urgency.**

63.    The same day, Inovio filed an annual report on Form 10-K with the SEC, reporting the Company's financial and operating results for its Q4 and FY ended December 31, 2024 (the "2024 10-K").  The 2024 10-K stated, *inter alia*, that "[i]n 2024, we continued to advance the

development of our commercialization plans for INO-3107 in the United States based on the notification from the FDA that the data from our completed Phase 1/2 trial (RRP-001) could be used to submit a BLA under the FDA's accelerated approval program[,]" and that "[w]e resolved the manufacturing issue in the first quarter of 2025 and are currently on track to begin a rolling submission of the BLA in mid-2025 and to request priority review[.]"

64.     The 2024 10-K also contained the same generic, boilerplate provisions as referenced in ¶ 32, *supra*, purporting to warn of risks that "may" or "could" materialize in connection with seeking accelerated approval for the INO-3107 BLA "if" certain conditions occurred, while simultaneously downplaying the same.

65.     Appended as exhibits to the 2024 10-K were substantively the same SOX certifications as referenced in ¶ 33, *supra*, signed by the Individual Defendants.

66.     On May 13, 2025, Inovio issued a press release reporting its financial results and recent business highlights for Q1 2025.  This press release, too, contained various statements touting INO-3107's purportedly demonstrated ability to meet an unmet medical need and/or significantly improve the safety or effectiveness of current RRP treatments, thereby indicating to investors that the FDA was likely to accept the INO-3107 BLA for accelerated approval or priority review.  For example, the press release stated, *inter alia*:

- *Clinical and immunological results from Phase 1/2 trial of INO-3107 published in Nature Communications in February 2025*
  - *INO-3107 induced new populations of T cells in the blood that traveled to airway tissue and were associated with significant clinical benefit as measured by reduced need for surgery*

* * *

INOVIO plans to begin rolling submission of the BLA in mid-2025 under FDA's accelerated approval program, subject to FDA concurrence, with the goal of completing the submission in the second half of 2025 and receiving FDA acceptance of the submission by the end of the year. FDA has previously awarded

breakthrough therapy designation for INO-3107 and INOVIO plans to request priority review of its BLA, which if granted would allow for an FDA approval decision (PDUFA date) in mid-2026.

(Emphases in original.)

67.    The press release also quoted Defendant Shea as stating, in relevant part:

As previously stated, our goal is to begin rolling submission in mid-2025, complete the submission in the second half of 2025 and receive file acceptance from the FDA by year end. If we receive priority review, it could allow for a PDUFA date in mid-2026 . . . . **Based on market research, we believe INO-3107 could be the preferred product for patients and providers**, if approved.

68.    Also on May 13, 2025, Inovio filed a quarterly report on Form 10-Q with the SEC, reporting the Company's financial and operating results for its Q1 ended March 31, 2025 (the "Q1 2025 10-Q"). The Q1 2025 10-Q contained substantively the same generic, boilerplate provisions as referenced in ¶ 32, *supra*, purporting to warn of risks that "may" or "could" materialize in connection with seeking accelerated approval for the INO-3107 BLA "if" certain conditions occurred, while simultaneously downplaying the same.

69.    Appended as exhibits to the Q1 2025 10-Q were substantively the same SOX certifications as referenced in ¶ 33, *supra*, signed by the Individual Defendants.

70.    On July 7, 2025, Inovio closed an underwritten public offering (the "July 2025 Offering") of 14,285,715 shares of its common stock and accompanying Series A warrants to purchase up to 14,285,715 shares of its common stock (or pre-funded warrants in lieu thereof) at an exercise price of $1.75 per share of common stock, as well as Series B warrants to purchase up to 14,285,715 shares of its common stock (or pre-funded warrants in lieu thereof) at an exercise price of $1.75 per share of common stock, at a combined public offering price of $1.75 per share of common stock and accompanying Series A and Series B warrants. Inovio reaped approximately

$22.4 million in net proceeds from the July 2025 Offering, after deducting underwriting discounts and commissions and offering expenses paid and payable by the Company.

