**IN THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| IN RE INOVIO PHARMACEUTICALS, INC. SECURITIES LITIGATION | 2:26-cv-00803-GAW<br><br>**AMENDED CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

# TABLE OF CONTENTS


I. SUMMARY OF THE ACTION ........ 1

II. JURISDICTION AND VENUE ........ 4

III. PARTIES AND RELEVANT NON-PARTIES ........ 5

A. Plaintiffs ........ 5

B. Defendants ........ 5

C. Relevant Non-Parties ........ 6

D. Confidential Witness ........ 6

IV. BACKGROUND ........ 7

A. Inovio Develops INO-3107 and Touts Early FDA Designations of INO-3107 and the Company's Contact with the FDA ........ 7

B. Inovio's CELLECTRA Device: The Critical Component Required to Administer INO-3107 ........ 11

C. The FDA's Biologics License Application Processes ........ 11

V. INOVIO MOVES FORWARD WITH INO-3017/CELLECTRA 5PSP BLA PURSUANT TO ASSURANCES OF OBTAINING ACCELERATED APPROVAL AND PRIORITY REVIEW ........ 13

A. Inovio's Planned Completion of Its BLA in 2024 is Delayed by Its Defective CELLECTRA Device and the Company Raises an Additional $30 Million ........ 13

B. Inovio Resumes Its BLA Push Under an Accelerated Approval Pathway for INO-3107 and Announces It Will Seek Priority Review ........ 16

C. Inovio Loses a Critical Justification for an Accelerated Pathway When a Competing RRP Therapy, Papzimeos—an Apparently More Effective RRP Treatment—Obtains FDA Approval First ........ 19

D. Inovio Finally Submits Its Long-Delayed BLA and Raises an Additional $25 Million ........ 23

VI. DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS DURING THE CLASS PERIOD ........ 24

A. October 10, 2023 ........ 24

B. November 9, 2023 ........ 26

C. January 3, 2024 .......... 31

D. January 24, 2024 .......... 33

E. March 6, 2024 .......... 35

F. April 2024 .......... 39

G. May 13, 2024 .......... 40

H. July 1, 2024 .......... 43

I. August 8, 2024 .......... 45

J. November 14, 2024 .......... 47

K. December 3, 2024 .......... 51

L. December 21, 2024 .......... 52

M. December 31, 2024 .......... 53

N. January 9, 2025 .......... 55

O. February 12, 2025 .......... 57

P. March 18, 2025 .......... 59

Q. May 13, 2025 .......... 63

R. August 12, 2025 .......... 66

S. August 26, 2025 .......... 70

T. September 5, 2025 .......... 72

U. November 3, 2025 .......... 74

V. November 10, 2025 .......... 76

W. December 2, 2025 .......... 80

VII. THE TRUTH ABOUT INO-3107'S BLA IS REVEALED TO THE MARKET .......... 81

A. The FDA Denies Priority Review and Questions Whether Inovio Submitted Adequate Information to Support Accelerated Pathway .......... 81

B. Defendants Continue to Assert After the Class Period That Inovio Will Walk Away From INO-3107 if It Is Not Processed Under the Accelerated Pathway .......... 83

C. FDA Site Inspection at Inovio's San Diego Laboratory in August 2026 Appears to Confirm CW1's Statements that During the Class Period the FDA Had Concerns About Contamination Issues ..... 83

VIII. ADDITIONAL SCIENTER ALLEGATIONS ..... 84

A. *Respondeat Superior* and Agency Principles Apply ..... 86

B. Defendants' Business Experience and Access to Information Support Scienter.. 86

C. The Misrepresentations Implicated Inovio's Core Operations ..... 87

D. Defendants Were Motivated to Conceal the CELLECTRA Defect and the Delay ..... 89

E. Inovio Raised Nearly $80 Million from Stock Offerings at Artificially Inflated Prices ..... 90

IX. NO SAFE HARBOR ..... 92

X. LOSS CAUSATION/ECONOMIC LOSS ..... 94

XI. CLASS ACTION ALLEGATIONS ..... 96

XII. CONTROL PERSON LIABILITY ..... 98

XIII. PRESUMPTION OF RELIANCE; FRAUD ON THE MARKET ..... 99

XIV. CAUSES OF ACTION ..... 100

COUNT I ..... 100

COUNT II ..... 103

PRAYER FOR RELIEF ..... 105

JURY TRIAL DEMAND ..... 105

Lead Plaintiffs ("Plaintiffs"), individually and on behalf of all others who purchased or otherwise acquired Inovio Pharmaceuticals, Inc. ("Inovio" or the "Company") (NASDAQ: INO) securities between October 10, 2023 and December 26, 2025, both dates inclusive (the "Class Period"), allege the following based upon personal knowledge as to themselves and their own acts, and information and belief as to all other matters. Plaintiffs' information and belief is based on the substantial investigation by Plaintiffs' counsel into the facts and circumstances alleged herein, including the following: (i) a review and analysis of public filings referenced herein made by Defendant Inovio with the United States Securities and Exchange Commission ("SEC"); (ii) a review and analysis of press releases, analyst reports, public statements, news articles, and other publications referenced herein disseminated by and/or concerning Inovio and Defendants Jacqueline E. Shea ("Shea") and Peter Kies ("Kies") named herein, including the dissemination of information on the Internet; (iii) a review and analysis of Company conference calls, press conferences, and related statements and other materials referenced herein; (iv) a review and analysis of those other documents referenced herein; and (v) an interview with a confidential witness ("CW") who was a former employee of Inovio. Many additional facts supporting the allegations are known only to Defendants and/or are within their exclusive custody or control. Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I. SUMMARY OF THE ACTION

1. This case centers on Defendants' misrepresentations to investors regarding Inovio's new drug treatment, designated as INO-3107, and its new intramuscular delivery system known as CELLECTRA 5PSP. Inovio was seeking United States Food and Drug Administration ("FDA") approval for the drug and the device "in tandem." Neither the drug nor the electric device used to administer it had any prior FDA approval, though Inovio had tried and failed on

several occasions to get the CELLECTRA system approved. The Company had acquired the patent for CELLECTRA in 2008.

2. It appeared to Inovio and its faithful investors that this time would be different. Inovio had chosen a rare disease, recurrent respiratory papillomatosis ("RRP"), which had no approved drugs for treatment. This set the Company up to seek an "orphan drug" designation, as well as a quick six-month approval timetable ("Priority Review"). The Company could also seek relaxed clinical standards for approval (the FDA's "Accelerated Pathway") by showing that the drug fills an unmet medical need to treat a serious condition.

3. Inovio trumpeted its success in obtaining orphan drug designation in a press release issued on July 29, 2020. The Company routinely boasted about its plans for a short path to commercialization.

4. While disseminating overly optimistic statements to the market throughout the Class Period, Defendants conducted numerous offerings of Inovio's securities, raising tens of millions of dollars.

5. What Inovio was hiding from investors was the fact that internally the data supporting the efficacy of INO-3107 was not looking so good, and Inovio's researchers felt the need to "massage" the data. This means a full-blown clinical review may be impossible for Inovio to pass, which would explain why Inovio has resisted that option and stated that **the Company "is not currently planning to seek approval for INO-3107 under the traditional pathway."**

6. A confidential witness revealed that the FDA has been suspicious of Inovio's experimental new device – the CELLECTRA device (inextricably tied to the request for approval of INO-3107) – which according to Inovio forces cells in the vicinity of electrodes

(inserted through the patient's skin) to open holes in their cell membranes, allow INO-3107 to flow into the cell, and then close the holes in their membranes, with no resulting damage to the cell.

7. Internally however, Inovio had manufacturing issues which caused a one-year delay in the production of a working CELLECTRA unit which also delayed its application for approval of the tandem INO-3107/CELLECTRA 5PSP's application.

8. The situation became much worse for Inovio's prospects for approval of the INO-3107/CELLECTRA 5PSP's application when a competing product to treat RRP appeared which needed no special device and used a simple needle for delivery. Despite having gained the FDA orphan drug designation in 2020, before Inovio finally filed its finalized BLA in November 2025, Inovio's competitor, Precigen Inc., gained approval for its drug to treat RRP in August 2025 called Papzimeos, beating Inovio to the market. That meant that the FDA may be less likely to grant an exception to the typical requirement for full clinical testing.

9. Inovio's application for Accelerated approval has now stalled. The FDA stated that Inovio did not submit adequate support for its application for Accelerated approval and its attendant lower clinical standards.

10. So far, Inovio has stood by its refusal to seek the alternative pathway (i.e., the Traditional Pathway), which would entail more fulsome clinical testing and validation of INO-3107/CELLECTRA 5PSP's efficacy.

11. The truth about the INO-3107/CELLECTRA 5PSP's application was disclosed on December 29, 2025, through an Inovio press release announcing that the review classification awarded by the FDA was only the Standard review.

12. In the same press release, it was disclosed that the FDA indicated that the Company's submission did not contain adequate information to justify eligibility for Accelerated Pathway with its lower clinical testing requirement.

13. These disclosures were disastrous for Inovio. Defendants further undermined Inovio's credibility with the market by disclosing that the Company **"is not currently planning to seek approval for INO-3107 under the traditional review pathway."**

14. The market's reaction to this unsettling new information was swift and fierce - Inovio's stock price fell $0.56 per share, or **24.45%**, to close at $1.73 per share on December 29, 2025.

15. Defendant's deceptions throughout the Class Period caused Inovio's investors to lose almost a quarter of their investment in one day. As of the filing of this Complaint, the Company has still not agreed to seek the Traditional review pathway with its attendant clinical testing requirements.

16. Meanwhile, the competing product, Papzimeos, which is administered with a single shot (four doses over twelve weeks), continues to be sold to patients suffering from recurrent respiratory papillomatosis.

17. As of the filing of this Complaint, Inovio has not gained FDA approval for its CELLECTRA device for any drug.

## II. JURISDICTION AND VENUE

18. The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5, promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

19. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

20. Venue is proper in this District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa and 28 U.S.C. § 1391(b)), because Inovio is headquartered in this District and many of the acts and conduct that constitute violations of law complained of herein, including the dissemination to the public of materially false and misleading information, occurred in this District.

21. In connection with the acts, conduct, and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of the national securities markets.

## III. PARTIES AND RELEVANT NON-PARTIES

### A. Plaintiffs

22. Plaintiffs, as set forth in the Certifications filed at Dkt. 6-4, acquired Inovio securities at artificially inflated prices during the Class Period and were damaged thereby.

### B. Defendants

23. Defendant Inovio is a Delaware corporation with its principal executive offices located at 660 West Germantown Pike, Suite 110, Plymouth Meeting, Pennsylvania 19462. The Company's common stock trades in an efficient market on the Nasdaq Stock Market ("NASDAQ") under the ticker symbol INO.

24. Defendant Jacqueline E. Shea ("Shea") has served as Inovio's President, Chief Executive Officer, and a Director of the Company at all relevant times.

25. Defendant Peter Kies ("Kies") has served as Inovio's Chief Financial Officer ("CFO") at all relevant times.

26. Defendants Shea and Kies are collectively referred to herein as the "Individual Defendants." The Individual Defendants, together with Inovio, are referred to herein as "Defendants."

27. The Individual Defendants possessed the power and authority to control the contents of Inovio's SEC filings and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected. Because of their positions and access to material non-public information, both Individual Defendants knew the adverse facts specified herein had not been disclosed to and/or were being concealed from the public and that the positive representations being made were then materially false and/or misleading. The Individual Defendants are liable for the false statements and omissions pleaded herein.

**C. Relevant Non-Parties**

28. Dr. Michael Sumner ("Sumner") has served as Inovio's Chief Medical Officer ("CMO") since June 2022. *See* LinkedIn, Michael Sumner, https://www.linkedin.com/in/mike-sumner-916a214/ (last visited Sep. 23, 2026).

**D. Confidential Witness**

29. Confidential Witness One ("CW1") served in senior roles overseeing clinical science and operations at Inovio from approximately August 2021 to October 2023. In that capacity, CW1 had direct oversight of clinical trial enrollment, site management, and data quality for Inovio's clinical programs, including the INO-3107 program at issue in this action. CW1 regularly attended recurring internal meetings—referred to internally as "Tiger Team" meetings—held approximately every other day at Inovio's headquarters and lasting one-to-three hours, at which Inovio's most senior executives, including Defendant Shea, Defendant Kies,

Inovio's Chief Operating Officer, and members of Inovio's Statistics group, reviewed clinical trial data, and discussed the Company's regulatory strategy.

## IV. BACKGROUND

### A. Inovio Develops INO-3107 and Touts Early FDA Designations of INO-3107 and the Company's Contact with the FDA

30. Inovio is a clinical-stage biotechnology company that develops deoxyribonucleic acid ("DNA") medicines to treat human papillomavirus ("HPV"), cancer, and infectious diseases. The Company was incorporated in 2009, following the merger of Inovio and VGX—another biopharmaceutical company that focused on developing DNA-based vaccines and therapies.

31. The Company's lead drug candidate, INO-3107, is an investigational DNA-based immunotherapy designed to treat RRP, a rare and debilitating condition caused primarily by chronic infection with HPV types 6 and 11 ("HPV-6" and "HPV-11").

32. RRP affects 1.8 out of every 100,000 adults in the United States and is characterized by the recurrent growth of benign tumors, or papillomas, in specific areas of the respiratory tract. Inovio Pharm., Inc., Investor Presentation 15 (Jan. 2024).

33. RRP is caused by the growth of benign, wart-like tumors (papillomas) in the respiratory tract usually near the vocal cords.

34. Treatment for RRP has mainly involved repeated surgeries to relieve the disease effects. The surgery involves the use of a laryngoscope that is placed through the mouth to then trim or cut away the wart-like growths (i.e., the papillomas) from the vocal cords respiratory airwaves.

35. The surgery does not address the underlying cause of the condition and can carry risks. Patients who develop the disease early in life may require hundreds of surgeries

throughout their lifetime. The physical and financial burdens of these frequent procedures therefore profoundly impact RRP patients' quality of life, underscoring the urgent need for a targeted therapeutic solution.

36. In the early stages of INO-3107's development and investigational phase, no other FDA-approved pharmacological treatment for RRP existed, which made INO-3107 a potentially transformative therapy and potentially eligible for FDA's accelerated approval program and orphan drug designation.

37. According to Inovio, INO-3107 treats RRP by delivering synthetic DNA directly into a patient's cells, prompting the patient's own immune system to recognize and destroy the HPV-infected cells that cause papilloma growth. Specifically, the DNA plasmids used in INO-3107 encode the E6 and E7 proteins that HPV-6 and HPV-11 use to drive infection, so that once delivered into cells, the body's immune system is trained to target and eliminate the cells producing those proteins. The DNA plasmids are delivered into the body using Inovio's proprietary CELLECTRA electroporation device, which administers brief electrical pulses at the injection site to temporarily open cell membranes, allowing the DNA plasmids to enter the surrounding cells. Once inside the cell, the DNA plasmids trigger the immune system to produce specialized immune cells that recognize and eliminate the HPV-infected cells.

38. Inovio claims that by directly targeting and eliminating the HPV-infected cells that drive papilloma growth, INO-3107 reduces the recurrence of papillomas and, in turn, decreases RRP patients' need for repeated surgical interventions as illustrated in this graphic produced by Inovio:




Inovio Pharm., Inc., Corporate Presentation 26 (Dec. 2024).

39. As Inovio explained in its annual report for 2023:

> DNA medicines are optimized DNA plasmids containing a gene encoding for a protein that is expressed once these plasmids are delivered into cells. We can design our plasmids to teach the body's cells to produce a wide range of proteins, including antigens to elicit a specific immune response and monoclonal antibodies to fight a specific pathogen. These DNA medicines can generate antigen-targeted humoral and cellular immune responses based on the indication, including antigen-specific cytotoxic, or killer, T cell responses that are important for fighting cancer and viral infections. . . .
>
> Our DNA medicines platform consists of DNA plasmids and our CELLECTRA devices, which are used to deliver the DNA plasmids into the cell.

Inovio Pharms., Inc., Annual Report 3-4 (Form 10-K) (Mar. 6, 2024).

40. The FDA granted Inovio the Orphan Drug Designation ("ODD") for INO-3107 on July 29, 2020. The FDA Office of Orphan Products Development provides that to get this designation, a company does not have to prove the drug works. They only need to show a "medically plausible basis" or a reasonable expectation that the drug *might work for a rare disease.* ODD is granted to drugs designed to treat, prevent, or diagnose rare diseases or conditions, and comes with certain incentives (like tax credits).

41. The FDA granted its Breakthrough Therapy designation ("BTD") to Inovio for INO-3107 on in September 2023. The BTD reflects the FDA's preliminary determination that early clinical evidence suggests the therapy may represent an improvement over existing treatments for a serious disease. The BTD also provides the sponsor with FDA guidance throughout development, including meetings and advice regarding the evidence that may support a future marketing application.

42. In the September 7, 2023, press release, Defendants touted the BTD designation and Inovio's interaction with the FDA as a possible means to expedite the approval of INO-3107:

> The FDA's Breakthrough Therapy designation is a process designed to expedite the development and review of drug candidates that are intended to treat a serious or life-threatening condition and for which preliminary clinical evidence indicates that the drug may demonstrate substantial improvement over available therapy on a clinically significant endpoint(s).
>
> 'This is yet another important step for INO-3107 and recognition that this first-in-class DNA medicine candidate has the potential to improve the lives of patients with RRP,' said INOVIO's President and Chief Executive Officer, Dr. Jacqueline Shea. 'As we recently announced, we have been interacting with the FDA with the goal to launch a pivotal trial for INO-3107 in the near term. With this Breakthrough Therapy designation, we look forward to continuing to work with the agency so that we can generate the evidence needed to support approval of INO-3107 as quickly and efficiently as possible, with an ultimate aim to help RRP patients and deliver on the promise of DNA medicine.'

### B. Inovio's CELLECTRA Device: The Critical Component Required to Administer INO-3107

43. The CELLECTRA 2000 iss Inovio's foundational electroporation device. It is portable, battery-powered, and made up of a pulse generator, applicator, and a needle array. Through the years, Inovio made additional versions of its CELLECTRA devices: the 3PSP and the 5PSP. The CELLECTRA 5PSP was the device designed to deliver INO-3107. None of these devices have been approved by the FDA for commercial use.

44. Inovio used its proprietary CELLECTRA 5PSP device in late-stage clinical trials of INO-3107 and ultimately selected that device as its route of administration for the drug.

45. Because the theory was that DNA plasmid depends on the CELLECTRA 5PSP device to enter host cells and enhance T-cell immune activation against HPV-infected tissue, any delay in the development of the device would also directly impair Inovio's ability to advance INO-3107 through the FDA's regulatory process.

46. Indeed, during Inovio's Q1 2024 Earnings Call with analysts (the "Q1 2024 Earnings Call"), Shea touted the fact that INO-3107 was "regulated as a combination product," meaning the Company would "need to submit on both the drug component as well as the device component" to the FDA.

### C. The FDA's Biologics License Application Processes

47. A Biologics License Application or BLA "is the formal submission to the U.S. Food and Drug Administration (FDA) through which an applicant requests permission to introduce a biological product into interstate commerce . . . ."

48. Acceptance of a BLA and approval of a BLA are two separate events governed by different standards. Acceptance requires only that the application be sufficiently complete to permit substantive review. Approval requires that the application satisfies the scientific and

regulatory requirements for licensure. 21 C.F.R. § 601.2(a). The FDA may *accept* a BLA for review while simultaneously identifying substantive issues that may ultimately disqualify the application for approval.

49. In October 2023, Inovio disclosed the following:

> [I]t has received feedback from the U.S. Food and Drug Administration (FDA) that data from its completed Phase 1/2 trial of INO-3107 for the treatment of RRP could support INOVIO's submission of a BLA for review under the FDA's accelerated approval program. The FDA also advised that the company's previously planned Phase 3 randomized, placebo-controlled trial would not be required to support this submission. INOVIO will be required to initiate a confirmatory trial prior to BLA submission for accelerated approval and satisfy all other FDA filing requirements.

50. A BLA submitted under the Accelerated Pathway is distinct from a Traditional Pathway. The Accelerated Pathway allows the sponsor to submit a BLA for approval based upon surrogate or intermediate clinical endpoints which occurs much sooner and requires less human clinical trials. According to the FDA:

> A surrogate endpoint used for accelerated approval is a marker - a laboratory measurement, radiographic image, physical sign or other measure that is thought to predict clinical benefit, but is not itself a measure of clinical benefit. Likewise, an intermediate clinical endpoint is a measure of a therapeutic effect that is considered reasonably likely to predict the clinical benefit of a drug, such as an effect on irreversible morbidity and mortality (IMM).The FDA bases its decision on whether to accept the proposed surrogate or intermediate clinical endpoint on the scientific support for that endpoint. Studies that demonstrate a drug's effect on a surrogate or intermediate clinical endpoint must be "adequate and well controlled" as required by the FD&C Act.