71.    On August 12, 2025, Inovio issued a press release reporting its financial results and recent business highlights for Q2 2025.  The press release touted the Company's preparedness to submit the INO-3107 BLA to the FDA with information sufficient to warrant the agency's accelerated approval or priority review, stating, *inter alia*:

> INOVIO completed the DV [design verification] testing for the CELLECTRA 5PSP device and requested in July 2025 that the FDA allow it to begin submitting its BLA on a rolling basis based on the Breakthrough Therapy designation previously granted to INO-3107. INOVIO anticipates completing its submission over the next several months and requesting a priority review. FDA inspection of INOVIO as clinical sponsor of the Phase 1/2 trial was successfully completed. The company is working on the device-related sections for its BLA and updating its active IND [Investigational New Drug application] so it can begin enrolling patients into its placebo-controlled, randomized confirmatory trial, which will include 100 patients and be conducted at approximately 20 sites across the United States.
>
> Data from a retrospective study (RRP-002) investigating the long-term clinical efficacy of patients treated with INO-3107 have been published in a peer-reviewed journal, *The Laryngoscope*. The data demonstrate that INO-3107 provided significant clinical benefit to RRP patients, as measured by reduction in surgery, that continued to improve in years two and three following initial treatment.

72.    The same day, Inovio filed a quarterly report on Form 10-Q with the SEC, reporting the Company's financial and operating results for its Q2 ended June 30, 2025 (the "Q2 2025 10-Q").  The Q2 2025 10-Q contained substantively the same generic, boilerplate provisions as referenced in ¶ 32, *supra*, purporting to warn of risks that "may" or "could" materialize in connection with seeking accelerated approval for the INO-3107 BLA "if" certain conditions occurred, while simultaneously downplaying the same.

73.    Appended as exhibits to the Q2 2025 10-Q were substantively the same SOX certifications as referenced in ¶ 33, *supra*, signed by the Individual Defendants.

74.    On August 26, 2025, Inovio issued a press release "announc[ing] that the FDA has notified INOVIO that it agrees with its rolling submission timeline for the BLA for INO-3107 as a treatment for adults with [RRP]" and that the Company "anticipates completing its submission to the FDA in the coming months and requesting priority review, with the goal of file acceptance by the FDA by the end of 2025."  The press release also quoted Defendant Shea as touting the INO-3107 BLA's prospects for FDA accelerated approval and/or priority review:

> We are pleased the FDA agreed to our rolling submission plan. ***We are also encouraged by their recent activity in recognizing the importance of accelerating the full approval of new technologies that can bring life-changing therapeutic options to patients suffering from rare diseases such as RRP . . . . Based on the totality of our data, we believe INO-3107 has the potential to become the preferred product for the treatment of RRP by patients and providers.*** We are leveraging our Breakthrough Therapy designation for INO-3107 to continue discussions with the FDA on the pathway to approval as we aim to bring our positively differentiated therapeutic option to patients as quickly as possible.

75.    On November 3, 2025, Inovio issued a press release announcing that it had completed its rolling submission of the INO-3107 BLA, seeking accelerated approval.  The press release stated, in relevant part:

- *[RRP] is a rare HPV-related disease of the respiratory tract with significant unmet need*
- *INO-3107 previously received Orphan Drug and Breakthrough Therapy designations; BLA submitted under FDA's Accelerated Approval program*
- *Expect to receive file acceptance by year end 2025 with potential PDUFA date in mid-2026 if request for priority review granted*

* * *

INOVIO submitted the BLA under the FDA's Accelerated Approval program and has requested a priority review, which if granted, is expected to be completed within six months following the 60-day filing period. If approved, INO-3107 would be INOVIO's first commercial product and the first DNA medicine available in the United States.

(Emphases in original.)