51. In order to obtain approval under Accelerated Pathway, an application must have conducted a confirmatory trial, or at least have one set up when the BLA is submitted. However, due to issues with the CELLECTRA 5PSP device, discussed above, INO-3107's confirmatory trial remains an outstanding issue according to Inovio's SEC filings.

52. A BLA that does obtain a Priority Review will receive an FDA decision within 6 months, rather than the typical 10 months. The Accelerated Pathway lessens the evidentiary

support that is required. A Traditional Pathway for FDA approval requires much more substantive clinical data and requires data sets and testing to confirm a clinical benefit. This is the pathway that Inovio has said it is currently unwilling to pursue.

## V. INOVIO MOVES FORWARD WITH INO-3017/CELLECTRA 5PSP BLA PURSUANT TO ASSURANCES OF OBTAINING ACCELERATED APPROVAL AND PRIORITY REVIEW

### A. Inovio's Planned Completion of Its BLA in 2024 is Delayed by Its Defective CELLECTRA Device and the Company Raises an Additional $30 Million

53. Biologics like INO-3107 are subject to the FDA's Quality Management System Regulation ("QMSR") regulations. 21 C.F.R. pt. 820. Pursuant to the FDA's QMSR, drug manufacturers are required to establish and document procedures to inspect and test its administering devices, confirming each device meets applicable quality and performance specifications for inclusion in regulatory submissions such as a BLA.

54. Biologics like INO-3107 are also subject to the FDA's safety regulations, including 21 C.F.R. parts 50, 56, 312, 314, 600 and part 820. 21 C.F.R. § 312.80 makes clear that statutory standards of safety and effectiveness apply to all drugs. *See* 21 C.F.R. § 312.80 ("Purpose" of "Drugs Intended to Treat Life-threatening and Severely-debilitating Illnesses"). The FDA's regulations also include specific rules and procedures that require a company to maintain adequate identification, control, and segregation of laboratory materials to prevent errors and contamination. Failure to meet the FDA's regulatory standards can jeopardize and preclude the approval of a BLA.

55. Defendants knew that the FDA had concerns about the use of the CELLECTRA device for delivery of medications based on prior experience. According to CW-1, Inovio's CELLECTRA device was not well accepted by the FDA. Defendants first learned about the FDA's skepticism for CELLECTRA during COVID when Inovio had been one of the first

companies to enroll subjects in a test for a vaccine using the CELLECTRA device. According to CW1, the FDA was skeptical of the CELLECTRA device, which resulted in Inovio's study being put on hold, and thereby enabling competitors of Inovio to "jump ahead" of Inovio. According to CW1, the FDA's concerns pertained to whether the CELLECTRA device was potentially carrying the COVID virus and thereby serving as a means of transmission. This necessitated the San Diego office undertaking extensive testing to demonstrate to the FDA that there was not a problem with contamination. Even though they established that the device was not carrying the virus, by the time the FDA's concerns were appeased, it was "too late."

56. Because INO-3107's synthetic DNA plasmids are supposedly administered using the CELLECTRA 5PSP device, FDA regulations required the device to undergo testing and demonstrate that it was "suitable for use or capable of functioning," with supporting documentation, for Inovio to submit.

57. Throughout the first seven months of 2024, Defendants repeatedly touted their plans to submit a BLA for INO-3107 in the second half of the year, signaling to investors that there were no issues with the CELLECTRA 5PSP or its component parts.

58. For example, on January 3, 2024, Inovio issued a press release announcing that it "plans to submit a BLA for INO-3107 as a potential treatment for [RRP] in the second half of 2024."

59. On May 13, 2024, the Company also stated that it "remains on target to submit its BLA seeking accelerated approval for INO-3107 in the second half of 2024" and further touted its ***purported readiness for a commercial launch in 2025***.

60. As late as July 1, 2024, the Company touted its addition to the "Russell 2000® Index" and, in doing so, again attributed the achievement to its "plans to submit a BLA for INO-

3107 under the FDA's accelerated approval pathway in the second half of 2024 and preparing to be commercial launch-ready in 2025[.]"

61. Indeed, these assurances were based, in part, on the Company's representations that the quality and integrity of its manufactured CELLECTRA devices had "been designed to optimize delivery of our DNA medicine candidates depending on the target disease" and were "validated and manufactured under Current Good Manufacturing Practices (cGMP)," which meant that the devices' "identity, strength, quality, and purity" were adequately controlled and met FDA standards.

62. Defendants' positive statements to investors regarding the trajectory toward INO-3107's FDA approval were revealed to be incorrect when, on August 8, 2024, during the Company's earnings call for the second quarter ("Q2") of 2024 (the "Q2 2024 Earnings Call"), Sumner disclosed that routine testing conducted to support INO-3107's BLA filing revealed a manufacturing defect in the plastic-molded part of the CELLECTRA 5PSP device.

63. The defect in the plastic-molded part of CELLECTRA 5PSP's array presented significant concerns for INO-3107's functionality. The array is the component of the CELLECTRA 5PSP device containing needle electrodes that physically penetrate the patient's skin to both inject the plasmid DNA and deliver the electrical pulses needed.

64. On the August 8, 2024 call, Sumner went on to downplay the significance of the problem with the CELLECTRA device, but nevertheless conceded that ***the fix of the issue would delay the BLA submission by nearly a year***:

> [Inovio's] device teams with the support of our external component manufacturers are working to rapidly address the issue, and then repeat the required testing for the array. The additional time needed for completing this work and testing has extended our anticipated timeline for BLA submission to mid-2025. We will, of course, endeavor to complete this work on a faster timeline, if possible, and we'll have more updates for you at our next quarterly report.

65. According to CW1, the CELLECTRA device had not been fully vetted and that at the time the Company disclosed the issue with CELLECTRA in August 2024, the FDA had concerns about viral contamination, as it had years earlier when the Company was trying to get the device approved for a Covid-19 vaccine.

66. The Company's response to these setbacks was to raise more money. In December 2024, the Company announced "an underwritten public offering of 10,000,000 shares of its common stock and accompanying warrants to purchase 10,000,000 shares of its common stock at an exercise price of $3.76 per share of common stock, at a combined public offering price of $3.00 per share of common stock and accompanying warrant," with expected gross proceeds of approximately $30 million.

**B. Inovio Resumes Its BLA Push Under an Accelerated Approval Pathway for INO-3107 and Announces It Will Seek Priority Review**

67. After announcing that Inovio had fixed the defect with CELLECTRA 5PSP device, Defendants touted their efforts to complete and submit Inovio's long-delayed BLA submission for a review under an Accelerated Pathway, meaning less clinical testing. Defendants also announced that the Company would seek a review of its BLA under a Priority Review timetable, meaning a faster decision time.

68. The FDA's Priority Review designation reflects the FDA's goal of acting on a BLA within six months of acceptance. To obtain priority review, an applicant must submit a written request demonstrating that the drug or indication offers "significant improvements in the safety or effectiveness of the treatment, diagnosis, or prevention of serious conditions when compared to standard applications."

69. The Standard Review pathway is the most common route to FDA approval. Under this pathway, the FDA's review of a BLA can take anywhere from 10 months to over a

year following submission, depending on the scope of information and materials requested during the agency's review.

70. Defendants repeatedly expressed confidence that the Company would proceed under the Accelerated Pathway.[1] For example, in a press release dated October 10, 2023, Inovio announced that it "received feedback from the U.S. Food and Drug Administration (FDA) that data from its completed Phase 1/2 trial of INO-3107 for the treatment of RRP could support INOVIO's submission of a BLA for review under the FDA's accelerated approval program."

71. On January 2024, the Company stated that "[b]ased on productive discussions with the FDA, we believe we now have established a path to submitting a BLA for INO-3107 under the accelerated approval program," while simultaneously announcing its concrete plans to submit the BLA under a Priority Review designation.

72. Defendants linked their representations of optimism for obtaining Priority Review under the Accelerated Pathway for INO-3107 with the FDA's earlier designations of INO-3107 as an Orphan Drug and a Breakthrough Therapy and "positive Phase 1/2 trial results."

73. The Company touted its belief that it has "established a path to submitting a BLA for INO-3107 under the accelerated approval program," it also stated that "[t]he FDA previously granted INO-3107 Orphan Drug designation and Breakthrough Therapy designation, and advised INOVIO that it could submit its BLA under the accelerated approval program using data from its already completed Phase 1/2 trial."

---

[1] As one analyst explained, Inovio "already had a Type B meeting with the FDA, and the agency agreed that the BLA submission would be under the accelerated approval program." Raghuram Selvaraju, *INO-3107 BLA Submission Expected in 2H24; Reiterate Neutral*, H.C. Wainwright & Co. (Jan. 3, 2024). A Type B meeting is a scheduled FDA meeting that occurs following the completion of a formal milestone in an investigational drug's development.

74. Additionally, at Inovio's Q1 2024 Earnings Call, Sumner stated that "as part of our pre-BLA meeting with the agency, we will obviously request priority review, which is one of the advantages of breakthrough designation based on everything the FDA has said to us about their recognition of the significant impact on these patients' quality of life."

75. The FDA grants BTD to drugs intended to treat a serious or life-threatening condition when *preliminary clinical evidence indicates that the drug may* demonstrate a substantial improvement over existing therapies on one or more clinically significant endpoints.

76. Likewise, ODD is granted to drugs based on the FDA's determination that the drug is intended to treat rare diseases affecting fewer than 200,000 people in the United States. The FDA found that INO-3107 fell into this category and granted it ODD on July 29, 2020, because, according to Inovio's Senior Vice President of Regulatory Affairs, Ami Shah Brown, the drug treats a "rare disease clearly underscores the importance of addressing the unmet medical need for this debilitating condition." This also happened to coincide with Inovio's unmet desire to get FDA approval for its CELLECTRA device, and with a lower standard of scrutiny.

77. After completing Phase 1/2 of its clinical trial, INO-3107's next steps toward gaining FDA approval included initiating its confirmatory trial in conjunction with preparing a BLA for submission to the FDA in accordance with 21 C.F.R. § 601.2 ("Applications for biologics licenses; procedures for filing").

78. A confirmatory trial is a later-stage study designed to verify and describe a drug's clinical benefit after earlier studies have suggested potential benefit. In the Accelerated Pathway context, such trials are generally conducted after approval to verify the clinical benefit on which accelerated approval was based.

### C. Inovio Loses a Critical Justification for an Accelerated Pathway When a Competing RRP Therapy, Papzimeos—an Apparently More Effective RRP Treatment—Obtains FDA Approval First

79. On August 14, 2025, Inovio lost an important justification for accelerated approval of its BLA: the FDA approved a competing DNA immunotherapy, PAPZIMEOS (zopapogene imadenovec-drba), made by Precigen, which it described as the "first and only approved therapy" for RRP. Precigen completed its rolling BLA submission in December 2024, the FDA accepted the BLA with Priority Review on February 25, 2025, and approved Papzimious on August 15, 2025.

80. PAPZIMEOS is a non-replicating adenoviral vector-based immunotherapy designed to treat RRP by generating an immune response directed against papilloma cells infected with HPV-6 and HPV-11. PAPZIMEOS relies on traditional delivery mechanisms to obtain cell penetration (of which, as CW1 said, the FDA has long been skeptical). Like INO-3107, PAPZIMEOS targets both HPV-6 and HPV-11.

81. PAPZIMEOS received FDA approval on August 14, 2025 after Precigen completed its rolling BLA submission under an accelerated approval pathway in December 2024. The FDA granted full approval, meaning Precigen was not required to conduct a confirmatory trial. The supporting clinical data, derived from the successful completion of Papzimeos's Phase 1/2 trial, was presented at the 2024 ASCO Annual Meeting on June 3, 2024.

82. The approval of PAPZIMEOS undermined the basis for Inovio's BLA for INO-3107 under the Accelerated Pathway. Because PAPZIMEOS treats the same condition as INO-3107, the FDA could conclude that INO-3107 does not offer a "meaningful therapeutic benefit . . . over existing treatments," which is a requirement for accelerated approval, and that INO-3107 lacks "significant improvements in the safety or effectiveness of the treatment . . . compared to standard applications," which is the standard for Priority Review.

83. Moreover, the available data appears to show that PAPZIMEOS had stronger prospective clinical evidence of complete response ("CR") than INO-3107, in the sense that a higher percentage of the subjects in PAPZIMEOS's clinical trial *no longer required surgery to treat their RRP* than subjects in INO-3107's Phase 1/2 trial, who required surgery during and after the dosing window.

84. For example, PAPZIMEOS's pivotal Phase 1/2 trial used a 12-month CR as its primary efficacy endpoint, with 51% of patients (18/35) achieving a CR.

85. By contrast, the data from INO-3107's Phase 1 trial (RRP-01), whose primary endpoints were safety and tolerability, showed that only 28% of patients (9/32) achieved CR (i.e., no surgical interventions) during or after the dosing window in Year 1.

86. INO-3107's trial data was problematic because the data was derived from clinical trials primarily designed to assess safety and tolerability, rather than efficacy. In both RRP-001 and RRP-002, the primary endpoint was safety and tolerability, while CR was measured only as a secondary endpoint. As a result, even if INO-3107 later demonstrated improved CR rates, or rates exceeding those of PAPZIMEOS, the data could not carry the same evidentiary weight as PAPZIMEOS's clinical CR data, which came from trials specifically designed to evaluate CR efficacy.

87. Because INO-3107 did not use efficacy as a primary endpoint, the Company could not reliably or adequately demonstrate an "improved patient response" relative to competing RRP drug PAPZIMEOS, which did use efficacy as a primary endpoint during its clinical trials, thereby undermining its ability to meet the FDA standard for accelerated approval and priority review.

88. Even before PAPZIMEOS received FDA approval, news of its impending FDA approval drew analyst concerns. On the Q3 2024 Earnings Call, an analyst asked: “with Precigen also reporting after the close and suggesting a 2025 launch, how are you thinking about your approach and go-to-market strategy, which could support uptake in the market given the prospects of a competitor already being on the market by the time you would launch?” In response, Inovio’s Chief Commercial Officer, Steven Egge, stated that he did not “know necessarily that Precigen[’s Papzimeos drug] will be in the market before [INO-3107] will” and expressed a commitment to deploying medical science liaisons and national account managers promptly upon the drug’s approval.

89. Defendants continued to downplay these concerns: Shea expressed her “confiden[ce] in the product profile” and emphasized her belief that INO-3107 had “the right profile to be the preferred product . . . for patients and physicians” during the Q3 2024 Earnings Call on November 14, 2024.

90. Egge also described INO-3107 as “well-differentiated” based on the Company’s “strategic choices on distribution, physician and patient targeting and segmentation as well as product positioning.”

91. And even when PAPZIMEOS received full FDA approval, the Company incredulously represented that it did not view this as a threat to INO-3107’s prospects for accelerated approval. For example, at the Piper Sandler 37th Annual Healthcare Conference on December 2, 2025, Sumner stated:

> [T]he Precigen product is a gorilla-based adenoviral product. But its treatment regimen is actually fundamentally different from 3107. So what do I mean by that? So both products deliver 4 doses. And we all start administration of our products after the patient has had a clinically warranted surgery to remove the papilloma and that induces a state of what we call minimal residual disease.

> But that's really where the difference[s e]nd because Precigen have decided they need to maintain that state of minimal residual disease throughout the whole treatment administration period. So if you're receiving Precigen's product at the third and fourth dose, which is at week 6 and week 12, you have to be scoped and if there are any papilloma present, you have to have them surgically removed.
>
> So you heard from Jacqui just how devastating these surgeries are for patients. So we feel it's sort of just contradictory to what you're actually trying to achieve from a therapeutic point of view to add additional surgeries into the treatment regimen. So when you look at efficacy, they start counting their surgeries after completion of their treatment regimen, whereas we start at day 0 include any surgery that patient has. So we really don't feel you can compare because 83% of their patient population had at least one of those minimal residual disease surgeries and 40% actually had two. So it's very difficult to -- in our mind, a surgery as a surgery to a patient. And so we don't like to compare the results.

Inovio Pharms., Inc., Company Conference Presentation, 7 (Dec. 2, 2025) (S&P Global, Inc. transcript).

92. Defendants knew or were reckless in not knowing that their assurances to the market that Papzimeos did not pose a risk to INO-3107's Accelerated Pathway and Priority Review request were false and misleading. Defendants knew or were reckless in not knowing that Inovio's researchers felt the need to "massage" the data to improve Inovio's chances of approval. CW1 had concerns that the INO-3107 test data may have been presented to look better than it is.

93. Indeed, in February 2026, at the Oppenheimer 36th Annual Healthcare & Life Sciences Conference, Shea confirmed that the approval of PAPZIMEOS was the reason the FDA questioned whether Inovio had sufficient data to support Accelerated Review:

> And maybe just a little more on the FDA's view that Inovio did not submit adequate information to justify eligibility for accelerated approval. Do you -- I guess what do you think is behind that? Do you think that's related to the full approval of Papzimeos?
>
> **Jacqueline Shea**
> *CEO, President & Director*
>
> So Jay, yes, so we do believe it's related to the full approval of Papzimeos.

### D. Inovio Finally Submits Its Long-Delayed BLA and Raises an Additional $25 Million

94. After a long delay, Inovio announced on November 3, 2025, that it had completed a rolling submission of its BLA for INO-3107, representing to investors that Inovio "submitted the BLA under the FDA's Accelerated Approval program and has requested a priority review," which, if granted, "is expected to be completed within six months following the 60-day filing period," with a potential commercial launch in 2026. Unlike priority review, which was expressly disclosed as a pending, contingent request, Inovio's accelerated-approval status was falsely presented as if it was an accomplished fact, without qualification. The press release made no mention of PAPZIMEOS's FDA approval or its potential impact on INO-3107's accelerated-approval prospects. Nor did it disclose that INO-3107's confirmatory trial had still not been initiated, even though Inovio had stated in October 2023 that such a trial would need to be initiated prior to BLA submission. Inovio would not disclose that until the following week's earnings call, when Sumner told investors the FDA had confirmed the Company needed only to have initiated the trial and enrolled a patient prior to approval, not prior to submission.

95. When Inovio disclosed this seemingly good news, Inovio's stock price increase $0.15 per share, or 6.38%, to close at $2.50 per share on November 3, 2025.

96. Just one week later, during the Company's Q3 2025 earnings call (the "Q3 2025 Earnings Call") on November 10, 2025, Sumner provided an update on INO-3107's confirmatory trial:

> We had previously aligned with the FDA on a design for a randomized placebo-controlled trial based on guidance indicating that a placebo control arm was required for an indication in patients who had two or more surgeries in the year prior to treatment. ***We now recognize that the landscape has changed following the recent full approval of Papzimeos including how the FDA might view data requirements to support product approvals***. ***The agency has confirmed that we***

> ***only need to have initiated the confirmatory trial and enrolled the patient prior to approval, which we believe is achievable based upon our progress to date.***
>
> As you will recall, we are working with more than 20 U.S. academic sites and have made significant progress with site initiation activities, which should enable us to rapidly initiate our confirmatory trial and deliver results in a timely manner. We nevertheless want the opportunity to further discuss potential options for our confirmatory trial design with the agency and have submitted a request for a Type D meeting.[2]

97. In the wake of this seemingly good news, Inovio announced another public offering, this time of "13,158,000 shares of its common stock at a public offering price of $1.90 per share," with all shares being sold by Inovio and the offering expected to close on or about November 12, 2025. The offering was expected to generate approximately $25 million in gross proceeds.

98. According to an analyst report, the raise was "expected to fund operations into 3Q:26 through INO-3107 approval." However, since the November 2025 capital raise, Inovio has completed two additional offerings of common stock and warrants, in April 2026 and July 2026.

## VI. DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS DURING THE CLASS PERIOD

### A. October 10, 2023

99. The Class Period begins on October 10, 2023. On that date, Inovio issued a press release during pre-market hours, also filed with the SEC on Inovio's October 10, 2023 Form 8-K and signed by Defendant Kies. The press release announced that the FDA had advised Inovio

---

[2] A Type D meeting is a category of formal meeting between the FDA and a sponsor used to resolve a narrow, limited set of issues in an ongoing drug development program—generally no more than two focused topics—as distinguished from the broader Type A, B, and C meetings. *See* U.S. Food & Drug Admin., *Formal Meetings Between the FDA and Sponsors or Applicants of PDUFA Products: Guidance for Industry*, at 4 (Aug. 12, 2026), https://www.fda.gov/media/172311/download.

that the Phase 1/2 trial data for INO-3107 could support a BLA submission under the FDA's accelerated approval program. Specifically, the press release stated, in relevant part:[3]

> ***INOVIO . . . has received feedback from the [FDA] that data from its completed Phase 1/2 trial of INO-3107 for the treatment of RRP could support INOVIO's submission of a BLA for review under the FDA's accelerated approval program.*** The FDA also advised that the company's previously planned Phase 3 randomized, placebo-controlled trial would not be required to support this submission. INOVIO will be required to initiate a confirmatory trial prior to BLA submission for accelerated approval and satisfy all other FDA filing requirements . . . . If approved, INO-3107 would be the first DNA medicine in the United States and the first INOVIO candidate to receive regulatory approval.