76.     On November 10, 2025, Inovio issued a press release reporting its financial results and recent business highlights for Q3 2025.  The press release reiterated that Inovio had "submitted the BLA under the FDA's accelerated approval program and has requested a priority review, which if granted, is expected to be completed within six months following file acceptance."  The press release also quoted Defendant Shea as stating, in relevant part:

> I'm very pleased to report that we've completed the rolling submission of our BLA for lead candidate INO-3107. We believe every patient deserves a treatment that reduces exposure to surgery and ***INO-3107 has the potential to meet that significant need in the RRP community***. The majority of patients in our Phase 1/2 trial needed fewer surgeries after treatment and showed continued improvement through Year 2 ***without additional doses, and without surgical interventions during the treatment window to maintain minimal residual disease as required by other treatment modalities***[.]

77.     The same day, Inovio filed a quarterly report on Form 10-Q with the SEC, reporting the Company's financial and operating results for its Q3 ended September 30, 2025 (the "Q3 2025 10-Q").  The Q3 2025 10-Q touted the Company's submission of the INO-3107 BLA for priority review, while simultaneously touting the strength of INO-3107's clinical results, stating, in relevant part:

> Utilizing our breakthrough therapy designation, we requested rolling submission of our [INO-3107] BLA in July 2025 and reported in November 2025 that we had completed the BLA submission, with the goal of receiving file acceptance by the FDA by the end of 2025. We have requested a priority review from the FDA, which, if granted, is expected to be completed within six months following the 60-day filing period.

> During 2025, we have presented key data regarding INO-3107 at several scientific conferences. Highlights from the data include:

> - 81% (26/32) of patients experienced a reduction of one or more surgeries at Year 1 post-treatment

> - By the end of Year 2, 91% (21/23) of evaluable patients continued to experience a reduction of one or more surgeries. Only two patients had not yet responded to treatment with INO-3107

- INO-3107 demonstrated continued clinical benefit, with a persistent decline in the mean number of surgeries through Year 2 post-therapy: A 78% reduction in mean annual surgeries was seen at Year 2 compared to the 1 year pre-treatment period (0.9, n=28 vs 4.1, n=32)

- Clinical response was not dependent upon low viral loads, molecular subtype or other elements of the papilloma microenvironment

78.     The Q3 2025 10-Q also contained substantively the same generic, boilerplate provisions as referenced in ¶ 32, *supra*, purporting to warn of risks that "may" or "could" materialize in connection with seeking accelerated approval for the INO-3107 BLA "if" certain conditions occurred, while simultaneously downplaying the same.

79.     Appended as exhibits to the Q3 2025 10-Q were substantively the same SOX certifications as referenced in ¶ 33, *supra*, signed by the Individual Defendants.

80.     Upon information and belief, on or about November 12, 2025, Inovio closed an underwritten public offering (the "November 2025 Offering") of 13,158,000 shares of its common stock at a public offering price of $1.90 per share, reaping approximately $25 million in gross proceeds before underwriting discounts and commissions and offering expenses, and excluding any exercise of the underwriters' option to purchase additional shares of common stock.

81.     The statements referenced in ¶¶ 53-57, 59-69, and 71-79 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) Inovio had insufficient information to justify the INO-3107 BLA's eligibility for FDA accelerated approval or priority review; (ii) accordingly, INO-3107's overall regulatory and commercial prospects were overstated; and (iii) as a result, Defendants' public statements were materially false and misleading at all relevant times.

82.    In addition, Defendants violated Item 303, which required Inovio to "[d]escribe any known trends or uncertainties that have had or that are reasonably likely to have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." Defendants' continued failure to disclose, *inter alia*, that they lacked sufficient data to support the INO-3107 BLA's accelerated approval or priority review by the FDA violated Item 303 because these issues represented known trends or uncertainties that were likely to have a material unfavorable impact on the Company's business and financial results.