100. The same press release quoted Defendant Shea emphasizing Inovio's "***focus[] on streamlining [its] development plan to support submission of a BLA for accelerated approval.***"

101. The boldfaced statements referenced in ¶¶ 99-100 were materially false and misleading when made because Defendants knew or were reckless in not knowing and failed to disclose that:

a. The safety and efficacy of the INO-3107/CELLECTRA 5PSP therapy was less favorable than publicly disclosed;

b. The chances of a speedy FDA approval of INO-3107/CELLECTRA 5PSP and quick rush to market were less than represented to the market;

c. Inovio was unwilling to face the higher clinical scrutiny called for by seeking approval of INO-3107/CELLECTRA 5PSP by way of a Standard Review by the FDA. Inovio's test results for INO-3107/CELLECTRA 5PSP were less than had been hoped for and researchers felt the need to "massage" the data;

[3] All emphases herein are added unless otherwise indicated.

d. The approval of a competing drug, PAPZIMEOS, which showed good efficacy, greatly reduced Inovio's chances of receiving approval for either the Accelerated Pathway or Priority Review, despite Defendants' public representations to the contrary;

e. Because of prior concerns with Inovio's Covid-19 BLA, the FDA was already skeptical of the CELLECTRA delivery system going into Inovio's INO-3107/CELLECTRA 5PSP BLA; and

f. The FDA had contamination concerns with Inovio's Covid-19 BLA, and during the Class Period there were internal concerns of contamination in the production of INO-3107. These concerns regarding INO-3107 were validated by an undisclosed FDA Form 483 issued soon after the Class Period ended citing multiple violations and contamination concerns. *See* Section VII(C) below. These issues would greatly have reduced Inovio's chances of receiving approval for either the Accelerated Pathway or Priority Review and would have been highly material to investors.

**B. November 9, 2023**

102. On November 9, 2023, Inovio issued a press release, filed with the SEC on a Form 8-K signed by Defendant Kies, reporting its financial results and operational highlights for the third quarter ("Q3") of 2023. The press release quoted Defendant Shea as stating, in relevant part:

> The past quarter has seen significant progress for our lead candidate, INO-3107, for the treatment of Recurrent Respiratory Papillomatosis, or RRP. . . . Following Breakthrough Therapy designation from the FDA in September and subsequent feedback that we no longer need to complete a Phase 3 trial prior to submitting a BLA under the accelerated approval program, our team is laser-focused on next steps. ***These steps include holding an Initial Comprehensive Multidisciplinary Breakthrough Therapy Meeting with the FDA in the near future to confirm***

***alignment on our accelerated development plans and to clarify timing associated with potentially making INO-3107 available to patients suffering from this devastating disease*.**

***The progress we have achieved with INO-3107 exemplifies the strategy we have been implementing over the past year, as we have focused on advancing late-stage candidates and driving toward near, mid- and long-term milestones for our pipeline. In the past 18 months, we have reshaped our company, reduced our operating spend and reprioritized our pipeline with INO-3107 as our lead candidate. I am more confident than ever that our experienced team is prepared to deliver on the next critical steps of development and on the promise of DNA medicine for patients*.**

103. The press release likewise stated, *inter alia*:

> ***INOVIO also received feedback from the FDA that data from its completed Phase 1/2 trial of INO-3107 could support INOVIO's submission of a BLA for review under the FDA's accelerated approval program.*** The FDA advised that completion of a Phase 3 trial would not be required to support this submission. INOVIO will be required to initiate a confirmatory trial prior to BLA submission for accelerated approval and satisfy all other FDA filing requirements. ***Subsequent to this feedback, INOVIO has been focused on preparing to file its BLA under the accelerated approval program.***
>
> The company anticipates additional meetings with the FDA to finalize next steps, including an Initial Comprehensive Multidisciplinary Breakthrough Therapy Meeting, or Type B meeting, which it has requested to be held in the fourth quarter of 2023. INOVIO plans to pursue other benefits offered by Breakthrough Therapy designation to quickly resolve any future questions, as well as take advantage of the opportunity to submit under the FDA's Rolling Review program and request a Priority Review once the BLA is fully submitted.

104. Also on November 9, 2023, Inovio filed a quarterly report with the SEC on Form 10-Q, reporting the Company's financial and operating results for its Q3 ended September 30, 2023 (the "Q3 2023 10-Q"). The Q3 2023 10-Q was signed by Defendant Shea and Defendant Kies, and reiterated its October 10, 2023 announcement regarding the FDA's INO-3107 feedback:

> **On October 10, 2023, we announced that we had received feedback from the U.S. Food and Drug Administration (FDA) that data from our completed Phase 1/2 clinical trial of INO-3107 for the treatment of RRP can be used to support the submission of a Biologic License Application, or BLA, for review under the FDA's accelerated approval program. The FDA also advised that**

> **we will no longer be required to conduct our previously planned Phase 3 randomized, placebo-controlled trial; however, we will need to initiate a confirmatory clinical trial prior to BLA submission for accelerated approval and will also need to satisfy all other FDA filing requirements**.

105. Appended as exhibits to the Q3 2023 10-Q were signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX"), wherein Defendant Shea and Defendant Kies certified that, in relevant part, the Q3 2023 10-Q "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report."

106. Later on November 9, 2023, Inovio held an earnings call with analysts and investors to discuss Inovio's Q3 2023 results. Defendants Shea and Kies participated in the call. In her opening statements, Defendant Shea stated the following:

> Over the last few months, I'm delighted to say that ***we've made significant progress advancing our lead candidate***, INO-3107 for the treatment of recurrent respiratory papillomatosis or RRP. ***After 2 very important regulatory developments, we are closer than ever to delivering on the promise of DNA medicines to patients and bringing the first DNA medicine to market in the United States. Specifically, in the third quarter of 2023, the FDA granted breakthrough therapy designation to INO-3107 based on clinical evidence indicating that it may demonstrate substantial improvement over existing therapies for RRP.***
>
> ***A couple of weeks following that breakthrough therapy designation, we received feedback from the FDA that data from our completed Phase I/II trial of 3107 could be used to support submission of a biological license application or BLA for review on the FDA's Accelerated Approval Program.*** Our Chief Medical Officer, Mike Sumner, will provide more context shortly, but this news means that we no longer need to complete a Phase III trial before BLA submission and will ultimately allow for a potentially much faster development pathway. ***We will, however, be required to initiate a confirmatory trial and satisfy all other FDA filing requirements prior to BLA submission as is usual for the accelerated approval pathway.*** To achieve that, our team has already submitted a request for an initial comprehensive multidisciplinary breakthrough therapy meeting to the FDA for the fourth quarter. This meeting will help further align our plans with the FDA and determine the timing for critical deliverables associated with our BLA submission.

> ***As we make progress on this new expedited pathway, we have every intention to utilize the opportunity to increase communication with the FDA and other advantages offered by breakthrough therapy designation, such as requesting a rolling submission of completed sections of our BLA and a priority review of the fully submitted BLA.***

107. After Defendant Shea's opening remarks, Sumner emphasized Inovio's advancement of INO-3107, stating:

> ***[W]e have made substantial progress with our lead candidate, INO-3107.*** To provide a little perspective on ***how fast this candidate has been advancing through development, we've created this time line.*** We started our Phase I/II trial in 2020, the same year the FDA granted orphan drug status. After announcing positive final results from the trial earlier this year, the European Commission granted orphan drug status in May, followed by the FDA's Breakthrough Therapy designation in September.

108. During the question-and-answer portion of the Q3 2023 earnings call, an analyst asked about the timing of the BLA filing and the potential approval. Defendant Shea explained:

> ***the news on [the] accelerated approval pathway is relatively new. We just heard in September. So, over the past few weeks, we've really been working to accelerate our time lines.*** We put together quite a detailed package to be considered by the FDA under the upcoming meeting. . . . ***But what we're really hoping to achieve in that meeting is to get some alignment with the FDA*** as to some of the content that needs to go into that submission package . . . .

109. Sumner further elaborated on Defendant Shea's comments:

> I think we've made tremendous progress as a team. ***We've really mapped out every single function and what we need to do to get to our BLA.*** In terms of the input we need from the FDA, I mean, ***obviously, we have a strategy.*** . . . But we're pulling on significant data points that we've had. ***I mean we've already gone through our PPQ strategy for 3100. We've used our s-electric device in our Phase III program. We've had several interactions with the agency on what we need to do for the device. We know, again, from a confirmatory study that what we want to propose, and we've had significant input of what we believe is going to be acceptable to the agency.*** And so, we need alignment on that protocol as we do need to start that study prior to filing our BLA.

110. Later, during the question-and-answer session, Defendant Shea stated:

> We believe that there are a reasonable number of core points for a company of our size to take on. ***We have in-house manufacturing for our device that we think***

> ***can meet our device manufacturing needs.*** And we have well-established relationships with our drug manufacturing CMO to manufacture the drug.

111. Defendant Shea ended the call by emphasizing INO-3107's progress towards commercialization:

> ***The significant progress we have made in advancing INO-3107 over the past few months, means that we are moving closer to providing a potentially life-changing nonsurgical treatment option to patients suffering from RRP.*** I remain incredibly grateful to the patients, patient advocates, trial investigators and our dedicated team here at Inovio that has enabled us to achieve this. ***I am confident that our experienced team is prepared for the next critical steps of development and potential commercialization for INO-3107.*** And thanks to the corporate strategy we've been implementing over the past year, I'm also confident that Inovio now has the key drivers in place for broader long-term success.

112. Around the same time, Inovio published its November 2023 Corporate Presentation, touting, "***Substantial progress with lead program, INO-3107, as potential treatment for RRP***" and under the heading "***Drivers for Success***," that Inovio was "[a]dvancing candidates with scientific and clinical promise, ***achievable pathways to market and strong commercial potential***" and "***[p]reparing to file first BLA under accelerated approval program***".

113. The boldfaced statements referenced in ¶¶ 102-04 and 106-12 were materially false and misleading when made because Defendants knew or were reckless in not knowing and failed to disclose and/or misrepresented that:

a. The safety and efficacy of the INO-3107/CELLECTRA 5PSP therapy was less favorable than publicly disclosed;

b. The chances of a speedy FDA approval of INO-3107/CELLECTRA 5PSP and quick rush to market were less than represented to the market;

c. Inovio was unwilling to face the higher clinical scrutiny called for by seeking approval of INO-3107/CELLECTRA 5PSP by way of a Standard Review by the FDA. Inovio's test results for INO-3107/CELLECTRA

5PSP were less than had been hoped for and researchers felt the need to "massage" the data;

d. Because of prior concerns with Inovio's Covid-19 BLA, the FDA was already skeptical of the CELLECTRA delivery system going into Inovio's INO-3107/CELLECTRA 5PSP BLA; and

e. The FDA had contamination concerns with Inovio's Covid-19 BLA, and during the Class Period there were internal concerns of contamination in the production of INO-3107. These concerns regarding INO-3107 were validated by an undisclosed FDA Form 483 issued soon after the Class Period ended citing multiple violations and contamination concerns. *See* Section VII(C) below. These issues would have greatly reduced Inovio's chances of receiving approval for either the Accelerated Pathway or Priority Review and would have been highly material to investors.

### C. January 3, 2024

114. On January 3, 2024, Inovio issued a press release announcing that it "plans to submit a BLA for INO-3107 as a potential treatment for [RRP] ***in the second half of 2024***." The press release stated that the announcement "***follows an Initial Comprehensive Multidisciplinary Breakthrough Therapy (Type B) Meeting with the FDA on critical aspects of the data package required to submit a BLA under the agency's accelerated approval program.***"

115. Indeed, the same press release quoted Defendant Shea as touting that, "***[b]ased on productive discussions with the FDA, we believe we now have established a path to submitting a BLA for INO-3107 under the accelerated approval program***," and that "***[o]ur plan is to complete the submission of our BLA in the second half of 2024 and request a Priority Review. We also plan to initiate a confirmatory trial prior to submission of our BLA. Concurrently, we***

***will continue advancing our commercial plans, with the goal of being ready to launch INO-3107 in 2025.***"

116. Around the same time, Inovio published its January 2024 Investor Presentation that reaffirmed the "***[s]ubstantial progress with lead program, INO-3107, as potential treatment for RRP***" and emphasized the "commercial advantage" of Inovio's device for INO-3107 being an "***[e]lectroporation device well tolerated by patients & easy to use by HCPs***."

117. The same Investor Presentation stated: "***Complete submission of BLA under accelerated approval program 2H24***" and "***Continue to accelerate commercialization plans to be prepared to launch in 2025***."

118. The boldfaced statements referenced in ¶¶ 114-18 were materially false and misleading when made because Defendants knew or were reckless in not knowing and failed to disclose and/or misrepresented that:

a. The safety and efficacy of the INO-3107/CELLECTRA 5PSP therapy was less favorable than publicly disclosed;

b. The chances of a speedy FDA approval of INO-3107/CELLECTRA 5PSP and quick rush to market were less than represented to the market;

c. Inovio was unwilling to face the higher clinical scrutiny called for by seeking approval of INO-3107/CELLECTRA 5PSP by way of a Standard Review by the FDA. Inovio's test results for INO-3107/CELLECTRA 5PSP were less than had been hoped for and researchers felt the need to "massage" the data;

d. Because of prior concerns with Inovio's Covid-19 BLA, the FDA was already skeptical of the CELLECTRA delivery system going into Inovio's

INO-3107/CELLECTRA 5PSP BLA; and

e. The FDA had contamination concerns with Inovio's Covid-19 BLA, and during the Class Period there were internal concerns of contamination in the production of INO-3107. These concerns regarding INO-3107 were validated by an undisclosed FDA Form 483 issued soon after the Class Period ended citing multiple violations and contamination concerns. *See* Section VII(C) below. These issues would have greatly reduced Inovio's chances of receiving approval for either the Accelerated Pathway or Priority Review and would have been highly material to investors.

**D. January 24, 2024**

119. On January 24, 2024, Defendant Shea and Sumner participated in an investor call hosted by Oppenheimer & Co. Inc. analyst Hartaj Singh, during which Defendant Shea was asked about Inovio's manufacturing capabilities in order to get INO-3107 commercially ready. Specifically, Defendant Shea explained:

> So in terms of the plasmid, we have our plasmids manufactured by a contract manufacturer that we've worked with for a number of years, and that's already at commercial scale. And as Mike has mentioned, we've already gone through PPQ for another product candidate previously with that manufacturer. So we're comfortable with where we are with our CMC package, and we have a great CMO partner there.
>
> In terms of the device, we manufacture our devices in-house. So ***we have complete control of that process***. As Mike says, devices are constantly evolving landscape. So it's been very important to get alignment with the FDA as to what their expectations are around the device both for the confirmatory study and also for launch. ***And I think following those discussions with the FDA, we're very comfortable with where we've ended up***.
>
> I think it's important to note that the device is proprietary to Inovio. This is our CELLECTRA device. And the purpose of the device is really to deliver the plasmids to the patient cells and then provide brief electrical pulses, which enable improved uptake of the plasmids to the patient cells and better immune responses. So the device is a necessary part of our combination product.

120. During the same call, Defendant Shea also touted Inovio's commercial strategy and abilities for INO-3107:

> As Dr. Best has mentioned, many of these patients are treated in academic centers or voice centers probably about 30 to 50 of them in the U.S. So those centers are going to be ***key to our commercial strategy and making sure that we can get 3107 to the patients who need it in an appropriate time frame.*** So we're really focused at the moment. This is a rare disease. It's an innovative product.
>
> ***And I'm pleased to say that we've got an experienced commercial team, led by our Chief Commercial Officer, Mark Twyman, who've got deep expertise and experience in bringing these types of innovative products to market, including in the rare disease space. So we're working across a number of different aspects at the moment, really making sure that we have all of our plans in place to engage with the external partners and service providers and also implementing our plans for product distribution, logistics, payer engagement, reimbursements and, of course, the patient hub.***

121. The boldfaced statements referenced in ¶¶ 119-20 were materially false and misleading when made because Defendants knew or were reckless in not knowing and failed to disclose and/or misrepresented that:

a. The safety and efficacy of the INO-3107/CELLECTRA 5PSP therapy was less favorable than publicly disclosed;

b. The chances of a speedy FDA approval of INO-3107/CELLECTRA 5PSP and quick rush to market were less than represented to the market;

c. Inovio was unwilling to face the higher clinical scrutiny called for by seeking approval of INO-3107/CELLECTRA 5PSP by way of a Standard Review by the FDA. Inovio's test results for INO-3107/CELLECTRA 5PSP were less than had been hoped for and researchers felt the need to "massage" the data;

d. Because of prior concerns with Inovio's Covid-19 BLA, the FDA was already skeptical of the CELLECTRA delivery system going into Inovio's

INO-3107/CELLECTRA 5PSP BLA; and

e. The FDA had contamination concerns with Inovio's Covid-19 BLA, and during the Class Period there were internal concerns of contamination in the production of INO-3107. These concerns regarding INO-3107 were validated by an undisclosed FDA Form 483 issued soon after the Class Period ended citing multiple violations and contamination concerns. *See* Section VII(C) below. These issues would have greatly reduced Inovio's chances of receiving approval for either the Accelerated Pathway or Priority Review and would have been highly material to investors.

**E. March 6, 2024**

122. On March 6, 2024, Inovio issued a press release reporting its financial results and operational highlights for the fourth quarter ("Q4") and full year ("FY") of 2023. In the press release's "Operational Highlights" section, Inovio reaffirmed its "***plans to submit its BLA for INO-3107 in the second half of 2024***" and stated that the "***FDA advised in October 2023 that INOVIO's completed Phase 1/2 trial could be used to submit its BLA under the accelerated approval program***." The press release further stated that "***INOVIO has accelerated its commercialization strategy to support a product launch in 2025 if regulatory approval is obtained on the anticipated timeline. Plans underway include strategies for product distribution and logistics, payor engagement and reimbursement, specialty pharmacy identification, customer service programs, field force design, and other sales and marketing activities.***"

123. The press release also quoted Defendant Shea as stating, in relevant part:

> In the past year we have taken our lead candidate, INO-3107 for RRP, from positive Phase 1/2 trial results to Breakthrough Therapy designation and ***an established path to BLA submission under the FDA's accelerated approval program. . . . The***

> ***year ahead will provide a critical opportunity to carry this positive momentum forward across our pipeline, particularly for INO-3107 as we prepare for BLA submission and the initiation of a confirmatory trial in the second half of 2024 and accelerate commercialization efforts for a potential 2025 launch.***

124. The same day, Inovio filed its annual report with the SEC on Form 10-K, signed by both Defendant Shea and Defendant Kies, reporting the Company's financial and operating results for its Q4 and FY ended December 31, 2023 (the "2023 10-K"). The 2023 10-K reaffirmed the approval prospects of INO-3107 and stated, in relevant part:

> Our lead candidate is INO-3107 for the treatment of recurrent respiratory papillomatosis, or RRP, a rare and debilitating disease of the respiratory tract caused by HPV infection. In our completed Phase 1/2 clinical trial of INO-3107 for the treatment of HPV-6 and HPV-11-associated RRP, 81.3% of patients experienced a reduction in the number of surgical interventions in the year following administration of INO-3107, when compared with the year prior to treatment.
>
> In February 2023, we announced data from the second cohort of our Phase 1/2 clinical trial, which followed the announcement of data from the first cohort in October 2022. In the second cohort of 11 patients who were administered INO-3107 via an exploratory side port needle, 10 of the 11 patients (91%) saw a reduction in surgical interventions in the year following initial treatment, with the measurement beginning on Day 0, the start of trial therapy. Of these 10 patients, four did not require surgery. There was a statistically significant median decrease of three surgical interventions when comparing the year following treatment to the year prior to treatment. INO-3107 was well tolerated and immunogenic among patients in the second cohort. The safety and efficacy results for the second cohort were consistent with results announced for the first cohort in October 2022.
>
> In the fourth quarter of 2023, ***we received feedback from the U.S. Food and Drug Administration, or FDA, that the data from this completed trial could be used to support the submission of a Biologic License Application, or BLA, for review under the FDA's accelerated approval program.*** As part of submitting our BLA under the accelerated program, we will need to satisfy all FDA filing requirements and initiate a confirmatory clinical trial prior to BLA submission.

125. The 2023 10-K also assured investors of the quality and integrity of its manufactured CELLECTRA devices, stating, *inter alia*, that these "devices have been designed to optimize delivery of our DNA medicine candidates depending on the target disease" and "***are validated and manufactured under Current Good Manufacturing Practices (cGMP)***."