<u>**The Truth Continues to Emerge**</u>

83.    On December 29, 2025, during pre-market hours, Inovio issued a press release announcing that the FDA had accepted the INO-3107 BLA on a standard rather than accelerated review timeline (the "December 2025 Press Release"). Defendants advised that the FDA had indicated that the Company did not submit adequate information to justify eligibility for accelerated approval. Defendants further advised that Inovio does not plan to seek approval under the standard review timeline and would request a meeting with the FDA to discuss how it may still pursue accelerated approval. Specifically, the press release stated, in relevant part:

> [T]he [FDA] accepted the company's [BLA] for INO-3107 for review as a potential treatment for adults with RRP. ***The review classification designated by FDA is Standard.***
>
> ***The FDA assigned INO-3107 a Prescription Drug User Fee Act (PDUFA) review goal date of October 30, 2026,*** which is the date by which it intends to take action on the application. The FDA has indicated that it is not currently planning to hold an advisory committee meeting to discuss this application.
>
> ***INOVIO filed its BLA under the accelerated approval pathway. In the file acceptance letter, the FDA noted as a potential review issue its preliminary conclusion that the company has not submitted adequate information to justify eligibility for the accelerated approval pathway.*** INOVIO continues to believe that INO-3107 provides a meaningful therapeutic benefit over existing treatments and fulfills the criteria for accelerated approval. INOVIO plans to request a meeting with FDA to discuss next steps to remain eligible under the accelerated approval

program. INOVIO is not currently planning to seek approval for INO-3107 under the traditional pathway.

84.    The foregoing disclosures shocked the market.  For example, that same day, not long after markets opened, *Bloomberg* published an article entitled "Inovio Falls as FDA Questions Drug's Accelerated Path Potential[,]"reporting that Inovio's shares "s[u]nk as much as 23%, [the] most intraday since July 3, after the FDA questioned the eligibility of its experimental treatment for adults with [RRP] for an accelerated approval."  Likewise, investor news outlets *Seeking Alpha* and *Benzinga* published articles within a few hours of the market opening, entitled "Inovio drops as respiratory papillomatosis asset denied accelerated review" and "Inovio Stock Sinks As FDA Pushes Back On Accelerated Approval For Rare Disease Drug[,]" respectively, with each noting that Inovio's stock price had cratered following the December 2025 Press Release's disclosures.

85.    Also on December 29, 2025, H.C. Wainwright issued a note addressing Inovio, observing that the INO-3107 BLA's "**accelerated review pathway [is] in dispute**" and that, "[o]f note, [the] FDA has designated the review classification as standard with a PDUFA goal date of October 30, 2026" because "the company has not submitted adequate information to justify eligibility for the accelerated approval pathway" (emphasis in original).  The following day, Jefferies, too, commented on the December 2025 Press Release's disclosures, observing that Inovio's "[s]tock was down ~20% following AA [accelerated approval] overhang in BLA acceptance with the standard review PDUFA date vs. [Inovio's] tight cash runway[,]" and that "if AA is not supportive, [the] program could be further delayed after Ph[ase ]3 results."

86.    Ultimately, following the December 2025 Press Release, Inovio's stock price fell $0.56 per share, or 24.45%, to close at $1.73 per share on December 29, 2025.

87.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## SCIENTER ALLEGATIONS

88.     During the Class Period, Defendants had both the motive and opportunity to commit fraud.  For example, during the Class Period, while disseminating the materially false and misleading statements alleged herein to maintain artificially inflated prices for Inovio securities, Defendants sold tens-of-millions of shares of the Company's common stock, as well as warrants to purchase tens-of-millions of shares of the Company's common stock, to investors via the April and December 2024 and July and November 2025 Offerings, reaping tens of millions of dollars in proceeds *per offering*.

89.     Defendants also had actual knowledge of the misleading nature of the statements they made, or acted in reckless disregard of the true information known to them at the time.  INO-3107 is Inovio's lead product candidate, and the INO-3107 BLA represents the Company's best opportunity to transition to a commercial-stage company.  Accordingly, the Individual Defendants were undoubtedly laser focused on the quality and sufficiency of INO-3107's clinical results and device components, as well as the INO-3107 BLA's prospects for FDA accelerated approval and priority review, as exemplified by their numerous statements regarding these subjects during the Class Period.  Indeed, Defendants repeatedly assured investors that they were in regular and comprehensive communication with the FDA regarding these items to ensure an "established path to BLA submission under the FDA's accelerated approval program" and alignment with the FDA on the information needed to achieve such approval and priority review, as illustrated, for example, by Defendants' statements in ¶¶ 29-30, 34-35, and 49, *supra*.