126. With respect to Inovio's commercialization and manufacturing efforts, the 2023 10-K stated, in relevant part:

> Because of the broad potential applications of our technologies, we intend to develop and commercialize products both on our own and through our collaborators and licensees. We intend to develop and commercialize products in well-defined specialty markets, such as HPV-related diseases, infectious diseases, and cancer. Where appropriate, we intend to rely on strategic marketing and distribution alliances. ***In 2023, we began accelerating the development of our commercialization plans for INO-3107 in the United States following notice from the FDA that the data from our completed Phase 1/2 trial in patients with RRP could be used to submit a BLA under the accelerated approval program.***
>
> We believe our plasmids can be produced in commercial quantities through uniform methods of fermentation and processing that are applicable to all plasmids. We believe we will be able to obtain sufficient supplies of plasmids for all foreseeable clinical investigations.

127. Appended as exhibits to the 2023 10-K were substantively the same SOX certifications as referenced in ¶ 105, *supra*, signed by Defendant Shea and Defendant Kies.

128. On the same day that Inovio's 2023 10-K was filed, the Individual Defendants hosted an earnings call, during which Defendant Shea stated:

> The past 12 months have been transformational for Inovio. ***Today, we are a company planning to submit our first BLA in the second half of this year and preparing for the potential commercial launch of our first products in 2025.*** If approved, INO-3107 could also become the first nonsurgical therapeutic option for patients with RRP and be the first DNA medicine available in the United States.
>
> To achieve this transformation, ***we have prioritized our product pipeline to focus on 3107 and other promising late-stage assets, all with high unmet medical need and strong commercial potential.*** We've remained committed to financial discipline, cutting our operating expenses nearly in half compared with 2022 and focused on leveraging the advantages of our platform to deliver on the promise of DNA medicine.
>
> ***
>
> Looking ahead, several key catalysts will help continue that momentum across our pipeline. ***In addition to submitting our BLA for 3107 under FDA's accelerated approval program, we plan to initiate a confirmatory trial in the second half of 2024, and we'll continue preparations for a potential 2025 launch.***

129. During the same earnings call, Sumner also praised INO-3107's progress, sharing, "***As you can see on this updated time line, we have achieved some major development and regulatory milestones in just over a year.***"

130. The boldfaced statements referenced in ¶¶ 122-26 and 128-29 were materially false and misleading when made because Defendants knew or were reckless in not knowing and failed to disclose and/or misrepresented that:

a. The safety and efficacy of the INO-3107/CELLECTRA 5PSP therapy was less favorable than publicly disclosed;

b. The chances of a speedy FDA approval of INO-3107/CELLECTRA 5PSP and quick rush to market were less than represented to the market;

c. Inovio was unwilling to face the higher clinical scrutiny called for by seeking approval of INO-3107/CELLECTRA 5PSP by way of a Standard Review by the FDA. Inovio's test results for INO-3107/CELLECTRA 5PSP were less than had been hoped for and researchers felt the need to "massage" the data;

d. Because of prior concerns with Inovio's Covid-19 BLA, the FDA was already skeptical of the CELLECTRA delivery system going into Inovio's INO-3107/CELLECTRA 5PSP BLA; and

e. The FDA had contamination concerns with Inovio's Covid-19 BLA, and during the Class Period there were internal concerns of contamination in the production of INO-3107. These concerns regarding INO-3107 were validated by an undisclosed FDA Form 483 issued soon after the Class Period ended citing multiple violations and contamination concerns. *See*

Section VII(C) below. These issues would have greatly reduced Inovio's chances of receiving approval for either the Accelerated Pathway or Priority Review and would have been highly material to investors.

**F. April 2024**

131. In April 2024, Inovio issued its April 2024 Corporate Presentation which repeatedly emphasized the INO-3107 BLA timeline and progress for accelerated approval, stating, *inter alia*, "***BLA filing for lead program INO-3107 to treat [RRP] under accelerated approval program expected in 2H24***," "***Targeting 2H24 BLA Submission***" and "***Accelerated Approval Pathway.***"

132. The boldfaced statements referenced in ¶ 131 were materially false and misleading when made because Defendants knew or were reckless in not knowing and failed to disclose and/or misrepresented that:

a. The safety and efficacy of the INO-3107/CELLECTRA 5PSP therapy was less favorable than publicly disclosed;

b. The chances of a speedy FDA approval of INO-3107/CELLECTRA 5PSP and quick rush to market were less than represented to the market;

c. Inovio was unwilling to face the higher clinical scrutiny called for by seeking approval of INO-3107/CELLECTRA 5PSP by way of a Standard Review by the FDA. Inovio's test results for INO-3107/CELLECTRA 5PSP were less than had been hoped for and researchers felt the need to "massage" the data;

d. Because of prior concerns with Inovio's Covid-19 BLA, the FDA was already skeptical of the CELLECTRA delivery system going into Inovio's INO-3107/CELLECTRA 5PSP BLA; and

e. The FDA had contamination concerns with Inovio's Covid-19 BLA, and during the Class Period there were internal concerns of contamination in the production of INO-3107. These concerns regarding INO-3107 were validated by an undisclosed FDA Form 483 issued soon after the Class Period ended citing multiple violations and contamination concerns. *See* Section VII(C) below. These issues would have greatly reduced Inovio's chances of receiving approval for either the Accelerated Pathway or Priority Review and would have been highly material to investors.

**G. May 13, 2024**

133. On May 13, 2024, Inovio issued a press release reporting its financial results and recent business highlights for the first quarter ("Q1") of 2024 and filed with the SEC on Form 8-K signed by Defendant Kies. With respect to the INO-3107 BLA and the Company's commercial preparations to manufacture INO-3107, the press release stated, *inter alia*:

> ***INOVIO remains on target to submit its BLA seeking accelerated approval for INO-3107 in the second half of 2024.*** INOVIO is preparing trial sites for recruitment based on recent feedback from the FDA that they had no additional comments on INOVIO's proposed design for the confirmatory trial. The trial is being strategically designed to focus on evaluating clinical benefit in reducing surgical intervention to control RRP disease for the majority of RRP patients. Repeat surgical interventions is the current standard of care for RRP. INOVIO's market research to date with patients and healthcare professionals indicates that a reduction of even one surgery matters, because every surgery poses a significant risk of causing permanent damage to the vocal cords.
>
> ***
>
> ***INOVIO continues preparations to be ready to launch commercially in 2025, should INO-3107 be approved. Efforts are focused on building the infrastructure needed to deliver the product to patients as quickly and easily as possible, from distribution and supply efforts to payer and healthcare provider support. INOVIO believes that INO-3107, if approved, has the potential to be the preferred treatment of choice for all patients with RRP, as well as healthcare professionals and payers based on results from completed clinical trials and the competitive strengths of the DNA medicine platform*** . . . .

134. Further, the press release quoted Defendant Shea as stating, in relevant part:

> In the first quarter of 2024, we continued to deliver on our priorities for the year. ***Of utmost importance, we remain on track to submit our BLA in the second half of 2024 under the accelerated approval pathway for INO-3107 as a treatment for RRP and are working to initiate our confirmatory trial as soon as possible based on feedback from the FDA on the trial's design. We are energized by the opportunity to potentially deliver the first FDA-approved therapy for this devastating disease and continue to work expeditiously to be prepared to serve RRP patients and the physicians caring for them.*** If approved, INO-3107 would also be the first DNA medicine on the market in the United States, representing a major milestone for our technology platform . . . .

135. That same day, Inovio filed a quarterly report with the SEC on Form 10-Q, reporting the Company's financial and operating results for its Q1 ended March 31, 2024 (the "Q1 2024 10-Q"). The Q1 2024 10-Q was signed by both Defendant Shea and Defendant Kies, and stated, *inter alia*, that "[w]e have received feedback from the FDA that data from our completed Phase 1/2 clinical trial of INO-3107 for the treatment of RRP can be used to support the submission of a BLA for review under the accelerated approval program," and that "[a]s part of submitting our BLA under the accelerated program, ***which we plan to do in the second half of 2024***, we will need to satisfy all FDA filing requirements and initiate a confirmatory clinical trial prior to BLA submission."

136. Appended as exhibits to the Q1 2024 10-Q were substantively the same SOX certifications as referenced in ¶ 105, *supra*, signed by Defendant Shea and Defendant Kies.

137. On May 13, 2024, Inovio held an earnings call with analysts and investors to discuss Inovio's Q1 2024 results, hosted by the Individual Defendants, during which Defendant Shea reaffirmed the INO-3107 BLA submission in the second half of 2024, explaining:

> Of utmost importance, ***we remain on track to file our BLA for 3107 in the second half of this year under the FDA's accelerated proof* [sic] *pathway. And we believe we have alignment with the FDA on our proposed confirmatory trial design based on recent feedback. Our team is energized by the opportunity to deliver the first potential FDA-approved therapy for this devastating disease and we're now moving to initiate the trial as soon as possible.*** As you will hear from Mark, we

> have also been advancing our commercial plans for 3107, establishing key relationships and putting the building blocks of a successful commercial launch strategy into place.

138. During the Q1 2024 earnings call, Sumner also emphasized the progress of the INO-3107 BLA: "***I'm pleased to share that we remain on target to submit our BLA seeking accelerated approval for 3107 in the second half of 2024. I'm also pleased to inform you that the FDA has advised us that they had no additional comments on our proposed confirmatory trial design. So we are working to initiate the trial as soon as possible.***"

139. Also on May 13, 2024, in connection with Inovio's Q1 2024 financial results and recent business highlights, the Company published an earnings presentation with a section titled "Prepare for Commercialization of INO-3107". In connection with the preparation to commercialize INO-3107, the presentation included the following assurances:

> Initiate confirmatory trial – ***Believe we're aligned with the FDA on trial design and moving forward; focused on delivering key competitive advantages in U.S. & ROW***
>
> ***File BLA 2H24 – Anticipate requesting rolling submission & priority review***
>
> ***Advance commercial plans for launch – Relationships being established with logistics, distribution, and supply partners, ad & brand agencies, conducting additional research***

140. The boldfaced statements referenced in ¶¶ 133-35 and 137-39 were materially false and misleading when made because Defendants knew or were reckless in not knowing and failed to disclose and/or misrepresented that:

a. The safety and efficacy of the INO-3107/CELLECTRA 5PSP therapy was less favorable than publicly disclosed;

b. The chances of a speedy FDA approval of INO-3107/CELLECTRA 5PSP and quick rush to market were less than represented to the market;

c. Inovio was unwilling to face the higher clinical scrutiny called for by seeking approval of INO-3107/CELLECTRA 5PSP by way of a Standard Review by the FDA. Inovio's test results for INO-3107/CELLECTRA 5PSP were less than had been hoped for and researchers felt the need to "massage" the data;

d. Because of prior concerns with Inovio's Covid-19 BLA, the FDA was already skeptical of the CELLECTRA delivery system going into Inovio's INO-3107/CELLECTRA 5PSP BLA; and

e. The FDA had contamination concerns with Inovio's Covid-19 BLA, and during the Class Period there were internal concerns of contamination in the production of INO-3107. These concerns regarding INO-3107 were validated by an undisclosed FDA Form 483 issued soon after the Class Period ended citing multiple violations and contamination concerns. *See* Section VII(C) below. These issues would have greatly reduced Inovio's chances of receiving approval for either the Accelerated Pathway or Priority Review and would have been highly material to investors.

**H. July 1, 2024**

141. On July 1, 2024, Inovio published a press release announcing the Company was added to the Russell 2000® Index, effective the same day. The press release quoted Defendant Shea emphasizing the importance and value of INO-3107, stating:

> ***The last year has been transformational for INOVIO thanks to our strategic vision focused on advancing late-stage candidates, particularly our lead candidate INO-3107 for RRP. . . . Being readded to the Russell 2000 signifies the value of the progress we have made recently and our commitment to the next level of our strategy, which includes our plans to submit a BLA for INO-3107 under the FDA's accelerated approval pathway in the second half of 2024 and preparing to be commercial launch-ready in 2025, should INO-3107 be approved.***

142. The boldfaced statements referenced in ¶ 141 were materially false and misleading when made because Defendants knew or were reckless in not knowing and failed to disclose and/or misrepresented that:

a. The safety and efficacy of the INO-3107/CELLECTRA 5PSP therapy was less favorable than publicly disclosed;

b. The chances of a speedy FDA approval of INO-3107/CELLECTRA 5PSP and quick rush to market were less than represented to the market;

c. Inovio was unwilling to face the higher clinical scrutiny called for by seeking approval of INO-3107/CELLECTRA 5PSP by way of a Standard Review by the FDA. Inovio's test results for INO-3107/CELLECTRA 5PSP were less than had been hoped for and researchers felt the need to "massage" the data;

d. Because of prior concerns with Inovio's Covid-19 BLA, the FDA was already skeptical of the CELLECTRA delivery system going into Inovio's INO-3107/CELLECTRA 5PSP BLA; and

e. The FDA had contamination concerns with Inovio's Covid-19 BLA, and during the Class Period there were internal concerns of contamination in the production of INO-3107. These concerns regarding INO-3107 were validated by an undisclosed FDA Form 483 issued soon after the Class Period ended citing multiple violations and contamination concerns. *See* Section VII(C) below. These issues would have greatly reduced Inovio's chances of receiving approval for either the Accelerated Pathway or Priority Review and would have been highly material to investors.

**I. August 8, 2024**

143. On August 8, 2024, Inovio issued a press release announcing its financial results and recent business highlights for Q2 of 2024, also filed with the SEC on Inovio's August 8, 2024 Form 8-K and signed by Defendant Kies. In that release, Defendants disclosed that Inovio now expected to submit the INO-3107 BLA to the FDA in mid-***2025***—approximately one year later than Defendants' previously projected mid-2024 submission timeline—due to "a manufacturing issue" involving a component of the CELLECTRA device. The press release further quoted Defendant Shea as stating, in relevant part:

> We continue to make progress with our lead candidate, INO-3107, which has the potential to significantly improve the lives of patients with RRP. ***We expect all non-device related elements of our BLA package to be completed by year end and our pre-BLA meeting last week with the FDA provided us with confidence that we remain on the right track for the regulatory submission. However, as part of the testing process required for BLA submission, we've recently identified a manufacturing issue with the single use disposable administration component of our device that we believe is resolvable, but will take additional time to rectify. . . . We're taking corrective steps to address the issue, and while we have not altered our ultimate expectations for INO-3107 to be a potentially transformative therapeutic option for RRP patients that could be the first DNA medicine approved for use in the United States, we now expect to be able to submit the BLA in mid-2025.*** We will continue to work hard to advance all other elements necessary for INO-3107's success, including working to initiate our confirmatory trial, advancing plans for our redosing trial, making key regulatory progress in Europe and the U.K., and continuing commercial preparations to be launch-ready if we receive approval. These efforts will help maintain the momentum that's carried us from Breakthrough Therapy Designation to BLA preparation in less than a year.

144. Later that same day, Inovio held a conference call with investors and analysts to discuss its financial and operating results for Q2 2024. During the call, Sumner provided additional details regarding the manufacturing issue affecting the CELLECTRA device, stating, in relevant part:

> While very pleased with this progress, ***we have unfortunately run into a manufacturing issue with a component of our CELLECTRA device.*** The single-use disposable administration component, otherwise known as the array . . . . The

> issue stems from one of the plastic molded parts within this array and was identified during routine testing to support our BLA filing. . . .
>
> ***Our device teams with the support of our external component manufacturers are working to rapidly address the issue, and then repeat the required testing for the array. The additional time needed for completing this work and testing has extended our anticipated time line for BLA submission to mid-2025. We will, of course, endeavor to complete this work on a faster time line,*** if possible, and we'll have more updates for you at our next quarterly report.

145. Defendants continued to overstate the INO-3107 BLA's prospects for FDA Accelerated Pathway and Priority Review in their quarterly report with the SEC on Form 10-Q, reporting the Company's financial and operating results for its Q2 ended June 30, 2024 (the "Q2 2024 10-Q"), signed by Defendant Shea and Defendant Kies:

> In the fourth quarter of 2023, we received feedback from the U.S. Food and Drug Administration, or FDA, that the data from this completed trial could be used to support the submission of a Biologic License Application, or BLA, for review under the FDA's accelerated approval program. As part of submitting our BLA under the accelerated program, we will need to satisfy all FDA filing requirements and initiate a confirmatory clinical trial prior to BLA submission. We previously expected to be able to submit our BLA by the end of 2024; however, during our device testing process we have recently identified a manufacturing issue involving the single use disposable administration component of the CELLECTRA 5PSP device that we plan to use in the confirmatory trial. We are currently working to resolve the manufacturing issue, ***but we now expect that the timing for submission of the BLA will likely be delayed until mid-2025.***

146. Appended as exhibits to the Q2 2024 10-Q were substantively the same SOX certifications as referenced in ¶ 105, *supra*, signed by Defendant Shea and Defendant Kies.

147. The boldfaced statements referenced in ¶¶ 143-45 were materially false and misleading when made because Defendants knew or were reckless in not knowing and failed to disclose and/or misrepresented that:

a. The safety and efficacy of the INO-3107/CELLECTRA 5PSP therapy was less favorable than publicly disclosed;

b. The chances of a speedy FDA approval of INO-3107/CELLECTRA 5PSP and quick rush to market were less than represented to the market;

c. Inovio was unwilling to face the higher clinical scrutiny called for by seeking approval of INO-3107/CELLECTRA 5PSP by way of a Standard Review by the FDA. Inovio's test results for INO-3107/CELLECTRA 5PSP were less than had been hoped for and researchers felt the need to "massage" the data;

d. Because of prior concerns with Inovio's Covid-19 BLA, the FDA was already skeptical of the CELLECTRA delivery system going into Inovio's INO-3107/CELLECTRA 5PSP BLA; and

e. The FDA had contamination concerns with Inovio's Covid-19 BLA, and during the Class Period there were internal concerns of contamination in the production of INO-3107. These concerns regarding INO-3107 were validated by an undisclosed FDA Form 483 issued soon after the Class Period ended citing multiple violations and contamination concerns. *See* Section VII(C) below. These issues would have greatly reduced Inovio's chances of receiving approval for either the Accelerated Pathway or Priority Review and would have been highly material to investors.

**J. November 14, 2024**

148. On November 14, 2024, Inovio issued a press release announcing its financial results and recent business highlights for the third quarter of 2024, also filed with the SEC on Inovio's November 14, 2024 Form 8-K and signed by Defendant Kies. The press release quoted Defendant Shea as touting INO-3107's purported ability to address an unmet medical need and/or significantly improve the safety or effectiveness of existing RRP treatments, thereby

signaling to investors that the FDA was likely to accept the INO-3107 BLA for accelerated approval or priority review:

> ***We continue to be focused on advancing INO-3107 and delivering a non-surgical option to RRP patients. Toward this goal, we expect to have all non-device modules for our BLA completed by year end, while in parallel we continue to implement the plan to resolve the previously announced manufacturing issue with the single-use array component of the device. With this progress, we continue to target the submission of our BLA in mid-2025 . . . .***

149. That same day, Inovio filed a quarterly report on Form 10-Q with the SEC, reporting the Company's financial and operating results for the quarter ended September 30, 2024 (the "Q3 2024 10-Q").

150. The Q3 2024 10-Q attempted to further assuage concerns related to INO-3107's delayed BLA, signed by Defendant Shea and Defendant Kies, stating, in relevant part:

> As part of submitting our BLA under the accelerated program, we will need to satisfy all FDA filing requirements and initiate a confirmatory clinical trial prior to BLA submission. We previously expected to be able to submit our BLA by the end of 2024; however, during our device testing process we identified a manufacturing issue involving the single use disposable administration component of the CELLECTRA 5PSP device that we plan to use in the confirmatory trial. We are currently working to resolve the manufacturing issue, but ***we now expect that the timing for submission of the BLA will likely be delayed until mid-2025.***

151. Appended as exhibits to the Q3 2024 10-Q were substantively the same SOX certifications as referenced in ¶ 105, *supra*, signed by Defendant Shea and Defendant Kies.

152. Also on November 14, 2024, Inovio hosted an earnings call with investors, during which Defendant Shea reiterated that Inovio remained committed to commercializing INO-3107 as quickly as possible. Shea stated, in part:

> This quarter, we continued to make progress on the key objectives we've been focused on for 2024 to deliver value to stakeholders in the near, mid and longer term . . . . Those objectives include: firstly, advancing our lead product candidate, INO-3107 towards commercialization; secondly, advancing our pipeline; and thirdly, continuing to strengthen our business overall.

***

> ***Moving on to regulatory matters; in August, we held a positive pre-BLA meeting with the FDA. Since then, we have continued preparing for submission of our BLA targeted in mid-2025. We expect to have all non-device-related modules for the BLA completed by the end of this year. You'll recall during our last quarterly call, we announced we have recently identified a manufacturing issue for the single-use component of our device during the testing required for our BLA submission.***
>
> ***We believe we have identified the appropriate resolution for this issue and are making good progress in implementation. In summary, we remain confident in our ability to deliver 3107 to the market for patients as an important and new therapeutic option to treat this devastating disease.*** As this is our primary focus, we are directing the majority of our resources, ***both people and financial towards completion of development, BLA submission and preparing for our potential commercialization of 3107***.