90.     Accordingly, Defendants participated in a scheme to defraud and committed acts, practices, and participated in a course of business that operated as a fraud or deceit on purchasers of the Company's securities during the Class Period.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

91.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Inovio securities during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosures.  Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

92.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Inovio securities were actively traded on the NASDAQ.  While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Inovio or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

93.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

94.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

95.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Inovio;

- whether the Individual Defendants caused Inovio to issue false and misleading financial statements during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the prices of Inovio securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

96.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

97.    Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- Inovio securities are traded in an efficient market;

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on the NASDAQ and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

- Plaintiff and members of the Class purchased, acquired and/or sold Inovio securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

98.    Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

99.    Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## COUNT I

### (Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants)

100.    Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

101.    This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

102.    During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities.  Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Inovio securities; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire Inovio securities and options at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

103.    Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Inovio securities.  Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Inovio's finances and business prospects.

104.    By virtue of their positions at Inovio, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose

such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants. Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth. In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

105.    Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control. As the senior managers and/or directors of Inovio, the Individual Defendants had knowledge of the details of Inovio's internal affairs.

106.    The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of Inovio. As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Inovio's businesses, operations, future financial condition and future prospects. As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of Inovio securities was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning Inovio's business and financial condition which were concealed by Defendants, Plaintiff and the other members of the Class purchased or otherwise acquired Inovio securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by Defendants, and were damaged thereby.

107.    During the Class Period, Inovio securities were traded on an active and efficient market. Plaintiff and the other members of the Class, relying on the materially false and misleading

statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Inovio securities at prices artificially inflated by Defendants' wrongful conduct. Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid. At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of Inovio securities was substantially lower than the prices paid by Plaintiff and the other members of the Class. The market price of Inovio securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

108.    By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

109.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## COUNT II

### (Violations of Section 20(a) of the Exchange Act Against the Individual Defendants)

110.    Plaintiff repeats and re-alleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

111.    During the Class Period, the Individual Defendants participated in the operation and management of Inovio, and conducted and participated, directly and indirectly, in the conduct

of Inovio's business affairs.  Because of their senior positions, they knew the adverse non-public information about Inovio's misstatement of income and expenses and false financial statements.

112.    As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Inovio's financial condition and results of operations, and to correct promptly any public statements issued by Inovio which had become materially false or misleading.

113.    Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Inovio disseminated in the marketplace during the Class Period concerning Inovio's results of operations.  Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Inovio to engage in the wrongful acts complained of herein. The Individual Defendants, therefore, were "controlling persons" of Inovio within the meaning of Section 20(a) of the Exchange Act.  In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Inovio securities.

114.    Each of the Individual Defendants, therefore, acted as a controlling person of Inovio.  By reason of their senior management positions and/or being directors of Inovio, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, Inovio to engage in the unlawful acts and conduct complained of herein.  Each of the Individual Defendants exercised control over the general operations of Inovio and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

115.    By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Inovio.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment against Defendants as follows:

A.    Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B.    Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.    Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.    Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

Dated: February 6, 2026                    Respectfully submitted,

                                          **POMERANTZ LLP**

                                          *s/ Emily C. Finestone*
                                          Emily C. Finestone (SBN 323709)
                                          Jeremy A. Lieberman
                                          (*pro hac vice* application forthcoming)
                                          J. Alexander Hood II
                                          (*pro hac vice* application forthcoming)
                                          600 Third Avenue, 20th Floor
                                          New York, New York 10016
                                          Telephone: (212) 661-1100
                                          Facsimile: (917) 463-1044
                                          efinestone@pomlaw.com
                                          jalieberman@pomlaw.com
                                          ahood@pomlaw.com

                                          *Attorneys for Plaintiff*