153. Inovio also accompanied the release of its Q3 2024 financial results with an investor presentation that, once again, assured investors that the INO-3107 BLA remained on track. The presentation slide titled "***INOVIO continues to make progress on key objectives for the near, mid and longer-term to deliver value to stakeholders***" included, in relevant part:

- Prepare for Commercialization of INO-3107
  - New immunology data presented at scientific conferences
  - ***Positive pre-BLA meeting with FDA in August***
    - ***All modules, other than device-related, expected to be complete by YE24***
    - ***Resolving manufacturing issue for single use device component for BLA submission, targeted for mid-2025***
  - Achieved ROW regulatory process – Innovation Passport granted by UK; ATMP certification received by EU
  - Focusing majority of capital resources on advancing INO-3107

154. The Q3 2024 presentation also explained why the immunology data was important for INO-3107: "***We believe these data provide compelling evidence that INO-3107 could be a game changer for RRP patients, if approved, by reducing their need for repeat surgeries to treat their disease***".

155. The boldfaced statements referenced in ¶¶ 148, 150 and 152-54 were materially false and misleading when made because Defendants knew or were reckless in not knowing and failed to disclose and/or misrepresented that:

a. The safety and efficacy of the INO-3107/CELLECTRA 5PSP therapy was less favorable than publicly disclosed;

b. The chances of a speedy FDA approval of INO-3107/CELLECTRA 5PSP and quick rush to market were less than represented to the market;

c. Inovio was unwilling to face the higher clinical scrutiny called for by seeking approval of INO-3107/CELLECTRA 5PSP by way of a Standard Review by the FDA. Inovio's test results for INO-3107/CELLECTRA 5PSP were less than had been hoped for and researchers felt the need to "massage" the data;

d. Because of prior concerns with Inovio's Covid-19 BLA, the FDA was already skeptical of the CELLECTRA delivery system going into Inovio's INO-3107/CELLECTRA 5PSP BLA; and

e. The FDA had contamination concerns with Inovio's Covid-19 BLA, and during the Class Period there were internal concerns of contamination in the production of INO-3107. These concerns regarding INO-3107 were validated by an undisclosed FDA Form 483 issued soon after the Class Period ended citing multiple violations and contamination concerns. *See* Section VII(C) below. These issues would have greatly reduced Inovio's chances of receiving approval for either the Accelerated Pathway or Priority Review and would have been highly material to investors.

**K. December 3, 2024**

156. Inovio issued a press release on December 3, 2024, announcing new retrospective data for INO-3107 from a Phase 1/2 trial, in which Sumner was quoted, "The durability data will help inform future research to establish re-dosing schedules that could further maintain or enhance clinical response for patients across the disease spectrum. ***We plan to share these data with the FDA as part of our BLA package targeted for submission in mid-2025.***" Defendant Shea was also quoted, emphasizing from the new data INO-3107's potential to "become the preferred product by healthcare providers and patients, if approved."

157. The boldfaced statement referenced in ¶ 156 was materially false and misleading when made because Defendants knew or were reckless in not knowing and failed to disclose and/or misrepresented that:

a. The safety and efficacy of the INO-3107/CELLECTRA 5PSP therapy was less favorable than publicly disclosed;

b. The chances of a speedy FDA approval of INO-3107/CELLECTRA 5PSP and quick rush to market were less than represented to the market;

c. Inovio was unwilling to face the higher clinical scrutiny called for by seeking approval of INO-3107/CELLECTRA 5PSP by way of a Standard Review by the FDA. Inovio's test results for INO-3107/CELLECTRA 5PSP were less than had been hoped for and researchers felt the need to "massage" the data;

d. Because of prior concerns with Inovio's Covid-19 BLA, the FDA was already skeptical of the CELLECTRA delivery system going into Inovio's INO-3107/CELLECTRA 5PSP BLA; and

e. The FDA had contamination concerns with Inovio's Covid-19 BLA, and during the Class Period there were internal concerns of contamination in the production of INO-3107. These concerns regarding INO-3107 were validated by an undisclosed FDA Form 483 issued soon after the Class Period ended citing multiple violations and contamination concerns. *See* Section VII(C) below. These issues would have greatly reduced Inovio's chances of receiving approval for either the Accelerated Pathway or Priority Review and would have been highly material to investors.

### L. December 21, 2024

158. On December 21, 2024, Inovio issued a corporate presentation reiterating its expectation that it would submit the INO-3107 BLA in mid-2025 under the FDA's accelerated approval pathway, while representing that it was advancing in-house device manufacturing capabilities, specifically under its "[c]ompany [h]ighlights," "***BLA submission targeted for mid-2025 under FDA accelerated approval program for lead program INO-3107 to treat [RRP].***" The presentation repeated the mid-2025 target date: "***Targeting BLA Submission Mid-2025.***"

159. In the December 21, 2024 corporate presentation, Inovio further stated that it had a "***Proposed Resolution of Array Issue***," which included a "***[h]igh confidence in [the] implemented resolution***[.]" The presentation also assures investors that Inovio was "***[a]dvancing [p]lans to be [l]aunch [r]eady by YE2025***" for INO-3107.

160. The boldfaced statements referenced in ¶¶ 158-59 were materially false and misleading when made because Defendants knew or were reckless in not knowing and failed to disclose and/or misrepresented that:

a. The safety and efficacy of the INO-3107/CELLECTRA 5PSP therapy was less favorable than publicly disclosed;

b. The chances of a speedy FDA approval of INO-3107/CELLECTRA 5PSP and quick rush to market were less than represented to the market;

c. Inovio was unwilling to face the higher clinical scrutiny called for by seeking approval of INO-3107/CELLECTRA 5PSP by way of a Standard Review by the FDA. Inovio's test results for INO-3107/CELLECTRA 5PSP were less than had been hoped for and researchers felt the need to "massage" the data;

d. Because of prior concerns with Inovio's Covid-19 BLA, the FDA was already skeptical of the CELLECTRA delivery system going into Inovio's INO-3107/CELLECTRA 5PSP BLA; and

e. The FDA had contamination concerns with Inovio's Covid-19 BLA, and during the Class Period there were internal concerns of contamination in the production of INO-3107. These concerns regarding INO-3107 were validated by an undisclosed FDA Form 483 issued soon after the Class Period ended citing multiple violations and contamination concerns. *See* Section VII(C) below. These issues would have greatly reduced Inovio's chances of receiving approval for either the Accelerated Pathway or Priority Review and would have been highly material to investors.

**M. December 31, 2024**

161. On December 31, 2024, Inovio issued its Q4 2024 financial results and accompanying earnings presentation reiterating that submission of the INO-3107 BLA remained its top strategic priority, while representing it was "***[p]rogressing strategy to [u]nlock the [p]romise of DNA Medicine***". It represented that it had "***[c]ompleted all non-device modules***" and "***resolved [the] array issue***." In the same presentation, the Company emphasized

"[s]trong . . . clinical data" and highlighted INO-3107's potential to be a "preferred product" which could represent the "1st DNA Medicine in [the] U.S., if approved." Inovio further represented that its next steps were to "***[b]egin rolling submission of BLA mid-2025 and to request priority review with [the] goal of completing the submission in 2H25 and receiving FDA acceptance for filing of submission by end of year***".

162. The boldfaced statements referenced in ¶ 161 were materially false and misleading when made because Defendants knew or were reckless in not knowing and failed to disclose and/or misrepresented that:

a. The safety and efficacy of the INO-3107/CELLECTRA 5PSP therapy was less favorable than publicly disclosed;

b. The chances of a speedy FDA approval of INO-3107/CELLECTRA 5PSP and quick rush to market were less than represented to the market;

c. Inovio was unwilling to face the higher clinical scrutiny called for by seeking approval of INO-3107/CELLECTRA 5PSP by way of a Standard Review by the FDA. Inovio's test results for INO-3107/CELLECTRA 5PSP were less than had been hoped for and researchers felt the need to "massage" the data;

d. The approval of a competing drug, PAPZIMEOS, which showed good efficacy, greatly reduced Inovio's chances of receiving approval for either the Accelerated Pathway or Priority Review, despite Defendants' public representations to the contrary;

e. Because of prior concerns with Inovio's Covid-19 BLA, the FDA was already skeptical of the CELLECTRA delivery system going into Inovio's INO-3107/CELLECTRA 5PSP BLA; and

f. The FDA had contamination concerns with Inovio's Covid-19 BLA, and during the Class Period there were internal concerns of contamination in the production of INO-3107. These concerns regarding INO-3107 were validated by an undisclosed FDA Form 483 issued soon after the Class Period ended citing multiple violations and contamination concerns. *See* Section VII(C) below. These issues would have greatly reduced Inovio's chances of receiving approval for either the Accelerated Pathway or Priority Review and would have been highly material to investors.

**N. January 9, 2025**

163. On January 9, 2025, Inovio issued a press release with the Company's "anticipated milestones for 2025 and key accomplishments from 2024." The press release touted Inovio's purported preparedness to submit the INO-3107 BLA to the FDA with information sufficient to support accelerated approval or priority review, stating, *inter alia*:

> ***Our top priorities for the coming year are the submission of our biologics license application (BLA) for INO-3107 and preparing to expedite the launch of the product commercially, should it be approved.*** We also look forward to making progress with our pipeline through collaborations and other potential strategic opportunities.
>
> INO-3107
>
> Anticipated Milestones for 2025
>
> - Submit BLA to the U.S. Food and Drug Administration (FDA) by mid-2025 and request priority review. ***INO-3107 could be the preferred non-surgical therapeutic option for recurrent respiratory papillomatosis (RRP) and would be the first DNA medicine approved for any indication in the United States, should it be approved.***

- ***Resolution of previously announced single-use array manufacturing issue expected by February 2025. Next steps following resolution include completion of retesting process for the CELLECTRA® device and finalization of the device sections of the Chemistry, Manufacturing and Controls (CMC) module, which will be used to update the active Investigational New Drug (IND) Application for the confirmatory trial as well as the BLA submission.***

***

- ***INOVIO believes that the design of the confirmatory trial could also support expansion into global markets based on feedback received to date from European and UK regulators.***

164. The boldfaced statements referenced in ¶ 163 were materially false and misleading when made because Defendants knew or were reckless in not knowing and failed to disclose and/or misrepresented that:

a. The safety and efficacy of the INO-3107/CELLECTRA 5PSP therapy was less favorable than publicly disclosed;

b. The chances of a speedy FDA approval of INO-3107/CELLECTRA 5PSP and quick rush to market were less than represented to the market;

c. Inovio was unwilling to face the higher clinical scrutiny called for by seeking approval of INO-3107/CELLECTRA 5PSP by way of a Standard Review by the FDA. Inovio's test results for INO-3107/CELLECTRA 5PSP were less than had been hoped for and researchers felt the need to "massage" the data;

d. The approval of a competing drug, PAPZIMEOS, which showed good efficacy, greatly reduced Inovio's chances of receiving approval for either the Accelerated Pathway or Priority Review, despite Defendants' public representations to the contrary;

e. Because of prior concerns with Inovio's Covid-19 BLA, the FDA was already skeptical of the CELLECTRA delivery system going into Inovio's INO-3107/CELLECTRA 5PSP BLA; and

f. The FDA had contamination concerns with Inovio's Covid-19 BLA, and during the Class Period there were internal concerns of contamination in the production of INO-3107. These concerns regarding INO-3107 were validated by an undisclosed FDA Form 483 issued soon after the Class Period ended citing multiple violations and contamination concerns. *See* Section VII(C) below. These issues would have greatly reduced Inovio's chances of receiving approval for either the Accelerated Pathway or Priority Review and would have been highly material to investors.

**O. February 12, 2025**

165. On February 12, 2025, Inovio issued a press release highlighting data from its Phase 1/2 clinical trial of INO-3107 as a treatment for RRP, which repeated the mid-2025 INO-3107 BLA timeline, stating, "***INOVIO plans to submit its biologics license application (BLA) for INO-3107 in mid-2025 and request rolling submission and priority review under the FDA's accelerated approval program.***"

166. That press release further quoted Defendant Shea as endorsing INO-3107's purportedly demonstrated ability to meet an unmet medical need and/or significantly improve upon the safety or effectiveness of existing RRP treatments, thereby further indicating to investors that the FDA was likely to accept the INO-3107 BLA for accelerated approval or priority review:

> These important data characterizing the cytotoxic T cell-based mechanism of action of INO-3107, in conjunction with our recently reported durability data showing that clinical benefit continued to improve through year two and into year three after

> initial treatment, with half of the patients not requiring any surgeries in year two, are ***part of the growing body of evidence that INO-3107 has the potential to be the preferred product of choice for both patients and healthcare providers***. . . . The primary goal for RRP patients is to reduce or eliminate the need for surgery and INO-3107 has the potential to do just that for the majority of patients. Every surgery matters and a safe and effective therapeutic alternative to surgery would be truly life-changing for RRP patients and their caregivers.

167. The boldfaced statements referenced in ¶¶ 165-66 were materially false and misleading when made because Defendants knew or were reckless in not knowing and failed to disclose and/or misrepresented that:

a. The safety and efficacy of the INO-3107/CELLECTRA 5PSP therapy was less favorable than publicly disclosed;

b. The chances of a speedy FDA approval of INO-3107/CELLECTRA 5PSP and quick rush to market were less than represented to the market;

c. Inovio was unwilling to face the higher clinical scrutiny called for by seeking approval of INO-3107/CELLECTRA 5PSP by way of a Standard Review by the FDA. Inovio's test results for INO-3107/CELLECTRA 5PSP were less than had been hoped for and researchers felt the need to "massage" the data;

d. The approval of a competing drug, PAPZIMEOS, which showed good efficacy, greatly reduced Inovio's chances of receiving approval for either the Accelerated Pathway or Priority Review, despite Defendants' public representations to the contrary;

e. Because of prior concerns with Inovio's Covid-19 BLA, the FDA was already skeptical of the CELLECTRA delivery system going into Inovio's INO-3107/CELLECTRA 5PSP BLA; and

f. The FDA had contamination concerns with Inovio's Covid-19 BLA, and during the Class Period there were internal concerns of contamination in the production of INO-3107. These concerns regarding INO-3107 were validated by an undisclosed FDA Form 483 issued soon after the Class Period ended citing multiple violations and contamination concerns. *See* Section VII(C) below. These issues would have greatly reduced Inovio's chances of receiving approval for either the Accelerated Pathway or Priority Review and would have been highly material to investors.

**P. March 18, 2025**

168. On March 18, 2025, Inovio issued a press release announcing its financial results and operational highlights for the Q4 and full year 2024, also filed on Inovio's March 18, 2025 Form 8-K and signed by Defendant Kies. The press release lists under "Next Steps" in relation to the INO-3107 BLA: "***Complete FDA-required design-verification testing - anticipated to be complete in first half of 2025***" and "***Submit BLA to the FDA – anticipate beginning rolling submission process mid-2025 and requesting priority review with goal of completing submission in second half of 2025 and receiving FDA acceptance of submission by year end.***" The press release quoted Defendant Shea as stating, in relevant part:

> INOVIO's recent progress puts us on the cusp of achieving several long-term goals for our DNA medicines, most importantly the submission of our first BLA and potential transition to a commercial-stage company. . . . ***By resolving the previously announced device array component issue, we are back on track to submitting our first BLA for INO-3107 to the FDA. We anticipate starting our submission in mid-2025 with non-device related modules under the agency's rolling submission program, assuming it is granted, with the goal of having the complete submission accepted for priority review before the end of the year. We continue to believe that INO-3107 has the potential to be the preferred product candidate offering durable clinical benefit, tolerability and a patient-centric dosing regimen and are moving forward with urgency.***

169. That same day, Inovio filed an Annual Report on Form 10-K with the SEC reporting the Company's financial and operating results for the quarter and fiscal year ended December 31, 2024 (the "2024 10-K"). The 2024 10-K stated, in relevant part:

> We previously expected to be able to submit our BLA by the end of 2024; however, during our device testing process we identified a manufacturing issue involving the single-use disposable administration component of the CELLECTRA 5PSP device that we will use in the confirmatory trial and will be submitted for approval for commercial use. ***We resolved the manufacturing issue in the first quarter of 2025 and are currently on track to begin a rolling submission of the BLA in mid-2025 and to request priority review, with a goal of receiving file acceptance by the FDA by the end of 2025.***

170. Appended as exhibits to the 2024 10-K were substantively the same SOX certifications as referenced in ¶ 105, *supra*, signed by Defendant Shea and Defendant Kies.

171. Also on March 18, 2025, Inovio held its Q4 2024 earnings call, hosted by the Individual Defendants. In Defendant Shea's opening statements, she reiterated Inovio's commitment to the INO-3107 timeline, stating:

> ***After significant progress in 2024, we remain focused on transforming INOVIO into a commercial-stage company and delivering on the promise of DNA Medicine for patients and shareholders alike.***
>
> To achieve that goal, our work this year will be driven by 3 main strategic priorities, submitting our BLA for INO-3107, our lead candidate for recurrent respiratory papillomatosis, ***advancing our commercial plan and preparing for a fast and efficient launch, and leveraging the strengths of our platform to drive progress across our diversified pipeline.***
>
> Advancing 3107 is our primary focus, and I'm very pleased to report that we have resolved the previously announced manufacturing issue involving the single-use array component of the CELLECTRA device.
>
> Our next step is to perform the FDA-required device verification testing known as DV testing for the combined handsets and single-use arrays required for our IND and BLA submissions.
>
> We now plan to begin submitting our BLA under the FDA's rolling submission process as well as commencing our confirmatory trial and requesting priority review in mid-2025. ***With this timeline, we anticipate being able to complete***

> ***rolling submission in the second half of the year to enable the FDA to accept our BLA filing before the end of the year.***

172. The Company also represented that, following internal quality sign-off and testing, it had resolved the previously disclosed manufacturing issue involving the single-use array component of the CELLECTRA delivery device, describing the modifications as effective in preventing reproduction of the prior failure mode. Sumner explained:

> [***W]e have made tremendous progress towards our primary goal, submitting our BLA for 3107. We have now completed the drafting of all non-device modules, including non-clinical, clinical, and CMC modules. And after extensive testing and internal quality sign-off, we have resolved the previously announced manufacturing issue involving the single-use array component of the CELLECTRA device.***
>
> To resolve the issue, our device team ***strengthened key components, reduced stress on breakage areas, and refined the production process for the plastic molded part of the array. We have tested the new array under similar testing to conditions to when the issue was first identified and have not been able to reproduce the breakage, which gives us great confidence that the modifications have resolved the issue.***
>
> ***We began manufacturing our new commercial-grade arrays which will now be utilized in the design verification testing so we can move forward to completing our IND and BLA submissions.*** In addition, the full Phase I/II clinical data and accompanying detailed immunology data were recently published in Nature Communications. ***These data further support the T-cell mechanism of action for 3107, which underpins the efficacy results we've seen.***

173. Later in the question-and-answer session, in response to an analyst's question about commercializing INO-3107, Defendant Shea stated, "***I think, obviously, we're still very close to filing our BLA.***"

174. In connection with the Q4 2024 financial results, Inovio also issued an earnings presentation. The presentation included a slide titled "***Progressing Strategy to Unlock the Promise of DNA Medicine***," which assured investors that Inovio "***[c]ompleted all non-device modules & resolved array issue***" as well as that INO-3107 had "***[p]otential to be preferred product***" and the "***1st DNA Medicine in U.S., if approved***" all in the "[n]ear [t]erm."

175. The earnings presentation continued to assure investors with a slide titled, "***INO-3107: Significant Progress Achieved Toward BLA Goal***," in which it stated, "***Regulatory & Device Progress – Completed drafting all non-device modules to submit to FDA and resolved manufacturing issue with single-use array***". Another slide similarly assured of progress and the INO-3107 BLA timeline: "***Begin rolling submission of BLA mid-2025 and to request priority review with goal of completing the submission in 2H25 and receiving FDA acceptance for filing of submission by end of year***".

176. In March 2025, Inovio also published its corporate presentation for the same period, which repeated the same statements as above in ¶ 174 from the Q4 2024 earnings presentation.

177. The March 2025 corporate presentation also included a slide titled "Inovio: Drivers for Success," which included assurances that Inovio is "***[a]dvancing candidates with scientific and clinical promise, achievable pathways to market and strong commercial potential***".

178. The boldfaced statements referenced in ¶¶ 168-69, 171-75 and 177 were materially false and misleading when made because Defendants knew or were reckless in not knowing and failed to disclose and/or misrepresented that:

a. The safety and efficacy of the INO-3107/CELLECTRA 5PSP therapy was less favorable than publicly disclosed;

b. The chances of a speedy FDA approval of INO-3107/CELLECTRA 5PSP and quick rush to market were less than represented to the market;

c. Inovio was unwilling to face the higher clinical scrutiny called for by seeking approval of INO-3107/CELLECTRA 5PSP by way of a Standard

Review by the FDA. Inovio's test results for INO-3107/CELLECTRA 5PSP were less than had been hoped for and researchers felt the need to "massage" the data;

d. The approval of a competing drug, PAPZIMEOS, which showed good efficacy, greatly reduced Inovio's chances of receiving approval for either the Accelerated Pathway or Priority Review, despite Defendants' public representations to the contrary;

e. Because of prior concerns with Inovio's Covid-19 BLA, the FDA was already skeptical of the CELLECTRA delivery system going into Inovio's INO-3107/CELLECTRA 5PSP BLA; and

f. The FDA had contamination concerns with Inovio's Covid-19 BLA, and during the Class Period there were internal concerns of contamination in the production of INO-3107. These concerns regarding INO-3107 were validated by an undisclosed FDA Form 483 issued soon after the Class Period ended citing multiple violations and contamination concerns. *See* Section VII(C) below. These issues would have greatly reduced Inovio's chances of receiving approval for either the Accelerated Pathway or Priority Review and would have been highly material to investors.

**Q. May 13, 2025**

179. On May 13, 2025, Inovio issued a press release announcing its financial results and recent business highlights for the first quarter of 2025, also filed with the SEC on Inovio's May 13, 2025 Form 8-K and signed by Defendant Kies. This press release likewise contained statements touting INO-3107's purported ability to address an unmet medical need and/or significantly improve the safety or effectiveness of existing RRP treatments, thereby signaling to

investors that the FDA was likely to accept the INO-3107 BLA for accelerated approval or priority review. The press release quoted Defendant Shea as stating, in relevant part:

> ***I'm pleased to confirm that we remain on track to submit our BLA for INO-3107 this year. As previously stated, our goal is to begin rolling submission in mid-2025, complete the submission in the second half of 2025 and receive file acceptance from the FDA by year end***. If we receive priority review, it could allow for a PDUFA [Prescription Drug User Fee Act] date in mid-2026. . . . We continue to focus our efforts and resources toward bringing this important product candidate to patients eager for a non-surgical therapeutic option to treat this devastating disease. ***Based on market research, we believe INO-3107 could be the preferred product for patients and providers***, if approved.

180. The May 13, 2025 press release included operational highlights which provided investors with further assurance of INO-3107 BLA timeline:

> The DV testing for INO-3107 has been initiated and is anticipated to be completed in the first half of 2025. ***INOVIO plans to begin rolling submission of the BLA in mid-2025 under FDA's accelerated approval program, subject to FDA concurrence, with the goal of completing the submission in the second half of 2025 and receiving FDA acceptance of the submission by the end of the year.*** FDA has previously awarded breakthrough therapy designation for INO-3107 and INOVIO plans to request priority review of its BLA, which if granted would allow for an FDA approval decision (PDUFA date) in mid-2026.

181. Also on May 13, 2025, Inovio filed a Quarterly Report on Form 10-Q with the SEC, reporting the Company's financial and operating results for the quarter ended March 31, 2025 (the "Q1 2025 10-Q").

182. Appended as exhibits to the Q1 2025 10-Q were substantively the same SOX certifications as referenced in ¶ 105, *supra*, signed by Defendant Shea and Defendant Kies.

183. That same day, Inovio held its Q1 2025 earnings call, during which Inovio assured investors of the progress made on the INO-3107 BLA and INO-3107's commercial readiness. Defendant Shea stated:

> I am very pleased to say that ***we remain on track to submit our BLA for INO-3107***, our lead candidate for the treatment of recurrent respiratory papillomatosis or RRP. As previously stated, our goal is to begin rolling submissions in mid-2025, complete the submission in the second half, and receive file acceptance by the end

of this year. This would allow for a PDUFA date in mid-2026 if we receive priority review. ***Our primary focus continues to be the submission of our BLA for 3107. We reported in March that we had resolved the manufacturing issue involving the single-use array component of the CELLECTRA device, and we have now moved on to the next step, initiating the device design verification testing known as DV testing required for our IND update and BLA submissions.***

184. Also on May 13, 2025, in connection with Inovio's Q1 2025 financial results and recent business highlights, the Company published an earnings presentation with statements regarding the progress made toward submitting the INO-3107 BLA, including that Inovio was "***[o]n track to begin rolling submission of BLA in mid-2025***." To be on track, Inovio "***[i]nitiated device design verification (DV) testing required for IND update and BLA submission***" and had "***[a]im[ed] to complete submission in the 2H25, receive[d] acceptance from FDA by EOY; plan[ned] to request priority review***."

185. The earnings presentation also reassured investors that Inovios"[l]ead [c]andidate: INO-3107" was a "***[p]otentially transformational therapy under accelerated approval pathway***".

186. The boldfaced statements referenced in ¶¶ 179-80 and 183-85 were materially false and misleading when made because Defendants knew or were reckless in not knowing and failed to disclose and/or misrepresented that:

a. The safety and efficacy of the INO-3107/CELLECTRA 5PSP therapy was less favorable than publicly disclosed;

b. The chances of a speedy FDA approval of INO-3107/CELLECTRA 5PSP and quick rush to market were less than represented to the market;

c. Inovio was unwilling to face the higher clinical scrutiny called for by seeking approval of INO-3107/CELLECTRA 5PSP by way of a Standard Review by the FDA. Inovio's test results for INO-3107/CELLECTRA

5PSP were less than had been hoped for and researchers felt the need to "massage" the data;

d. The approval of a competing drug, PAPZIMEOS, which showed good efficacy, greatly reduced Inovio's chances of receiving approval for either the Accelerated Pathway or Priority Review, despite Defendants' public representations to the contrary;

e. Because of prior concerns with Inovio's Covid-19 BLA, the FDA was already skeptical of the CELLECTRA delivery system going into Inovio's INO-3107/CELLECTRA 5PSP BLA; and

f. The FDA had contamination concerns with Inovio's Covid-19 BLA, and during the Class Period there were internal concerns of contamination in the production of INO-3107. These concerns regarding INO-3107 were validated by an undisclosed FDA Form 483 issued soon after the Class Period ended citing multiple violations and contamination concerns. *See* Section VII(C) below. These issues would have greatly reduced Inovio's chances of receiving approval for either the Accelerated Pathway or Priority Review and would have been highly material to investors.

**R. August 12, 2025**

187. On August 12, 2025, Inovio issued a press release announcing its financial results and recent business highlights for Q2 of 2025 and filed with the SEC on Form 8-K signed by Defendant Kies. The press release touted the Company's purported preparedness to submit the INO-3107 BLA to the FDA with information sufficient to support accelerated approval or priority review, quoting Defendant Shea:

> ***With device DV testing complete, we remain on track to submit our BLA for INO-3107 in the second half of this year, with the goal of having FDA acceptance of the file by year end.*** Utilizing our breakthrough therapy designation, we've requested rolling submission and expect to be able to immediately provide the clinical and non-clinical modules for review, while we complete work on the device-related sections and update our Investigational New Drug (IND) Application for our confirmatory trial. . . . We believe that INO-3107 could become the preferred treatment option for Recurrent Respiratory Papillomatosis (RRP) patients and their physicians—a treatment option with the potential to change the trajectory of this disease***. I look forward to building on the significant progress of this past quarter and providing updates as we work toward a potential approval date in mid-2026.***

188. The Q2 2025 press release continued:

> ***INOVIO completed the DV testing for the CELLECTRA 5PSP device and requested in July 2025 that the FDA allow it to begin submitting its BLA on a rolling basis based on the Breakthrough Therapy designation previously granted to INO-3107. INOVIO anticipates completing its submission over the next several months and requesting a priority review.*** FDA inspection of INOVIO as clinical sponsor of the Phase 1/2 trial was successfully completed. The company is working on the device-related sections for its BLA and updating its active IND so it can begin enrolling patients into its placebo-controlled, randomized confirmatory trial, which will include 100 patients and be conducted at approximately 20 sites across the United States.

189. That same day, Inovio filed a Quarterly Report on Form 10-Q with the SEC, reporting the Company's financial and operating results for the quarter ended June 30, 2025 (the "Q2 2025 10-Q"). Appended as exhibits to the Q2 2025 10-Q were substantively the same SOX certifications as referenced in ¶ 105, *supra*, signed by Defendant Shea and Defendant Kies.

190. Later on August 12, 2025, Inovio held an earnings call, hosted by the Individual Defendants. In her opening remarks, Defendant Shea praised the progress on the INO-3107 BLA and the CELLECTRA device, stating:

> I'd like to start today by highlighting the important progress we've made so far this year as we work to achieve our key strategic priorities. Most importantly, ***I'm very pleased to report that we remain on track to submit our BLA for INO-3107 in the second half of this year, thanks to several key accomplishments.***
>
> ***We have completed the design verification or DV testing of our CELLECTRA 5PSP device, which allows us to move forward with the next key regulatory***

> ***milestones for this program.*** Utilizing the breakthrough therapy designation awarded by the FDA to 3107 we have also requested rolling submission of our BLA. Our goal is to complete the submission and receive file acceptance by year-end. ***We plan to request a priority review of our BLA, which, if accepted, would provide a 6-month review of the file, potentially providing for a PDUFA date around the middle of 2026.***

191. After Defendant Shea's opening remarks, Sumner further praised the progress on the INO-3107 BLA:

> [W]e have made significant progress so far this year towards our primary goal, which is to submit our BLA for INO-3107 in the second half of 2025. With DV testing for the CELLECTRA 5PSP device complete and nondevice-related modules of the BLA ready for submission, we have moved forward with the next phase of our regulatory plans, requesting rolling submission of our BLA from the FDA in July. Rolling submission is one of the options available to candidates like 3107 that have been granted breakthrough therapy designation. **We aim to complete our BLA submission over the next several months and request a priority review.** If granted, this would allow for a 6-month review period leading to a potential PDUFA date in the middle of 2026.
>
> **We are now focused on finalizing the device-related sections of the BLA and updating our active IND so that we can commence enrollment for our placebo-controlled randomized confirmatory trial, which will include 100 RRP patients and be conducted at approximately 20 sites across the United States.** Amidst our focus on preparing for our BLA submission, I'm also pleased to report that the FDA inspection of Inovio as clinical sponsor of the Phase I/II trial was successfully completed. This is an important step in them regulatory process that's designed to assess compliance with FDA regulations for the conduct of clinical trials.

192. In the closing remarks of the Q2 2025 earnings call, Defendant Shea emphasized Inovio's focus on INO-3107's progress towards commercialization, stating, "***First and foremost, submitting our BLA for 3107 on a rolling basis, updating our active IND for our confirmatory trial with our completed device data and continuing to advance our commercial preparations so that we'll be ready to launch 3107 quickly and efficiently, if approved.***"

193. In connection with the release of the Company's Q2 2025 financial results and recent business highlights, Inovio published an earnings presentation, which assured investors that the INO-3107 BLA was on track for submission, stating, "***Regulatory Timelines on Track***"

and "***[o]n track to begin rolling submissions of BLA in mid-2025***," "***Goal: receive acceptance from FDA by EOY; plan to request priority review***." The presentation also assured investors of the commercialization of INO-3107, including, "***RRP Represents a Significant Market Opportunity***," "***INO 3107: Market Research Continues to Support Preferred Product Profile***," specifically that the "***CELLECTRA device [is] easy to use by HCPs***," and a key catalyst for the INO-3107 BLA submission was to "***Be ready to launch quickly and efficiently if approved***."

194. The boldfaced statements referenced in ¶¶ 187-88 and 190-93 were materially false and misleading when made because Defendants knew or were reckless in not knowing and failed to disclose and/or misrepresented that:

a. The safety and efficacy of the INO-3107/CELLECTRA 5PSP therapy was less favorable than publicly disclosed;

b. The chances of a speedy FDA approval of INO-3107/CELLECTRA 5PSP and quick rush to market were less than represented to the market;

c. Inovio was unwilling to face the higher clinical scrutiny called for by seeking approval of INO-3107/CELLECTRA 5PSP by way of a Standard Review by the FDA. Inovio's test results for INO-3107/CELLECTRA 5PSP were less than had been hoped for and researchers felt the need to "massage" the data;

d. The approval of a competing drug, PAPZIMEOS, which showed good efficacy, greatly reduced Inovio's chances of receiving approval for either the Accelerated Pathway or Priority Review, despite Defendants' public representations to the contrary;

e. Because of prior concerns with Inovio's Covid-19 BLA, the FDA was already skeptical of the CELLECTRA delivery system going into Inovio's INO-3107/CELLECTRA 5PSP BLA; and

f. The FDA had contamination concerns with Inovio's Covid-19 BLA, and during the Class Period there were internal concerns of contamination in the production of INO-3107. These concerns regarding INO-3107 were validated by an undisclosed FDA Form 483 issued soon after the Class Period ended citing multiple violations and contamination concerns. *See* Section VII(C) below. These issues would have greatly reduced Inovio's chances of receiving approval for either the Accelerated Pathway or Priority Review and would have been highly material to investors.

## S. August 26, 2025

195. On August 26, 2025, Inovio issued a press release "announc[ing] that the FDA has notified INOVIO that it agrees with its rolling submission timeline for the BLA for INO-3107 as a treatment for adults with [RRP]" and that the Company "anticipates completing its submission to the FDA in the coming months and requesting priority review, with the goal of file acceptance by the FDA by the end of 2025." The press release also quoted Defendant Shea regarding INO-3107 BLA's prospects for FDA accelerated approval and priority review:

> ***We are pleased the FDA agreed to our rolling submission plan. We are also encouraged by their recent activity in recognizing the importance of accelerating the full approval of new technologies that can bring life-changing therapeutic options to patients suffering from rare diseases such as RRP. . . . Based on the totality of our data, we believe INO-3107 has the potential to become the preferred product for the treatment of RRP by patients and providers. We are leveraging our Breakthrough Therapy designation for INO-3107 to continue discussions with the FDA on the pathway to approval as we aim to bring our positively differentiated therapeutic option to patients as quickly as possible.***

196. The boldfaced statements referenced in ¶ 195 were materially false and misleading when made because Defendants knew or were reckless in not knowing and failed to disclose and/or misrepresented that:

a. The safety and efficacy of the INO-3107/CELLECTRA 5PSP therapy was less favorable than publicly disclosed;

b. The chances of a speedy FDA approval of INO-3107/CELLECTRA 5PSP and quick rush to market were less than represented to the market;

c. Inovio was unwilling to face the higher clinical scrutiny called for by seeking approval of INO-3107/CELLECTRA 5PSP by way of a Standard Review by the FDA. Inovio's test results for INO-3107/CELLECTRA 5PSP were less than had been hoped for and researchers felt the need to "massage" the data;

d. The approval of a competing drug, PAPZIMEOS, which showed good efficacy, greatly reduced Inovio's chances of receiving approval for either the Accelerated Pathway or Priority Review, despite Defendants' public representations to the contrary;

e. Because of prior concerns with Inovio's Covid-19 BLA, the FDA was already skeptical of the CELLECTRA delivery system going into Inovio's INO-3107/CELLECTRA 5PSP BLA; and

f. The FDA had contamination concerns with Inovio's Covid-19 BLA, and during the Class Period there were internal concerns of contamination in the production of INO-3107. These concerns regarding INO-3107 were validated by an undisclosed FDA Form 483 issued soon after the Class

Period ended citing multiple violations and contamination concerns. *See* Section VII(C) below. These issues would have greatly reduced Inovio's chances of receiving approval for either the Accelerated Pathway or Priority Review and would have been highly material to investors.

**T. September 5, 2025**

197. On September 5, 2025, Defendant Shea participated in the H.C. Wainwright 27th Annual Global Investment Conference. Defendant Shea began by noting the progress made in the INO-3107 BLA:

> ***We expect to complete our BLA submission in the second half of this year with the goal of FDA accepting the file by year-end. And we believe that 3107 has the potential to become the preferred first-line treatment over the current standard of care, which is repeated surgery and a recently FDA-approved therapy based on our positively differentiated product profile.***
>
> ***To note, we believe the recent approval in the space is good news for 3107 as it indicates FDA support for expediting rare disease treatments and open us to new therapeutic technologies. It's also positive validation of the broader indication and the high unmet medical need within the RRP community for new therapeutic options.***

198. Defendant Shea also discussed the "Phase I/II trial and [Inovio's] durability extension trial," noting the "***FDA regard[s] data from this trial as substantial evidence of effectiveness under the accelerated approval pathway***."

199. Throughout Defendant Shea's presentation she emphasized the progress Inovio has made on INO-3107:

> ***So just to recap the progress that we've made towards our BLA goal.*** This year, we completed our device design verification testing, which was the final piece of work that we needed to do ahead of submitting our BLA. ***FDA agreed to our rolling submission time line, and we're on track to submit our BLA in the second half of this year with the goal of receiving file acceptance by year-end.***
>
> ***We've made good progress on our confirmatory trial preparations.*** We're currently updating our IND application for the trial initiation, and we're targeting conducting this trial at 20-plus sites across major U.S. medical centers. And we

> published the data from RRP-001 in Nature Communications in February this year, the retrospective duration study in the Laryngoscope and the Nature Communications paper also describes in detail the immunology work that we've done to really characterize our T cell mechanism of action, where what we saw was that our T cell responses correlated with clinical benefit. We're going to be presenting this data at other conferences coming up in the second half of this year.
>
> So let's talk about the commercial opportunity for 3107. ***We see a really significant commercial opportunity here for a nonsurgical therapy for RRP.*** As I've mentioned, the current standard of care repeated surgery has the potential to cause irreparable harm to patients' vocal cords, and it doesn't address the underlying cause of the disease, the viral infection.

200. The boldfaced statements referenced in ¶¶ 197-99 were materially false and misleading when made because Defendants knew or were reckless in not knowing and failed to disclose and/or misrepresented that:

a. The safety and efficacy of the INO-3107/CELLECTRA 5PSP therapy was less favorable than publicly disclosed;

b. The chances of a speedy FDA approval of INO-3107/CELLECTRA 5PSP and quick rush to market were less than represented to the market;

c. Inovio was unwilling to face the higher clinical scrutiny called for by seeking approval of INO-3107/CELLECTRA 5PSP by way of a Standard Review by the FDA. Inovio's test results for INO-3107/CELLECTRA 5PSP were less than had been hoped for and researchers felt the need to "massage" the data;

d. The approval of a competing drug, PAPZIMEOS, which showed good efficacy, greatly reduced Inovio's chances of receiving approval for either the Accelerated Pathway or Priority Review, despite Defendants' public representations to the contrary;

e. Because of prior concerns with Inovio's Covid-19 BLA, the FDA was already skeptical of the CELLECTRA delivery system going into Inovio's INO-3107/CELLECTRA 5PSP BLA; and

f. The FDA had contamination concerns with Inovio's Covid-19 BLA, and during the Class Period there were internal concerns of contamination in the production of INO-3107. These concerns regarding INO-3107 were validated by an undisclosed FDA Form 483 issued soon after the Class Period ended citing multiple violations and contamination concerns. *See* Section VII(C) below. These issues would have greatly reduced Inovio's chances of receiving approval for either the Accelerated Pathway or Priority Review and would have been highly material to investors.

**U. November 3, 2025**

201. On November 3, 2025, Inovio issued a press release announcing that it had completed its rolling submission of the INO-3107 BLA seeking accelerated approval. The press release stated, in relevant part:

> - ***Expect to receive file acceptance by year end 2025 with potential PDUFA date in mid-2026 if request for priority review granted***
>
> ***
>
> ***INOVIO submitted the BLA under the FDA's Accelerated Approval program and has requested a priority review, which if granted, is expected to be completed within six months following the 60-day filing period.*** If approved, INO-3107 would be INOVIO's first commercial product and the first DNA medicine available in the United States.

202. The boldfaced statements referenced in ¶ 201 were materially false and misleading when made because Defendants knew or were reckless in not knowing and failed to disclose and/or misrepresented that:

a. The safety and efficacy of the INO-3107/CELLECTRA 5PSP therapy was less favorable than publicly disclosed;

b. The chances of a speedy FDA approval of INO-3107/CELLECTRA 5PSP and quick rush to market were less than represented to the market;

c. Inovio was unwilling to face the higher clinical scrutiny called for by seeking approval of INO-3107/CELLECTRA 5PSP by way of a Standard Review by the FDA. Inovio's test results for INO-3107/CELLECTRA 5PSP were less than had been hoped for and researchers felt the need to "massage" the data;

d. The approval of a competing drug, PAPZIMEOS, which showed good efficacy, greatly reduced Inovio's chances of receiving approval for either the Accelerated Pathway or Priority Review, despite Defendants' public representations to the contrary;

e. Because of prior concerns with Inovio's Covid-19 BLA, the FDA was already skeptical of the CELLECTRA delivery system going into Inovio's INO-3107/CELLECTRA 5PSP BLA; and

f. The FDA had contamination concerns with Inovio's Covid-19 BLA, and during the Class Period there were internal concerns of contamination in the production of INO-3107. These concerns regarding INO-3107 were validated by an undisclosed FDA Form 483 issued soon after the Class Period ended citing multiple violations and contamination concerns. *See* Section VII(C) below. These issues would have greatly reduced Inovio's

chances of receiving approval for either the Accelerated Pathway or Priority Review and would have been highly material to investors.

**V. November 10, 2025**

203. On November 10, 2025, Inovio issued a press release announcing its financial results and recent business highlights for the third quarter of 2025 and filed with the SEC on Form 8-K signed by Defendant Kies. The press release began by stating Inovio "***Completed rolling [BLA] submission seeking accelerated approval for lead candidate INO 3107; requested priority review***" and "***[e]xpect[s] to receive file acceptance by year end 2025 with potential PDUFA date in mid-2026 if request for priority review granted***." In accordance with the INO-3107 BLA announcements, Defendant Shea was quoted, in relevant part:

> ***I'm very pleased to report that we've completed the rolling submission of our BLA for lead candidate INO-3107.*** We believe every patient deserves a treatment that reduces exposure to surgery and ***INO-3107 has the potential to meet that significant need in the RRP community***. The majority of patients in our Phase 1/2 trial needed fewer surgeries after treatment and showed continued improvement through Year 2 without additional doses, and without surgical interventions during the treatment window to maintain minimal residual disease as required by other treatment modalities.

204. The November 10, 2025 press release further reiterated that Inovio had "***submitted the BLA under the FDA's accelerated approval program and has requested a priority review, which if granted, is expected to be completed within six months following file acceptance. Commercial preparations continue to advance for a potential launch in mid-2026.***"

205. That same day, Inovio filed a Quarterly Report on Form 10-Q with the SEC, reporting the Company's financial and operating results for the quarter ended September 30, 2025 (the "Q3 2025 10-Q"). The Q3 2025 10-Q touted the Company's submission of the INO-

3107 BLA for priority review while simultaneously emphasizing the strength of INO-3107's clinical results, stating, in relevant part:

> Utilizing our breakthrough therapy designation, we requested rolling submission of our BLA in July 2025 and reported in November 2025 that we had completed the BLA submission, with the goal of receiving file acceptance by the FDA by the end of 2025. ***We have requested a priority review from the FDA, which, if granted, is expected to be completed within six months following the 60-day filing period.***
>
> During 2025, we have presented key data regarding INO-3107 at several scientific conferences. Highlights from the data include:
>
> - 81% (26/32) of patients experienced a reduction of one or more surgeries at Year 1 post-treatment
> - By the end of Year 2, 91% (21/23) of evaluable patients continued to experience a reduction of one or more surgeries. Only two patients had not yet responded to treatment with INO-3107
> - INO-3107 demonstrated continued clinical benefit, with a persistent decline in the mean number of surgeries through Year 2 post-therapy: A 78% reduction in mean annual surgeries was seen at Year 2 compared to the 1 year pre-treatment period (0.9, n=28 vs 4.1, n=32)
> - Clinical response was not dependent upon low viral loads, molecular subtype or other elements of the papilloma microenvironment

206. Also on November 10, 2025, Inovio held an earnings call, hosted by the Individual Defendants. In her opening remarks, Defendant Shea told investors "the rolling submission of [the] BLA for INO-3107" was completed and Inovio is "now focused on the next steps in the process of bringing 3107 to patients." Defendant Shea continued, "***we expect to receive file acceptance by the FDA by year-end, and we have requested a priority review of the BLA, which, if granted, would provide for a potential PDUFA date around mid-2026"*** and "***Although we will be second to market***, we continue to believe that INO-3107 has compelling advantages that could make it the preferred treatment by RRP patients and their health care providers."

207. At the November 10, 2025 earnings call Sumner also discussed the rolling submission of the INO-3107 BLA and the PDUFA, explaining:

> We completed the rolling submission of our BLA on October 30, submitting a strong application package that we believe clearly articulates the clinical efficacy of 3107 and demonstrates a tolerable safety profile in clinical trials to date. We submitted under the accelerated approval pathway and have requested a priority review. ***So we anticipate file acceptance by year-end. and if priority review is granted, a PDUFA date potentially mid next year.*** In the meantime, we are preparing for our pre-approval inspections for both in-house and external manufacturing sites. And you may remember that the FDA completed our clinical inspection in August this year. We are also working to finalize our confirmatory trial plans.
>
> We had previously aligned with the FDA on a design for a randomized placebo-controlled trial based on guidance indicating that a placebo control arm was required for an indication in patients who had two or more surgeries in the year prior to treatment. We now recognize that the landscape has changed following the recent full approval of Papzimeos including how the FDA might view data requirements to support product approvals. The agency has confirmed that we only need to have initiated the confirmatory trial and enrolled the patient prior to approval, ***which we believe is achievable based upon our progress to date.***

208. Defendant Shea ended the presentation portion of the Q3 2025 earnings call emphasizing INO-3107: "***our primary focus continues to be on 3107 and a potential launch mid next year***."

In connection with the Q3 2025 earnings call, Inovio published an earnings presentation, which reiterated the following regarding INO-3107: "***Requested Priority Review; If granted, potential PDUFA in mid-2026***," "***Expect BLA file acceptance by EOY; if Priority Review granted, potential PDUFA date mid-2026***," "***Submit revised IND to initiate confirmatory trial***," "***Have submitted a request for a Type D meeting with FDA to discuss options for trial design***."

209. The boldfaced statements referenced in ¶¶ 203-08 were materially false and misleading when made because Defendants knew or were reckless in not knowing and failed to disclose and/or misrepresented that:

a. The safety and efficacy of the INO-3107/CELLECTRA 5PSP therapy was less favorable than publicly disclosed;

b. The chances of a speedy FDA approval of INO-3107/CELLECTRA 5PSP and quick rush to market were less than represented to the market;

c. Inovio was unwilling to face the higher clinical scrutiny called for by seeking approval of INO-3107/CELLECTRA 5PSP by way of a Standard Review by the FDA. Inovio's test results for INO-3107/CELLECTRA 5PSP were less than had been hoped for and researchers felt the need to "massage" the data;

d. The approval of a competing drug, PAPZIMEOS, which showed good efficacy, greatly reduced Inovio's chances of receiving approval for either the Accelerated Pathway or Priority Review, despite Defendants' public representations to the contrary;

e. Because of prior concerns with Inovio's Covid-19 BLA, the FDA was already skeptical of the CELLECTRA delivery system going into Inovio's INO-3107/CELLECTRA 5PSP BLA; and

f. The FDA had contamination concerns with Inovio's Covid-19 BLA, and during the Class Period there were internal concerns of contamination in the production of INO-3107. These concerns regarding INO-3107 were validated by an undisclosed FDA Form 483 issued soon after the Class Period ended citing multiple violations and contamination concerns. *See* Section VII(C) below. These issues would have greatly reduced Inovio's

chances of receiving approval for either the Accelerated Pathway or Priority Review and would have been highly material to investors.

**W. December 2, 2025**

210. On December 2, 2025, Defendant Shea attended the Piper Sandler 27th Annual Healthcare Conference during which she hosted a question-and-answer session. Defendant Shea discussed INO-3107, sharing, "we estimate that Precigen will likely have single-digit market penetration within the first year. ***So the majority of the prevalent pool is still going to be available to us, hopefully when we come to market.***"

211. The boldfaced statements referenced in ¶ 210 were materially false and misleading when made because Defendants knew or were reckless in not knowing and failed to disclose and/or misrepresented that:

a. The safety and efficacy of the INO-3107/CELLECTRA 5PSP therapy was less favorable than publicly disclosed;

b. The chances of a speedy FDA approval of INO-3107/CELLECTRA 5PSP and quick rush to market were less than represented to the market;

c. Inovio was unwilling to face the higher clinical scrutiny called for by seeking approval of INO-3107/CELLECTRA 5PSP by way of a Standard Review by the FDA. Inovio's test results for INO-3107/CELLECTRA 5PSP were less than had been hoped for and researchers felt the need to "massage" the data;

d. The approval of a competing drug, PAPZIMEOS, which showed good efficacy, greatly reduced Inovio's chances of receiving approval for either the Accelerated Pathway or Priority Review, despite Defendants' public representations to the contrary;

e. Because of prior concerns with Inovio's Covid-19 BLA, the FDA was already skeptical of the CELLECTRA delivery system going into Inovio's INO-3107/CELLECTRA 5PSP BLA; and

f. The FDA had contamination concerns with Inovio's Covid-19 BLA, and during the Class Period there were internal concerns of contamination in the production of INO-3107. These concerns regarding INO-3107 were validated by an undisclosed FDA Form 483 issued soon after the Class Period ended citing multiple violations and contamination concerns. *See* Section VII(C) below. These issues would have greatly reduced Inovio's chances of receiving approval for either the Accelerated Pathway or Priority Review and would have been highly material to investors.

## VII. THE TRUTH ABOUT INO-3107'S BLA IS REVEALED TO THE MARKET

### A. The FDA Denies Priority Review and Questions Whether Inovio Submitted Adequate Information to Support Accelerated Pathway

212. On December 29, 2025, Inovio issued a press release announcing that the FDA had accepted the INO-3107 BLA but had designated the review classification as "Standard." Inovio further disclosed that "[i]n the file acceptance letter, the FDA noted as a *potential review issue its preliminary conclusion that the company has not submitted adequate information to justify eligibility for the accelerated approval pathway*." The press release further announced that "[t]he FDA assigned INO-3107 a PDUFA of October 30, 2026, which is the date by which it intends to take action on the application . . . ."

213. Remarkably, Inovio disclosed in the press release that "it is not currently planning to seek approval for INO-3107 under the traditional pathway" effectively admitting – at the time

of this statement – that it will walk away from INO-3107 if it does not obtain review based on the less rigorous clinical testing requirements of Accelerated Pathway.

214. These disclosures shocked the market. On this news, Inovio's stock price dropped dramatically $0.56 per share, or 24.45%, to close at $1.73 per share on December 29, 2025.

215. That same day, not long after markets opened, Bloomberg published an article entitled, "Inovio Falls as FDA Questions Drug's Accelerated Path Potential[,]"reporting that Inovio's shares "s[u]nk as much as 23%, [the] most intraday since July 3, after the FDA questioned the eligibility of its experimental treatment for adults with [RRP] for an accelerated approval." Likewise, investor news outlets Seeking Alpha and Benzinga published articles within a few hours of the market opening, entitled "Inovio drops as respiratory papillomatosis asset denied accelerated review" and "Inovio Stock Sinks As FDA Pushes Back On Accelerated Approval For Rare Disease Drug[,]" respectively, with each noting that Inovio's stock price had cratered following the December 2025 Press Release's disclosures.

216. Also on December 29, 2025, H.C. Wainwright issued a note addressing Inovio, observing that the INO-3107 BLA's "accelerated review pathway [is] in dispute" and that, "[o]f note, [the] FDA has designated the review classification as standard with a PDUFA goal date of October 30, 2026" because "the company has not submitted adequate information to justify eligibility for the accelerated approval pathway" (emphasis in original). The following day, Jefferies, too, commented on the December 2025 Press Release's disclosures, observing that Inovio's "[s]tock was down ~20% following AA [accelerated approval] overhang in BLA acceptance with the standard review PDUFA date vs. [Inovio's] tight cash runway[,]" and that "if AA is not supportive, [the] program could be further delayed after Ph[ase ]3 results."

217. As a result of Defendants' wrongful acts and omissions, and the precipitous

decline in the market value of the Company's securities, Plaintiff and other Class Members have suffered significant losses and damages

### B. Defendants Continue to Assert After the Class Period That Inovio Will Walk Away From INO-3107 if It Is Not Processed Under the Accelerated Pathway

218. Months after the FDA denied Priority Review and raised doubts about the BLA's continued eligibility for Accelerated Pathway, Shea made the following statements at the Citizens Life Science Conference hosted by Inovio on March 10, 2026:

> We've requested a meeting with FDA to discuss some preliminary comments we received in the file acceptance letter related to eligibility for accelerated approval pathway, and we're not currently planning to seek approval under the traditional pathway. We continue to believe that the accelerated approval program is the best and fastest path to approval for 3107. We believe even with one product on the market, there's a significant remaining unmet medical need and significant market opportunity.

219. This drew immediate analyst interest, with one analyst asking Shea to "drill down a little bit more on the regulatory interactions that [Inovio] had and what is to come." Shea responded:

> So in January, we asked FDA for a meeting. FDA came back and said they were willing to meet, but they asked us to complete an assessment aid. And then an assessment aid is really a document that allows us to put forth our case and our rationale in quite a lot of detail as to why we think we're eligible for approval under the accelerated approval program as well as some other clinical and other data that they asked for. So we submitted that assessment aid in February, and we're now waiting for FDA to schedule the meeting.

### C. FDA Site Inspection at Inovio's San Diego Laboratory in August 2026 Appears to Confirm CW1's Statements that During the Class Period the FDA Had Concerns About Contamination Issues

220. From August 4, 2026, to August 5, 2026, the FDA inspected Inovio's control testing laboratory in San Diego and issued a Form 483 with its observations. The FDA's findings were as follows:

> Failure to maintain adequate segregation of laboratory materials.

> Specifically, your firm failed to maintain adequate identification, control, and segregation of laboratory materials to prevent errors and contamination. Refrigerator with identification number (b)(4) which is labelled "GMP" and stores GMP samples contains materials that are not intended to be used in GMP operations. Furthermore, sample storage areas should have restricted access to authorized personnel to protect the samples from deterioration, adulteration, and unauthorized access.

221. The Form 483—which was issued to Edward Judson Brandreth, Senior VP Quality—additionally contained the following with respect to the inspection's observations:

The observations of objectionable conditions and practices listed on the front of this form are reported:

1. Pursuant to Section 704(b) of the Federal Food, Drug and Cosmetic Act, or

2. To assist firms inspected in complying with the Acts and regulations enforced by the Food and Drug Administration.

Section 704(b) of the Federal Food, Drug, and Cosmetic Act (21 USC 374(b)) provides:

"Upon completion of any such inspection of a factory, warehouse, consulting laboratory, or other establishment, and prior to leaving the premises, the officer or employee making the inspection shall give to the owner, operator, or agent in charge a report in writing setting forth any conditions or practices observed by him which, in his judgement, indicate that any food, drug, device, or cosmetic in such establishment (1) consists in whole or in part of any filthy, putrid, or decomposed substance, or (2) has been prepared, packed, or held under insanitary conditions whereby it may have become contaminated with filth, or whereby it may have been rendered injurious to health. A copy of such report shall be sent promptly to the Secretary."

222. The Form 483 observations issued in August 2026 reflect a similar contamination issue described by CW1 during their employment at Inovio during the Class Period.

## VIII. ADDITIONAL SCIENTER ALLEGATIONS

223. During the Class Period, Defendants acted with scienter in that Defendants knew, or recklessly disregarded, that the public documents and statements they issued and disseminated

during the Class Period to the investing public in the name of the Company, or in their own name, were materially false and misleading. Defendants knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements and documents as primary violations of the federal securities laws. Defendants, by virtue of their receipt of information reflecting the true facts regarding Inovio, and their control over and/or receipt and/or modification of Inovio's allegedly materially false and misleading misstatements, were active and culpable participants in the fraudulent scheme herein.

224. Defendants knew and/or recklessly disregarded the false and misleading nature of the information they caused to be disseminated to the investing public. The fraudulent scheme described herein could not have been perpetrated during the Class Period without the knowledge and complicity of, or at least reckless disregard by, personnel at the highest levels of the Company, including the Individual Defendants.

225. The Individual Defendants, because of their positions in Inovio, controlled the contents of Inovio's public statements during the Class Period. The Individual Defendants were each provided with or had access to the information alleged herein to be false and/or misleading prior to or shortly after its issuance and had the ability and opportunity to prevent its issuance or cause it to be corrected. Because of their position and access to material, non-public information, the Individual Defendants knew or recklessly disregarded that the adverse facts herein had not been disclosed to and were being concealed from the public and that the positive representations made were false and misleading. As a result, each of the Defendants is responsible for the accuracy of Inovio's corporate statements and, therefore, is responsible and liable for the representations contained therein.

226. The following facts support a strong inference of scienter, when viewed holistically and in the context of this amended pleading.

**A. *Respondeat Superior* and Agency Principles Apply**

227. Inovio is liable for the acts of the Individual Defendants under the doctrine of *respondeat superior* and common law principles of agency as all of the wrongful acts complained of herein were carried out within the scope of their employment or agency without authority or apparent authority to do so. The scienter of the Individual Defendants is similarly imputed to Inovio under *respondeat superior* and agency principles.

**B. Defendants' Business Experience and Access to Information Support Scienter**

228. Defendant Shea joined Inovio in March 2019 as Chief Operating Officer, before later serving as Chief Executive Officer and President starting May 2022. Jacqueline Shea, LinkedIn, https://www.linkedin.com/in/jacqueline-shea-2a077b99/ (last visited Sep. 24, 2026) ("Shea LinkedIn Profile"). At Inovio, Shea is responsible for Inovio's manufacturing, commercial, business development, and alliance management operations, as well as serving as a key member of the executive team along with the CFO and CSO in formulating and implementing corporate strategy. Jacqueline Shea Professional Summary, S&P Global, https://www.capitaliq.spglobal.com/apisv3/spg-webplatform-core/search/searchResults?vertical=&q=jacqueline%20e.%20shea (last visited Sep. 24, 2026). Defendant Shea has over ten years of experience as a life sciences senior executive, with an extensive track record of achievement in leadership, strategy, development, operational management, product development, and international corporate development. *Id.*

229. Defendant Kies has been Chief Financial Officer at Inovio since June 2002. Peter Kies Professional Summary, S&P Global, https://www.capitaliq.spglobal.com/apisv3/spg-

webplatform-core/search/searchResults?vertical=&q=kies%20inovio (last visited Sep. 24, 2026). Kies previously served as the Chief Financial Officer at Newgen Results Corporation from 1996 to 2002. Kies also served as an auditor for Ernst and Young LLP and holds a B.S. in Business Administration from United States International University in San Diego, California. *Id.*

230. The Individual Defendants' access to material, non-public information concerning INO-3107 was not solely a function of their titles or professional backgrounds; it was structural and recurring. As alleged by CW1 in ¶ 29, *supra*, Defendant Shea and Defendant Kies, together with Inovio's Chief Operating Officer and members of Inovio's Statistics group, regularly attended internal "Tiger Team" meetings held approximately every other day and lasting one to three hours, at which Inovio's most senior executives reviewed clinical trial data and discussed the Company's regulatory strategy for INO-3107. This near-daily meeting cadence gave the Individual Defendants direct, contemporaneous access to the same underlying clinical data and regulatory analysis that forms the basis of the falsity allegations detailed herein, independent of any inference drawn solely from their corporate titles or professional backgrounds.

### C. The Misrepresentations Implicated Inovio's Core Operations

231. The fraud alleged herein implicates the core operations of Inovio. INO-3107 is prioritized by the Company as its main pipeline. Indeed, Inovio repeatedly acknowledged the significance of INO-3107 as its leading drug candidate and its pending FDA approval as a pivotal moment for the Company. In the November 14, 2024, Q3 Earnings Call, Defendant Shea emphasized that because delivering INO-3107 to the market "is [the Company's] primary focus, [they] are directing the majority of [their] resources, both people and financial towards completion of development, BLA submission, and preparing for [the] potential commercialization of 3107." Therefore, this leading product candidate represents Inovio's best and only opportunity to advance to a commercial-stage company. The alleged misconduct

directly implicated the commercial and regulatory aspects of Inovio's INO-3107 drug and CELLECTRA device, both of which are Inovio's lifeline.

232. Therefore, the Individual Defendants, as senior level executive and/or directors, were in such positions at the company to access all material, non-public information concerning any issues with the accelerated approval process of INO-3107. According to CW1, Defendant Shea and Defendant Kies were involved in internal, "Tiger Team" meetings that were held nearly every other day. CW1 stated that, in order to make INO-3107's safety and efficacy data "look more attractive to investors and the FDA," it was necessary to "scrub" and "massage" the data—including thorough statistical adjustments and the exclusion of certain data outliers such that, from a "statistical point of view," the data would "look better than it is." CW1 stated that they personally witnessed the results of the relevant Phase 2 trial data through their participation in the Tiger Team meetings attended by Kies and Shea as described above. Thus, the focus on INO-3107 was one of the Company's most important strategic initiatives on which the Individual Defendants were intensely focused. The Individual Defendants repeatedly highlighted the significant progress they made advancing their lead candidate, INO-3107, whose success or failure was a critical consideration for Inovio's investors. Such knowledge is imputable to the Individual Defendants, given the implication of core operations, the Individual Defendants' role and status within Inovio, the Individual Defendants' specific professional and educational backgrounds, the Individual Defendants' oversight and extensive involvement in the clinical trials and other efforts, the Individual Defendants' frequent public statements to analysts and investors detailing the clinical trials and the application process, and their personal involvement in the key events and circumstances at issue, as otherwise alleged herein.

### D. Defendants Were Motivated to Conceal the CELLECTRA Defect and the Delay

233. Defendants' motivations can be readily inferred through their own statements about INO-3107 because they consistently highlighted its critical importance of being the first FDA-approved therapy for RRP and their intricate involvement in the process. For example, in the August 8, 2024, Q2 Conference Call, Defendant Shea stated, "I want to emphasize that we're confident in our path forward, and remain focused on the opportunity to deliver not only what could be the first FDA-approved therapy for this devastating disease. But the first DNA medicine approved for use in the United States." Defendant Shea continued to tout INO-3107's importance even after a competitor RRP drug, Papzimeos, was approved by the FDA, stating, in the September 5, 2025, Conference Call, "we believe that 3107 has the potential to become the preferred first-line treatment over the current standard of care, which is repeated surgery and a recently FDA-approved therapy based on our positively differentiated product profile."

234. To reflect what was publicly stated, Defendants were motivated to present a more favorable interpretation of data to continue to fund its operations, and eventually commercialize their leading drug candidate, INO-3107. According to CW1, based on initial INO-3107 clinical data Inovio was receiving during their tenure, Company leadership was "very aggressive in what they were saying was going to happen" publicly, representing that results were "looking great," even as, in CW1's assessment, the Company was "over [its] skis a bit" relative to what the underlying data actually supported. Shea was heavily involved in the process for INO-3107. CW1 stated Defendant Shea personally directed the Company's statisticians on "how to maneuver the data and pull the right data to present the right picture," and that, more broadly, Company leadership "did not want to hear" unfavorable findings once Inovio's biostatisticians completed their analyses. The Individual Defendants' personal stake in obtaining priority review

and accelerated approval for INO-3107 certainly would have caused them to monitor the preparations for such inspection and testing, the results of the quality and performance inspections, and the FDA's comments, putting their bonuses and other compensations in jeopardy.

235. According to Inovio's SEC filings, the Company's target bonuses for Shea and Kies were 60% and 40% of their base salary, respectively. *See* Inovio, Proxy Statement (Schedule 14A), 28 (Apr. 7, 2025). In making executive compensation decisions, Inovio's Compensation Committee assessed actual performance against their corporate goals in 2024 and 2025. Throughout the Class Period, one of the key corporate goals was related to the submission of the BLA for INO-3107, and its subsequent commercialization. *Id.*; *see also* Inovio Proxy Statement (Schedule 14A) (filed Apr. 11, 2024)); Inovio Proxy Statement (Schedule 14A) (filed Apr. 7, 2026). Notably, 60% of the Individual Defendants' target bonuses during the Class Period were directly tied to the accelerated approval of INO-3107. *Id.* at 25.

236. As reflected in Inovio's SEC filings, Shea and Kies were motivated to conceal the truth. The total payout under the non-equity incentive plan for Shea in 2024 was $340,704 and $158,123 for Kies. *See* Inovio, Proxy Statement (Schedule 14A), 28 (Apr. 7, 2025). However, for 2025, total payout had significantly decreased, with Shea only receiving $144,144, and Kies receiving $68,236, which effectively puts their bonuses in jeopardy. *See* Inovio, Proxy Statement (Schedule 14A), 28 (Apr. 7, 2026). Thus, Shea and Kies were uniquely motivated by their non-equity incentive plan payouts to maintain stock price throughout the Class Period.

### E. Inovio Raised Nearly $80 Million from Stock Offerings at Artificially Inflated Prices

237. Prior to and during the Class Period, Inovio repeatedly told investors that it had "incurred significant losses in recent years" and expected to "incur significant net losses in the

foreseeable future." *See* SEC Form 424B5 prospectus supplement ("SEC Form 424B5") (July 2–3, 2025). Indeed, in the Form 10-Ks it filed during the Class Period, the Company consistently reported an accumulated deficit exceeding $1 billion, which increased from year to year.

238. While the Company warned that it "may never become profitable," the key to its "success" was admittedly "dependent on [its] ability to develop [its] DNA medicines and proprietary device technology," in particular, INO-3107, which the Company professed "may prove difficult or costly to obtain." *See* SEC Form 424B5.

239. And, while its lead investigative DNA drug, INO-3107, remained in clinical development, the Company had "limited sources of revenue" and its operating costs continued to rise. In the immediate term, the Company was therefore dependent on financing activities to continue to "fund [its] operations." *Id.* For example, in its 2025 Form 10-K, the Company stated that it "will need to seek additional capital," which "may occur through . . . future public or private debt or equity financings," and warned that "[i]f adequate funds are not available, the Company may need to delay, reduce the scope of or put on hold one or more of its clinical and/or preclinical programs."

240. As a result, and together with the false and misleading statements Defendants made during the Class Period, Inovio conducted three public offerings: the December 13, 2024 Offering, the July 3, 2025 Offering, and the November 11, 2025 Offering. Inovio also conducted a fourth public offering earlier in the Class Period, on April 18, 2024, which is not otherwise relied upon herein. In a public offering, the issuer sells a fixed number of new shares to investors at a set offering price in a single transaction. The issuer sets the per share offering price based upon the security's market trading price, trading volume, and prevailing market conditions. And when the share price is higher, the issuer can raise more money for each share sold, allowing the

company to generate more capital while reducing dilution to existing shareholders. A summary of the timing and amounts of all four of Inovio's Class Period offerings is reflected in the table below:

| Public Offering Date | Per Share Offering Price | Offering Amount |
|---|---|---|
| April 18, 2024 | $7.69 | $35.9 million |
| December 13, 2024 | $3.00 | $30 million |
| July 3, 2025 | $1.75 | $25 million |
| November 11, 2025 | $1.90 | $25 million |

241. If not for Defendants' alleged false and misleading statements regarding INO-3107's likelihood of receiving priority review and accelerated approval, the Company would have been unable to offer its shares to the public at the prices it did across these offerings and obtain the approximately $116 million in aggregate funds it intended to use "primarily for the development of [its] clinical pipeline, preparing for a potential commercial launch of INO-3107" and to "fund its operations" through future quarters. *See* SEC Form 424B5.

## IX. NO SAFE HARBOR

242. The safe harbor provisions for forward-looking statements under the Private Securities Litigation Reform Act of 1995 are applicable only under certain circumstances that do not apply to any of the materially false and misleading statements and omissions alleged in this Complaint.

243. First, many of the identified false and misleading statements and omissions herein are not forward-looking statements, but instead are statements of current or historic fact, or are actionable in context because they omit then-existing material facts.

244. Second, many of the identified false and misleading statements herein were not identified as forward-looking statements.

245. Third, to the extent there were any forward-looking statements that were identified as such at the time made, those statements also contained statements of present or past facts and so are not entitled to protection under the safe harbor.

246. Fourth, to the extent there were any forward-looking statements that were identified as such at the time made, there were no meaningfully cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Such statements were also not accompanied by cautionary language that was meaningful because such warnings or "risk" factors contained in, or incorporated by reference in, the relevant press release, SEC filings, earnings call, or other public statements described herein were general, "boilerplate" statements of risk that would affect any information technology and consulting company, and misleadingly contained no factual disclosure of any of the specific details concerning its revenue, profits, cash position and capitalization or similar important factors that would give investors adequate notice of such risks.

247. Fifth, to the extent there were any such forward-looking statements, Defendants are liable for those false and misleading forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, or by reason of what the speaker failed to note, was materially false and/or misleading, and/or that each statement was authorized and/or approved by an executive officer of Inovio who actually knew that each such statement was false or misleading when made.

248. For all these same reasons, the bespeaks caution doctrine likewise does not apply to shield Defendants from liability.

## X. LOSS CAUSATION/ECONOMIC LOSS

249. The market for Inovio securities was open, well-developed, and efficient at all relevant times. During the Class Period, as detailed herein, Defendants engaged in a course of conduct and a scheme to deceive the market that artificially inflated Inovio's share price and operated as a fraud or deceit on Class Period purchasers of Inovio shares by misrepresenting the material facts as detailed herein. As detailed above, at the end of the Class Period, when Defendants' prior misrepresentations became known to the public, the price of Inovio shares fell precipitously, as the prior artificial inflation came out. As a result of their purchases of Inovio shares during the Class Period, Plaintiff and other Class Members suffered economic losses, *i.e.*, damages, under the U.S. federal securities laws.

250. During the Class Period, Defendants presented a misleading picture of Inovio's financial condition, revenues, performance, and business prospects. Defendants' false and misleading statements had the intended effect and caused Inovio shares to trade at artificially inflated prices throughout the Class Period and until the truth was fully revealed to the market.

251. In response to issuance of corrective disclosures on August 8, 2024, and December 29, 2025, the price of Inovio shares sharply dropped, on high volume, as detailed herein, thereby removing inflation from the price of Inovio shares, causing real economic loss to Plaintiff and Class Members, investors who had purchased Inovio shares during the Class Period. The August 8, 2024 disclosure revealed the truth concealed by Defendants' misrepresentations and omissions regarding the CELLECTRA device's manufacturing readiness and the BLA's true submission timeline, as alleged herein. The December 29, 2025 disclosure revealed the truth concealed by Defendants' misrepresentations and omissions regarding the sufficiency of Inovio's data to support accelerated approval and the INO-3107 BLA's actual prospects for priority review, as alleged herein. Each disclosure thus corrected a distinct, previously concealed

adverse fact directly related to the specific misrepresentations and omissions alleged herein, and each caused a corresponding, statistically significant decline in Inovio's stock price that cannot be explained by any change in general market or industry conditions.

252. The price declines described above were not attributable to market-wide or sector-wide conditions. On Friday, August 9, 2024, the trading day on which Inovio's stock price declined following the first corrective disclosure, the broader market rose: the S&P 500 gained 0.47%, the Nasdaq Composite gained 0.51%, and the Dow Jones Industrial Average gained 0.13%. *See How Major US Stock Indexes Fared Friday, 8/9/2024*, Associated Press (Aug. 9, 2024), https://apnews.com/article/wall-street-stocks-dow-nasdaq-33e9bcb6134babda2a19fa30664c7161 (last visited Sep. 24, 2026). Inovio's 3.1% decline that day thus ran directly counter to the prevailing market trend. Similarly, on Monday, December 29, 2025, the trading day on which Inovio's stock price declined following the second corrective disclosure, the broader market recorded only a modest decline: the S&P 500 fell 0.3%, the Dow Jones Industrial Average fell 0.5%, and the Nasdaq Composite fell 0.5%. *See How Major US Stock Indexes Fared Monday, 12/29/2025*, Associated Press (Dec. 29, 2025), https://apnews.com/article/stocks-dow-jones-nasdaq-nvidia-4830fe43c0683dff12857d3a07aee6b7 (last visited Sep. 24, 2026). Inovio's contemporaneous 24.45% decline was thus more than 45 times the magnitude of the broadest market index's decline that day, confirming the decline in Inovio's stock price was attributable to Company-specific news, not general market conditions.

253. Both of these declines were a direct and proximate result of the nature and extent of Defendants' fraud being revealed to investors and the market. The timing and magnitude of the price decline in Inovio securities negates any inference that the loss suffered by Plaintiff and

other Class Members was caused by changed market conditions, macroeconomic factors, or Inovio-specific facts unrelated to Defendants' fraudulent conduct.

254. The economic loss, *i.e.*, damages, suffered by Plaintiff and other Class Members was a direct and proximate result of Defendants' fraudulent scheme to artificially inflate Inovio's stock price and the subsequent significant decline in the value of Inovio securities when Defendants' prior misrepresentations and other fraudulent conduct were revealed.

## XI. CLASS ACTION ALLEGATIONS

255. Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Inovio securities during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosures.

256. Excluded from the Class are Defendants herein, the officers and directors of the Company at all relevant times, members of their immediate families and their legal representative, heirs, successors, or assigns and any entity in which Defendants have or had a controlling interest.

257. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Inovio securities were actively traded on the NASDAQ. While the exact number of Class Members is unknown to Plaintiffs at this time and can be ascertained only through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Inovio or its transfer agent and may be notified of the pendency of this action by mail using the form of notice similar to that customarily used in securities class actions.

258. Plaintiffs' claims are typical of the claims of members of the Class, as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law alleged herein.

259. Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation. Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

260. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

a. whether the federal securities laws were violated by Defendants' acts as alleged herein;

b. whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations, and management of Inovio;

c. whether the Individual Defendants caused Inovio to issue false and misleading financial statements during the Class Period;

d. whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

e. whether the price of Inovio securities during the Class Period was artificially inflated because of Defendants' conduct complained of herein; and

f. whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

261. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class Members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually

redress the wrongs done to them. Additionally, there will be no difficulty in the management of this action as a class action.

262. As alleged herein, Plaintiffs will rely, in part on the presumption of reliance established by the fraud-on-the-market doctrine, inasmuch as Defendants made public misrepresentations or failed to disclose material facts during the Class Period; the misrepresentations and omissions were material and would tend to induce a reasonable investor to misjudge the value of Inovio securities; Inovio securities are traded in an efficient market; the Company's shares were liquid and traded with moderate to heavy volume during the Class Period; the Company traded on the NASDAQ and was covered by multiple analysts; and Plaintiffs and members of the Class purchased or otherwise acquired Inovio securities between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

263. Based upon the foregoing, Plaintiffs and members of the Class are entitled to a presumption of reliance upon the integrity of the market.

## XII. CONTROL PERSON LIABILITY

264. The Individual Defendants, because of their positions with Inovio, possessed the power and authority to control the contents of the Company's reports to the SEC, press releases, advertisements, promotional materials, and presentations to securities analysts, money and portfolio managers, and institutional investors. Each Individual Defendant possessed the power to direct or cause the direction of the management and policies of Inovio. Each Individual Defendant had a duty to promptly disseminate complete, accurate, and truthful information with respect to Inovio's business, operations, and financial condition. Each Individual Defendant was provided with copies of the Company's SEC filings and press releases alleged herein to be false or misleading prior to, or shortly after, their issuance and had the ability and opportunity to

prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information, each Individual Defendant knew or recklessly disregarded that the adverse facts and omissions specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations and omissions which were being made were then materially false and/or misleading.

## XIII. PRESUMPTION OF RELIANCE; FRAUD ON THE MARKET

265. At all relevant times, the market for Inovio's common stock was an efficient market, supporting a presumption of reliance under the fraud-on-the-market doctrine for the following reasons, among others:

(a) Inovio met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market, under the ticker symbol "INO";

(b) Inovio had approximately 69 million shares outstanding as of March 12, 2026 such that its stock was liquid. During the Class Period, numerous shares of Inovio stock were traded on a daily basis, with moderate to heavy volume, demonstrating an active and broad market for Inovio stock and permitting a strong presumption of an efficient market;

(c) As a regulated issuer, Inovio filed periodic public reports with the SEC;

(d) Inovio regularly communicated with public investors via established market communication mechanisms, including regular disseminations of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

(e) Inovio was followed by several securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms during the Class Period. Each of these reports was publicly available and entered the public marketplace;

(f) Unexpected material news about Inovio was reflected in and incorporated into the Company's stock price during the Class Period; and

(g) As a result of the foregoing, the market for Inovio's common stock promptly digested current information regarding the Company from all publicly available sources and reflected such information in Inovio's stock price. Under these circumstances, all purchasers of Inovio's securities during the Class Period suffered similar injury through their purchase of Inovio's securities at artificially inflated prices, and a presumption of reliance applies

266. Alternatively, reliance need not be proven in this action because the action involves omissions and deficient disclosures. Positive proof of reliance is not a prerequisite to recovery pursuant to ruling of the United States Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 153 (1972). All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered the omitted information important in deciding whether to buy or sell the subject security.

## XIV. CAUSES OF ACTION

### COUNT I

**<u>Violation of Section 10(b) of the Exchange Act and SEC Rule 10b-5 Promulgated Thereunder Against All Defendants</u>**

267. Plaintiffs repeat and reallege each and every allegation contained above as though set forth in full herein.

268. This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

269. During the Class Period, Defendants engaged in a plan, scheme, conspiracy, and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiffs and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes, and artifices to defraud in connection with the purchase and sale of securities. Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiffs and other Class Members, as alleged herein; (ii) artificially inflate and maintain the market price of Inovio securities; and (iii) cause Plaintiffs and other members of the Class to purchase or otherwise acquire Inovio securities and options at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

270. Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Inovio securities. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Inovio's finances and business prospects.

271. Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein, including by virtue of their positions at Inovio, and intended thereby to deceive Plaintiffs and the other members of the Class, or in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants. Such acts and omissions of Defendants were committed willfully or with reckless disregard for the truth. In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

272. Information showing that Defendants acted knowingly or with reckless disregard for the truth is within Defendants' knowledge and control. As senior managers and a director of Inovio, the Individual Defendants had knowledge of the details of Inovio's operations, business, and internal affairs.

273. The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of Inovio. As officers and/or directors of a publicly held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Inovio's businesses, operations, financial condition and prospects. As a result of the dissemination of the aforementioned false and misleading reports, releases, and public statements, the market price of Inovio securities was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning Inovio's business and financial condition which were concealed by Defendants, Plaintiffs and other members of the Class purchased or otherwise acquired Inovio securities at

artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by Defendants and were damaged thereby.

274. During the Class Period, Inovio securities were traded on an active and efficient market. Plaintiffs and other members of the Class, relying on the materially false and misleading statements described herein, which Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Inovio securities at prices artificially inflated by Defendants' wrongful conduct. Had Plaintiffs and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities or would not have purchased or otherwise acquired them at the inflated prices that were paid. At the time of the purchases and/or acquisitions by Plaintiffs and the Class, the true value of Inovio securities was substantially lower than the prices paid by Plaintiffs and the other members of the Class. The market price of Inovio securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiffs and Class Members.

275. By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly have violated Section 10(b) of the Exchange Act and Rule 10b-5, promulgated thereunder.

276. As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases, acquisitions, and sales of Inovio's securities during the Class Period, upon the disclosure that Inovio had been disseminating material misstatements and omissions to the investing public.

## COUNT II

## <u>Violation of Section 20(a) of the Exchange Act Against the Individual Defendants</u>

277. Plaintiffs repeat and reallege each and every allegation contained above as though set forth in full herein.

278. During the Class Period, the Individual Defendants participated in the operation and management of Inovio, and conducted and participated, directly and indirectly, in the conduct of Inovio's business affairs. Because of their senior positions, they knew the adverse non-public information about Inovio's misstatements of income and expenses and its dissemination of false financial documents.

279. As officers and/or directors of a publicly held company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Inovio's financial condition and results of operations, and to correct promptly any public statements issued by Inovio which had become materially false and misleading.

280. Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases, and public filings which Inovio disseminated in the marketplace during the Class Period concerning Inovio's results of operations. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Inovio to engage in the wrongful acts complained of herein. The Individual Defendants, therefore, were "controlling persons" of Inovio within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Inovio securities.

281. Both of the Individual Defendants, therefore, acted as a controlling person of Inovio. By reason of their senior management positions and/or being directors of Inovio, both of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, Inovio to engage in the unlawful acts and conduct complained of herein. Both of the Individual Defendants exercised control over the general operations of Inovio and possessed the power to

control the specific activities which comprise the primary violations about which Plaintiffs and the other members of the Class complain.

282. By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Inovio.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs demand judgment against Defendants as follows:

A. Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiffs as Class Representatives;

B. Requiring Defendants to pay damages sustained by Plaintiffs and the Class by reason of the acts and statements alleged herein;

C. Awarding Plaintiffs and the other members of the Class pre-judgment and post-judgment interest, as well as their reasonable attorneys' fees, expert and consultant fees, and other costs;

D. Awarding damages in favor of Plaintiffs and the other Class members where appropriate against all Defendants, jointly and severally, for all injuries sustained as a result of Defendants' wrongdoing, in an amount to be determined at trial, including pre-judgment and post-judgement interest, as allowed by law; and

E. Awarding such other and further relief as this Court may deem just and proper.

## JURY TRIAL DEMAND

Plaintiffs hereby demand a trial by jury on all triable claims.

Dated: September 24, 2026

Respectfully submitted,

By: s/ James M. Wilson, Jr.
James M. Wilson, Jr. (admitted *pro hac vice*)

**FARUQI & FARUQI, LLP**
685 Third Avenue, 26th Floor
New York, NY 10017
Telephone: 212-983-9330
Facsimile: 212-983-9331
Email: jwilson@faruqilaw.com

Robert W. Killorin (admitted *pro hac vice*)
**FARUQI & FARUQI, LLP**
3565 Piedmont Road NE Building Four,
Suite 380
Atlanta, GA 30305
Telephone: 404-847-0617
Facsimile: 404-506-9534
Email: rkillorin@faruqilaw.com

Timothy J. Peter (#306965)
**FARUQI & FARUQI, LLP**
1617 John F Kennedy Blvd. Suite #1550
Philadelphia, PA 19103
Telephone: 215-277-5770
Facsimile: 215-277-5771
Email: tpeter@faruqilaw.com

*Attorneys for Lead Plaintiffs and Lead Counsel for the putative Class*

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on September 24, 2026, I caused true and correct copies of the foregoing to be served on all counsel of record via CM/ECF.

Dated: September 24, 2026

By: s/ *James M. Wilson, Jr.*
James M. Wilson, Jr.